**Nos. 25-3722, 25-3835, 25-4137, 25-4150, 25-4190, 25-4218**

## IN THE
# United States Court of Appeals
### FOR THE NINTH CIRCUIT

IN RE COLLEGE ATHLETE NIL LITIGATION

GRANT HOUSE; et al.,

*Plaintiffs-Appellees*,

V.

GRACE MENKE; et al.,

*Objectors-Appellants*,

V.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION; et al.,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Northern District of California
No. 4:20-cv-03919-CW, Hon. Claudia A. Wilken

### EXCERPTS OF RECORD – VOLUME I OF VI

Arthur H. Bryant
ARTHUR BRYANT LAW, P.C.
1999 Harrison Street, 18th Floor
Oakland, CA 94612
(510) 391-5454
arthur@arthurbryantlaw.com

Steven F. Molo
  *Counsel of Record*
Eric A. Posner
Bonnie K. St. Charles
MOLOLAMKEN LLP
300 N. LaSalle Street, Suite 5350
Chicago, IL 60654
(312) 450-6700
smolo@mololamken.com

*Counsel for the Menke Objectors-Appellants*
*(Additional Counsel Listed on Inside Cover)*

Sara Tofighbakhsh
MOLOLAMKEN LLP
430 Park Avenue
New York, NY  10022
(212) 607-4950
stofighbakhsh@mololamken.com

Eric R. Nitz
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
(202) 556-2000
enitz@mololamken.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

IN RE COLLEGE ATHLETE NIL
LITIGATION

Case No. 4:20-cv-03919-CW

[~~PROPOSED~~] **FINAL JUDGMENT OF DISMISSAL WITH PREJUDICE AS TO DEFENDANTS NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, ATLANTIC COAST CONFERENCE, THE BIG TEN CONFERENCE, INC., THE BIG 12 CONFERENCE, INC., PAC-12 CONFERENCE AND SOUTHEASTERN CONFERENCE AS MODIFIED**

Hon. Claudia Wilken

---

[PROPOSED] FINAL JUDGMENT AND DISMISSAL
WITH PREJUDICE

01-MenkeER-0003

Case No. 4:20-cv-03919-CW

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that final judgment is **ENTERED** in accordance with the terms of the Fourth Amended Stipulation and Settlement Agreement (ECF No. 958-1) (the "Fourth Amended Settlement Agreement") and the Order Granting Plaintiffs' Motion for Final Settlement Approval.  Terms and phrases in this Judgment will have the same meaning as in the Fourth Amended Settlement Agreement.

The Court has personal jurisdiction over Plaintiffs and the Settlement Classes and subject matter jurisdiction to approve the Fourth Amended Settlement Agreement.  Final approval of the Fourth Amended Settlement Agreement was granted.

The Court dismisses on the merits and with prejudice this Action against Defendants National Collegiate Athletic Association ("NCAA"), Atlantic Coast Conference ("ACC"), The Big Ten Conference, Inc. ("Big Ten"), The Big 12 Conference, Inc. ("Big 12"), Pac-12 Conference ("Pac-12") and Southeastern Conference ("SEC") (collectively, the "Defendants"), including the claims of Plaintiffs and the claims of the Settlement Classes pursuant to the terms of the Fourth Amended Settlement Agreement, with each party to bear its own costs and attorneys' fees, except as provided in the Fourth Amended Settlement Agreement.

Those persons and entities identified in the list attached hereto as **Exhibit A** are excluded from the Damages Settlement Classes.  Such persons and entities are not included in or bound by this Judgment solely as it relates to the Damages Settlement for which they opted out.  Such persons and entities are not entitled to any recovery of the damages settlement proceeds obtained in connection with the Fourth Amended Settlement Agreement.

The Court hereby enters the Injunction attached hereto as **Exhibit B**.  Defendants are accordingly enjoined and restrained as set forth in Exhibit B, for the term set forth in Exhibit B.

The Releasees shall be discharged and released from the Released Claims pursuant to the terms of the Fourth Amended Settlement Agreement.  The Fourth Amended Settlement Agreement is binding on, and will have res judicata and preclusive effect according to the terms of the Fourth Amended Settlement Agreement in all pending and future lawsuits or other proceedings maintained by or on behalf of Plaintiffs and the Releasors with respect to the claims released by the Fourth Amended Settlement Agreement.  Plaintiffs and Members of the

-1-

-2-

Settlement Classes shall be permanently barred and enjoined from instituting, commencing, prosecuting, or asserting any claim released pursuant to the terms of the Fourth Amended Settlement Agreement.

This document will constitute a final judgment (and a separate document constituting the judgment) for purposes of Rule 58 of the Federal Rules of Civil Procedure. Without affecting the finality of the Judgment in any way, this Court hereby retains continuing, exclusive jurisdiction on all matters relating to administration, consummation, implementation, enforcement, and interpretation of the Fourth Amended Settlement Agreement and this Judgment, and for any other necessary purpose.

**IT IS SO ORDERED.**

DATED:  June 6, 2025

_____
HONORABLE CLAUDIA WILKEN
UNITED STATES SENIOR DISTRICT JUDGE

# EXHIBIT A

01-MenkeER-0006



**College Athlete Compensation Settlement**

### OPT OUTS HOUSE

**Count**                    **353**

| | ClaimID | First1 | Last1 |
|---|---|---|---|
| 1 | 10185748201 | AARON | HOLIDAY |
| 2 | 10183380501 | AARON | SABATO |
| 3 | 9000008601 | AARON | SCHUNK |
| 4 | 10064367001 | AARON DEVON | EPPS |
| 5 | 10575357901 | AARON JOSHUA | NESMITH |
| 6 | 10298903501 | AASHARI | CROSSWELL |
| 7 | 10266507201 | ABIGAIL | HOOD |
| 8 | 10168453801 | ABIGAIL | SIMINSKI |
| 9 | 10169368001 | ADAM | KUNKEL |
| 10 | 10095957001 | ADDISON | OOMS |
| 11 | 10264966201 | ADRIAN | DEL CASTILLO |
| 12 | 10132544701 | AIDAN | ROBBINS |
| 13 | 10105793301 | AKAYLEB AI | EVANS |
| 14 | 10117632601 | ALARIC | JACKSON |
| 15 | 10624939301 | ALERICK | SOULARIE |
| 16 | 10132110701 | ALEVA | HIFO |
| 17 | 10293841601 | ALEX | FONTENOT |
| 18 | 10327506001 | ALEX JEFFREY | HORNIBROOK |
| 19 | 10429454101 | ALEXANDER | BACHMANN |
| 20 | 10072300701 | ALEXANDER CARL | SHAW |
| 21 | 10301716101 | ALEXANDER JORDAN | PERRY |
| 22 | 10059430001 | AL-MALIK | HAUSMAN |
| 23 | 10551825601 | AMANI | ORUWARIYE |
| 24 | 20000646501 | AMARI | CATCHINGS |
| 25 | 9000045201 | AMARVEER | SINGH |
| 26 | 10272678401 | AMBER C | MELGOZA |
| 27 | 10132381501 | AMMON | HANNEMANN |
| 28 | 9000013601 | ANDREW | ABBOTT |
| 29 | 10105591201 | ANDREW STEPHEN | LOCK |
| 30 | 20001783101 | ANTHONY | GILL |
| 31 | 10174446801 | ANTHONY | GOULD |
| 32 | 10059595901 | ANTHONY | PANDY |
| 33 | 10266685401 | ASA | LACY |
| 34 | 10138756801 | AUSTIN | SEIBERT |
| 35 | 10670843001 | AUSTIN CEDRIC | MONTGOMERY |
| 36 | 10073653101 | AVA JOYCE | ANDERSON |

01-MenkeER-0007

| 37 | 10130570901 | AZEEZ O | OJULARI |
|----|----|----|----|
| 38 | 10132309801 | BAYLOR | ROMNEY |
| 39 | 10122106001 | BELLA SARA KRISTIANA | FISCO |
| 40 | 10132370001 | BENJAMIN | BYWATER |
| 41 | 60013067301 | BENJAMIN | RICHARDSON |
| 42 | 10081666601 | BENJAMIN JAMES | BOULWARE |
| 43 | 10132377301 | BLAKE | FREELAND |
| 44 | 10132286001 | BRACKEN | EL-BAKRI |
| 45 | 10264683101 | BRADLEY | KAAYA |
| 46 | 9000044001 | BRADY | MCCONNELL |
| 47 | 10215885001 | BRADY | OCONNELL |
| 48 | 10132091701 | BRAYDEN | ELBAKRI |
| 49 | 10264679001 | BREVIN | JORDAN |
| 50 | 10292247001 | BRITTANY | BREWER |
| 51 | 60014250701 | BRYAN | SCHOR |
| 52 | 10423123301 | BRYCE P | LOVE |
| 53 | 10672726601 | BRYCE RAYMOND | NZE |
| 54 | 10406819001 | CADE MICHAEL | MCNAMARA |
| 55 | 10289394901 | CADE P | CUNNINGHAM |
| 56 | 10093737801 | CADEN | HAWS |
| 57 | 9000004501 | CAITLIN S | DRISCOLL |
| 58 | 10138853601 | CALEB | WILLIAMS |
| 59 | 10074765601 | CAMERON | ECHOLS-LUPER |
| 60 | 10098444701 | CAMERON | KRUTWIG |
| 61 | 10089020901 | CAMERON | TAYLOR BRITT |
| 62 | 10577546001 | CAMERON | VALLADARES |
| 63 | 10271516601 | CAMERON DAVID | SERIGNE |
| 64 | 10256068701 | CAMERON JAMES | RISING |
| 65 | 10146449601 | CARMEN ALEXANDER | MLODZINSKI |
| 66 | 10266372501 | CARSON | GREEN |
| 67 | 10537993101 | CARSON | STRONG |
| 68 | 50004102401 | CARTER | CUNNINGHAM |
| 69 | 10267690201 | CASSIUS JEROME | STANLEY |
| 70 | 10279788201 | CAYDEN B | WALLACE |
| 71 | 10107554601 | CHAD | KELLY |
| 72 | 10115364801 | CHARLES | MATTHEWS |
| 73 | 10131242801 | CHARLES KENT | WOERNER |
| 74 | 10265213201 | CHARLESTON | RAMBO |
| 75 | 9000037401 | CHASE | STRUMPF |
| 76 | 10132279301 | CHAZ | AH YOU |
| 77 | 10183911001 | CHAZZ | SURRATT |
| 78 | 10147798301 | CHLOE LEE | KITTS |
| 79 | 9000011001 | CHRIS | MCMAHON |
| 80 | 10119475401 | CLEVELAND ALAN | JACKSON |

| 81 | 10181757501 | COLBY | PARKINSON |
| 82 | 10267103501 | COLTON | PRATER |
| 83 | 10244072401 | CONNOR FRANCIS | PRIELIPP |
| 84 | 10304358501 | CORNELIS | VAN EYK |
| 85 | 9000012301 | CURTIS | WEAVER |
| 86 | 10264461501 | DAMUZHEA | BOLDEN |
| 87 | 10072106001 | DANIEL VIRGIL | MILLS |
| 88 | 10119482101 | DAVID | BELL |
| 89 | 10250173701 | DAVION KNEAL | ERVIN-POINDEXTER |
| 90 | 9000022701 | DAVIS MCKEE | WENDZEL |
| 91 | 10132342601 | DAX | MILNE |
| 92 | 10399824001 | DAXTER | MILES |
| 93 | 10292504501 | DEMARCUS | FIELDS |
| 94 | 10535880001 | DEMETRIS | HARRIS |
| 95 | 10248268801 | DENZEL R | MIMS |
| 96 | 10259482001 | DEONTAY | ANDERSON |
| 97 | 10399792101 | DEREK | CULVER |
| 98 | 10617204901 | DERRICK | BARNES |
| 99 | 10292998101 | DERRICK | WHITE |
| 100 | 10068863901 | DESTINY | SLOCUM |
| 101 | 10031731501 | DIBAJI | WALKER |
| 102 | 9000039001 | DIXIE | WOOTEN III |
| 103 | 9000041101 | DONELL | PASTER |
| 104 | 10406872301 | DONOVAN | PEOPLES-JONES |
| 105 | 10461244701 | DONOVAN JOHN | CLINGAN |
| 106 | 10115393401 | DONTAIE | ALLEN |
| 107 | 60013159901 | DONTE | INGRAM |
| 108 | 10081682401 | DORIAN SCOTT | ODANIEL |
| 109 | 10174134001 | DREW | EUBANKS |
| 110 | 10407075401 | DUNCAN | ROBINSON |
| 111 | 10243871701 | DYLAN M | SMITH |
| 112 | 10132258601 | EARL | MARINER |
| 113 | 10577020601 | EDGAR | BURROLA |
| 114 | 10022943801 | ELIJAH | BLADES |
| 115 | 10682167201 | ELIZA | EKSTRAND |
| 116 | 10265601001 | ELLE | MEZZIO |
| 117 | 10088111701 | EMMA | ROWLAND |
| 118 | 10669726201 | EMMALINE M | EKSTRAND |
| 119 | 10096015701 | ERIC | STRIKER |
| 120 | 10108474201 | ERICK | HALLETT |
| 121 | 10427953901 | ERICK BERNARD | NEAL |
| 122 | 10584208401 | ERIK | STEVENSON |
| 123 | 10585939401 | EVERETT | HUNTER |
| 124 | 10236602001 | FILIP | PETRUSEV |

| 125 | 10282698501 | FRANK | MASON |
| 126 | 10407087001 | FRANZ JACOB | WAGNER |
| 127 | 10138382401 | GABE | BRKIC |
| 128 | 10093788301 | GABREYL SALE AH YOU | SUMMERS |
| 129 | 10093002501 | GAVIN | CROSS |
| 130 | 10558999801 | GRANT | HALEY |
| 131 | 10301568101 | GREGORY MICHEAL | FRANCIS |
| 132 | 9000023001 | GRIFFIN | CONINE |
| 133 | 10132347501 | GUNNER | ROMNEY |
| 134 | 9000040901 | HANNAH | CROFUT |
| 135 | 10132299901 | HARRIS | LACHANCE |
| 136 | 10297108001 | HARRY | ALLEN |
| 137 | 10228253501 | HASAHN | FRENCH |
| 138 | 10670832601 | HASHEM | ASADALLAH |
| 139 | 10132254901 | HAYDEN | LIVINGSTON |
| 140 | 10148109301 | HAYDEN RANDLE | HURST |
| 141 | 10308612201 | HAYDEN THOMAS | HOWERTON |
| 142 | 10176924601 | HUNTER | LONG |
| 143 | 10059357401 | HUNTER ALEXANDER | ECHOLS |
| 144 | 10113611001 | HUNTER HARKINS | BARCO |
| 145 | 10407039001 | HUNTER RYAN | DICKINSON |
| 146 | 10641051901 | IKEM | OKEKE |
| 147 | 10132393101 | ISAAC | REX |
| 148 | 10132134001 | ISAIAH | KAUFUSI |
| 149 | 50004112101 | ISHMAEL | HYMAN |
| 150 | 10132337201 | JACKSON | KAUFUSI |
| 151 | 10272933501 | JACOB | BROWNING |
| 152 | 10273003901 | JACOB | EASON |
| 153 | TBD | JACOB | EVANS |
| 154 | 50018889001 | JACOB | HUFF |
| 155 | 10181975401 | JACOB | LOWE |
| 156 | 9000036101 | JACOB | MCCARTHY |
| 157 | 10132262801 | JACOB | OLDROYD |
| 158 | 10060818801 | JACOB B | CURHAN |
| 159 | 10561625401 | JACOB THOMAS-MICHAEL | COX |
| 160 | TBD | JAIME | JAQUEZ JR |
| 161 | 10271230001 | JAKE MATTHEW | BENZINGER |
| 162 | 10259328001 | JAMAL | SHEAD |
| 163 | 10132287201 | JAMES | EMPEY |
| 164 | 10108582501 | JAMES | MORRISSEY |
| 165 | 10399833001 | JAMES | OKONKWO |
| 166 | 10248570701 | JAMES H | LYNCH |
| 167 | 10338679801 | JAMES K | BLACKMON |
| 168 | 10115744701 | JAMES LANDON | YOUNG |

| 169 | 10168550601 | JAMISON ATHENS | GORDON |
| 170 | 10266489401 | JARED | HOCKER |
| 171 | 10132296301 | JARED | KAPISI |
| 172 | 10558965201 | JASON | CABINDA |
| 173 | 9000007301 | JASON | PRESTON |
| 174 | 10071952101 | JAWON CORTEZ | JOHNSON |
| 175 | 10273007601 | JAXSON | KIRKLAND |
| 176 | 10448489501 | JAYDEN | CURRY |
| 177 | 10174287301 | JAYDON | GRANT |
| 178 | 10107952701 | JAYLON | ROBINSON |
| 179 | 10267671901 | JAYSON | TATUM |
| 180 | 10278942301 | JEREMIAH J | LEDBETTER |
| 181 | 10399801901 | JERMAINE | HALEY |
| 182 | 10119661101 | JERRON NEHEMIAH | CAGE |
| 183 | 10072511901 | JIMMY | BELL |
| 184 | 10271615801 | JOHN | COLLINS |
| 185 | 10115270001 | JOHN | RHODES |
| 186 | 10411288801 | JOHN MICHAEL | SCHMITZ |
| 187 | 10327022001 | JOHN STEPHEN | CICHY |
| 188 | 10271590701 | JOHN THOMAS | WOLFORD |
| 189 | 10354014301 | JOHNNY | JUZANG |
| 190 | 10132213601 | JONAH | TRINNAMAN |
| 191 | 10132154501 | JONATHAN | LINEHAN |
| 192 | 10624822401 | JORDAN | BECK |
| 193 | 10399822601 | JORDAN | MCCABE |
| 194 | 10267680001 | JORDAN LEWIS | TUCKER |
| 195 | 10181709501 | JOSE | ARCEGA-WHITESIDE |
| 196 | TBD | JOSH | SMITH |
| 197 | 10323348901 | JOSH JAMES | WHYLE |
| 198 | 10115747201 | JOSHUA | ALI |
| 199 | 10160109801 | JOSHUA ANDREAS | PIERRE-LOUIS |
| 200 | 10064645101 | JOSHUA NOAH | GRAY |
| 201 | 10297394501 | JULIUS | BRENTS |
| 202 | 10132444301 | JUSTEN DEAN | SMITH |
| 203 | 20000008901 | JUSTIN | RAGIN |
| 204 | 9000042401 | KAHLIL | JOHNSON |
| 205 | 10119512601 | KAMERON DREW | WILLIAMS |
| 206 | 10168563401 | KARISSA ROSE | QUENICHET |
| 207 | 10095954401 | KATELYN | OHASHI |
| 208 | 10118798101 | KATHLEEN | DOYLE |
| 209 | 10182876701 | KATHRYN | MEYER |
| 210 | 10288431601 | KATHRYN E | WESTBELD |
| 211 | 10267399801 | KEATON | SUTHERLAND |
| 212 | 10132232001 | KEENAN | ELLIS |

01-MenkeER-0011

| 213 | 10303728701 KEIR | THOMAS |
| 214 | 10419992101 KELLAN | GRADY |
| 215 | 10181753801 KEVIN | COSTELLO |
| 216 | 10266791301 KEVIN | MARFO |
| 217 | 10174670201 KEVIN TYLER | ABEL |
| 218 | 10576958701 KHALIL | TATE |
| 219 | 9000035901 KHYRI | THOMAS |
| 220 | 9000033301 KRISTOPHER FARRELL | JENKINS |
| 221 | 10354769101 KYLA | ROSS |
| 222 | 10071888701 KYLIN JATAVIAN | HILL |
| 223 | 10228833101 LAMONT | EVANS |
| 224 | 10248828901 LAUREN | COX |
| 225 | 10081650201 LOGAN JAMES | TISCH |
| 226 | 20000538201 LOPINI | KATOA |
| 227 | 10132234301 LORENZO | FAUATEA |
| 228 | 10098639001 LUCAS | WILLIAMSON |
| 229 | 10115486001 MADELYNNE | SCHERR |
| 230 | 10354757501 MADISON | KOCIAN |
| 231 | 10139005101 MAGGIE | NICHOLS |
| 232 | 10399793301 MALIK | CURRY |
| 233 | 10661535001 MALIQUE | JACOBS |
| 234 | 10119518701 MARC CRANDALL | LOVING |
| 235 | TBD MARCUS | ALLEN |
| 236 | 9000038701 MARCUS | WALLACE II |
| 237 | 10280054601 MARCUS ANDREW | ZEGAROWSKI |
| 238 | 10168636501 MARGARET MARY | OTOOLE |
| 239 | 9000026801 MARQUES | TOWNES |
| 240 | 10132401701 MASEN | WAKE |
| 241 | 10671858701 MASON | MOSES |
| 242 | 10357112701 MASSIMILIANO C | BORGHI |
| 243 | 10304146101 MATHEU | NELSON |
| 244 | 10624048101 MATTHEW | BUTLER |
| 245 | 10308323601 MATTHEW | CROSS |
| 246 | 10185683001 MATTHEW | MCLAIN |
| 247 | 10607526301 MAURICE | ODUM |
| 248 | 10535918001 MEKHI | LAPOINTE |
| 249 | 60004611701 MICAH | PARTEN |
| 250 | 60004638901 MICHAEL | HARLEY |
| 251 | 10132397901 MICHAEL | TANUVASA |
| 252 | 10671862901 MICHAEL | VAN RAAPHORST |
| 253 | 10577147801 MICHAEL | WILEY |
| 254 | 10181802601 MICHAEL | WILSON |
| 255 | 10119848601 MICHAEL DONOVAN ALEXANDER | JORDAN |
| 256 | 10168421601 MICHAEL LOGAN | MENNING |

01-MenkeER-0012

| 257 | 10185813901 | MICHAELA NNE | ONYENWERE |
| 258 | 10095968401 | MIKAYLA | PIVEC |
| 259 | 10282996201 | MONTELL H | COZART |
| 260 | 10186277501 | MORRELL ALEXANDER | OSLING III |
| 261 | 10294012501 | MYA | HOLLINGSHED |
| 262 | 10138565101 | MYKEL | JONES |
| 263 | 10131645801 | NAKOBE RASHOD | DEAN |
| 264 | 20000942801 | NATE | SAVINO |
| 265 | 10399777501 | NATHAN | ADRIAN |
| 266 | 10183413501 | NATHANIEL | BRITT |
| 267 | 10225092301 | NATHANIEL | PIERRE-LOUIS |
| 268 | 10064572001 | NAZREON NYRU | REID |
| 269 | 10132263001 | NEIL | PAUU |
| 270 | 60016300801 | NICHOLAS | DINARDI |
| 271 | 10335992801 | NICHOLAS | SWINEY |
| 272 | 10071770601 | NICHOLAS  DYLAN | FITZGERALD |
| 273 | 10249039901 | NICHOLAS  J | LOFTIN |
| 274 | 10390868701 | NIGEL | JOHNSON |
| 275 | 10551039701 | NKOSI | PERRY |
| 276 | 10264308801 | NYSIER | BROOKS |
| 277 | 10168639001 | OWEN WILLIAM | SCHWEBACH |
| 278 | 10119745701 | PALAIE TOFAU | GAOTEOTE |
| 279 | 10125674701 | PARKER | MESSICK |
| 280 | 10169921901 | PAUL | STAMM |
| 281 | 10139462701 | PAYTN BLISS | MONTICELLI |
| 282 | 10132360801 | PAYTON | WILGAR |
| 283 | 10168582801 | QUINCI GRACE | THOMAS |
| 284 | 10406853001 | QUINN RICHARD | NORDIN |
| 285 | 10228421001 | RASHAD | WILLIAMS |
| 286 | 10406638601 | RASHAN ABDUL | GARY |
| 287 | 9000043701 | RASHARD | DAVIS |
| 288 | 10076433201 | RILEY | CORNELIO |
| 289 | 10123600101 | ROMANE JOELLE | LONGUEVILLE |
| 290 | 10200954501 | ROMAR | REID |
| 291 | 10404494901 | RON | TIAVAASUE |
| 292 | 9000010801 | RYAN | ROLISON |
| 293 | 10627241001 | RYAN ALAN | MILLER |
| 294 | 10353654101 | SADDIQ | BEY |
| 295 | 10345876101 | SARAH JESSICA | FULLER |
| 296 | 10114970001 | SAVANNA J | FAULCONER |
| 297 | 10400107001 | SEAN | ALLISON |
| 298 | 10553320801 | SEAN | CLIFFORD |
| 299 | 9000019201 | SEAN | HJELLE |
| 300 | 10226992001 | SETH D | HENIGAN |

| 301 | 10319845301 | SHAQUEM | GRIFFIN |
| 302 | 10319846501 | SHAQUILL | GRIFFIN |
| 303 | 9000020101 | SHEA | LANGELIERS |
| 304 | 10406869301 | SHEA CHRISTOPHER | PATTERSON |
| 305 | 10264964901 | SLADE | CECCONI |
| 306 | 10106258801 | SOPHIE ELIZABETH | CUNNINGHAM |
| 307 | 10399818401 | SPENCER | MACKE |
| 308 | 10345715001 | SPENCER  GEORGE | JONES |
| 309 | 10441953201 | STANLEY | DYE |
| 310 | 10186006701 | STEPHAN | BLAYLOCK |
| 311 | 10339048001 | STEPHEN DEON | CARR |
| 312 | 10399844501 | TAJZMEL | SHERMAN |
| 313 | 10411041701 | TANNER | MORGAN |
| 314 | 10264744601 | TATHAN | MARTELL |
| 315 | 9000025501 | TAYLER | PERSONS |
| 316 | 10272954201 | TAYLOR | RAPP |
| 317 | 10168612201 | TEEGAN MAKAY | MADARA |
| 318 | 60004591901 | TEVIN | BROYLES |
| 319 | 10174492401 | TIMMY | HERNANDEZ |
| 320 | 10060763901 | TIMOTHY CHAD | HANSEN |
| 321 | 10559025301 | TRACE | MCSORLEY |
| 322 | 10132179001 | TRAJAN ATOA JAMES | PILI |
| 323 | 10082362201 | TRENTON | SIMPSON |
| 324 | 10539467101 | TREVIS | GIPSON |
| 325 | 10174410901 | TREVON | BRADFORD |
| 326 | 10393269001 | TREVON | SIDNEY |
| 327 | 9000024201 | TREVOR | SCOTT |
| 328 | 10569283901 | TREY | LANCE |
| 329 | 60000015001 | TRISTAN | NICKELSON |
| 330 | 10322162101 | TROY | CAUPAIN |
| 331 | 10327318901 | TROY CHARLES | FUMAGALLI |
| 332 | 10126474401 | TRU | THOMPSON |
| 333 | 10088826401 | TYJON | LINDSEY |
| 334 | 60004098401 | TYLER | BAUM |
| 335 | 10115387901 | TYLER | HERRO |
| 336 | 10264878501 | TYREE | ST LOUIS |
| 337 | 10132151001 | URIAH | LEIATAUA |
| 338 | 10329114301 | VALENTINO | DALTOSO |
| 339 | 10278788801 | VANCE | JACKSON |
| 340 | 10407086901 | VICTOR MORITZ | WAGNER |
| 341 | 20001203001 | VINCENT | SAMPSON |
| 342 | 10399825101 | VINCENT TREVON | MITCHELL |
| 343 | 10071816401 | WESTIN BRANNING | GRAVES |
| 344 | 10115926201 | WILL | LEVIS |

| 345 | 10130617901 | WILLIAM JACOB | FROMM |
| 346 | 10038339701 | XAVIER | SIMPSON |
| 347 | 10559630901 | YETUR | GROSS-MATOS |
| 348 | 9000021401 | ZACHARY | GELOF |
| 349 | 10132297501 | ZACHARY | KATOA |
| 350 | 10132317701 | ZACHARY | WILSON |
| 351 | 10132084001 | ZACHARY G | DAWE |
| 352 | 10407053501 | ZAKARIE | IRVIN |
| 353 | 10234469301 | ZION | BETHEA |

| 354 | SETH BEER (pursuant to Court order) |
| 355 | BENJAMIN BURR-KIRVEN (pursuant to Court order) |
| 356 | YOELI CHILDS (pursuant to Court order) |
| 357 | JAMES OKONKWO (pursuant to Court order) |

01-MenkeER-0015

# EXHIBIT B

01-MenkeER-0016

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**(OAKLAND DIVISION)**

| | |
|---|---|
| In re: College Athlete NIL Litigation | No. 4:20-CV-03919 (N.D. Cal) |
| | **SECOND AMENDED INJUNCTIVE RELIEF SETTLEMENT** |

# APPENDIX A

01-MenkeER-0017

# ARTICLE 1

## DEFINITIONS

**Section 1.**      As used in this Injunctive Relief Settlement, the following terms shall have the following meanings unless expressly stated otherwise:

(a)      "Academic Year" means July 1 of any given calendar year during the Term through and including June 30 of the following calendar year.

(b)      "Action" means *In re: College Athlete NIL Litigation*, Case No. 4:20-CV-03919 (N.D. Cal).

(c)      "Associated Entity or Individual" means:

  a. An entity that is or was known (or should have been known) to the athletics department staff of a Member Institution, to exist, in significant part, for the purpose of (i) promoting or supporting a particular Member Institution's intercollegiate athletics program or student-athletes; and/or (2) creating or identifying NIL opportunities solely for a particular Member Institution's student-athletes;

  b. An individual who is or was a member, employee, director, officer, owner, or agent of an entity described in Section 1(c)(a) above;

  c. An individual who directly or indirectly (including contributions by an affiliated entity or family member) has contributed more than $50,000 over their lifetime to a particular Member Institution or to an entity described in Section 1(c)(a) above;

  d. An individual or entity that (1) has been directed or requested by a Member Institution's athletics department staff to assist in the recruitment or retention of prospective or current student-athletes, or (2) otherwise has assisted in the recruitment or retention of prospective or current student-athletes; or

2

SECOND AMENDED INJUNCTIVE RELIEF SETTLEMENT
Case Nos. 4:20-CV-03919

01-MenkeER-0018

e. Any entity owned, controlled, or operated by, or otherwise affiliated with, the individuals or entities described in Section 1(c)(a)-(d) above other than a publicly traded corporation.

(d)  "Class Counsel" means the law firms of Winston & Strawn LLP and Hagens Berman Sobol Shapiro LLP, with Steve Berman and Jeffrey Kessler as co-lead Class Counsel, or such other counsel as may be appointed by the Court during the Term of the Injunctive Relief Settlement.

(e)  "Conference Defendant" means individually each of the Atlantic Coast Conference (the "ACC"), The Big Ten Conference, Inc. (the "Big Ten"), The Big 12 Conference, Inc. (the "Big 12"), the Pac-12 Conference (the "Pac-12"), and the Southeastern Conference (the "SEC"); collectively the foregoing are referred to as "Conference Defendants".

(f)  "Court" means the United States District Court for the Northern District of California.

(g)  "Defendants" means, collectively, the NCAA, the ACC, the Big Ten, the Big 12, the Pac-12, and the SEC.

(h)  "Designated Enforcement Entity" means the NCAA and/or such other entit(ies) as may be designated by the Conference Defendants that is responsible for rule-enforcement activities set forth in and permitted by this Injunctive Relief Settlement and the SSA, including but not limited to investigating alleged violations and serving as the party seeking enforcement in any arbitration that occurs pursuant to Article 6, Section 2.

(i)  "Designated Reporting Entity" means the entit(ies) designated by Defendants to receive the information described in Article 2, Sections 4 and 5.

(j)  "Designated Student-Athlete" is any student-athlete who a Member Institution attests was or would have been removed from the Member Institution's 2025-2026 roster due to the implementation of roster limits who was either:

3

SECOND AMENDED INJUNCTIVE RELIEF SETTLEMENT
Case Nos. 4:20-CV-03919

a. certified as eligible for practice or competition at the Member Institution (i.e., on a roster whether as a recruited or walk-on player), during the 2024-2025 Academic Year, prior to April 7, 2025, including student-athletes who transferred, or

b. a student-athlete initial enrollee at a Division I Member Institution for the 2025-26 Academic Year who, prior to April 7, 2025, was recruited to be, or was assured by an institutional staff member they would be, on the Member Institution's roster for the 2025-2026 Academic Year.

(k) "Final Approval" means when the Court issues an order finally approving the Stipulation and Settlement Agreement and has entered judgment in accordance with its terms but does not include any appeals periods or appeals of that judgment.

(l) "Injunctive Relief Settlement" means this Appendix A to the SSA.

(m) "Member Institution" means any college, school, or university that is a member in any sport of NCAA Division I and/or a Conference Defendant, together with any entity owned, controlled, funded, or operated by said college, school, or university (or any division or department thereof).

(n) "NIL" or "name, image and likeness" means a person's name, nickname(s), picture, portrait, likeness, signature, voice, caricature, identifying biographical information, or other identifiable features.

(o) "Non-Defendant Conferences" means all NCAA Division I conferences that are not named as Conference Defendants.

(p) "Non-Defendant Conference Member Institutions" means all NCAA Division I Member Institutions that are not members of any Conference Defendant.

(q) "Pool" means the benefits pool as described in Article 3.

(r) "Membership Financial Reporting System Reports" or "MFRS" means the annual financial data reported by NCAA members pursuant to NCAA Constitution, Article 2(D)(1)(c), in

4

SECOND AMENDED INJUNCTIVE RELIEF SETTLEMENT
Case Nos. 4:20-CV-03919

01-MenkeER-0020

the form currently reported or as otherwise expressly permitted by this Injunctive Relief Settlement.

(s)     "NCAA" means the National Collegiate Athletic Association.

(t)     "Shared Revenue" has the meaning as described in Article 3.

(u)     "Stipulation and Settlement Agreement" or "SSA" means the Stipulation and Settlement Agreement to which this Injunctive Relief Settlement is attached as Appendix A, entered into as of September 26, 2024, by and between Plaintiffs, both individually and on behalf of the Classes, and Defendants, in *In re: College Athlete NIL Litigation*, Case No. 4:2020-CV-03919 (N.D. Cal).

(v)     "Term" means ten (10) Academic Years after the date of Final Approval of the SSA by the Court.

**Section 2.   Further Definitions.**   In addition to the foregoing, any capitalized terms otherwise defined in the SSA shall have the same meaning as described therein.

01-MenkeER-0021

## ARTICLE 2

## PAYMENTS TO STUDENT ATHLETES & REPORTING

**Section 1.  Payment Rules.**  Defendants shall change all NCAA Division I and Conference Defendant rules to permit payments to student-athletes contemplated by the terms of this Injunctive Relief Settlement.  For avoidance of doubt, payments that are not contemplated by this Injunctive Relief Settlement (*e.g.*, any payment to a student-athlete that, when aggregated with other payments above those permitted by NCAA Division I rules as of the date of the motion for preliminary approval, would result in a Member Institution exceeding the Pool defined below) remain prohibited.

**Section 2.  Member Institution Payments for NIL, Institutional Brand Promotion, or Other Rights.** Each Member Institution, and each student-athlete, will have the right to enter into an exclusive or non-exclusive license and/or endorsement agreement for that student-athlete's NIL, institutional brand promotion, or other rights as permitted by this Injunctive Relief Settlement, provided, however, that no such licenses or agreements shall authorize payments for the right to use a student-athlete's NIL for a broadcast of collegiate athletic games or competitive athletic events.  In addition the Member Institution or a designee/subcontractor of the Member Institution (*e.g.*, a local rights holder) may act as the marketing agent for the student-athlete with respect to third-party NIL contracts; provided, however, that a parent, guardian, lawyer, or other competent representative may assist the student-athlete in discussions regarding entering into an exclusive or non-exclusive license or endorsement agreement, unless the student-athlete waives in writing the assistance of a parent, guardian, lawyer, or other competent representative.

Neither Defendants nor their Member Institutions may enter into any NIL agreement including but not limited to any licensing, institutional brand promotion, or endorsement agreement with a prospective or enrolled student-athlete for a term that extends beyond his or her eligibility to participate in NCAA sports; provided, however, that if a Defendant or a Member Institution has

SECOND AMENDED INJUNCTIVE RELIEF SETTLEMENT
Case Nos. 4:20-CV-03919

01-MenkeER-0022

licensed the rights to use the NIL of a student-athlete to promote the Defendant or the Member Institution's academic or athletic program in content created while the student-athlete is enrolled, such licensee shall not be required to discontinue use of such content, if and as permitted by the agreement with the student-athlete, after that student-athlete's eligibility has expired. For avoidance of doubt, such licensee shall not be permitted by the prior sentence, after the student-athlete's eligibility has expired, to sell goods and services incorporating the NIL of the student-athlete, or to continue (or continue to authorize) use of the NIL of such student-athlete to promote the goods or services of a third party.

**Section 3.  Third Party NIL Payments**. The NCAA shall not have any Division I rules prohibiting student-athletes from receiving payments from third parties for NIL, other than as set forth in this Injunctive Relief Settlement.  For the avoidance of doubt, entities or organizations that are owned, controlled, or operated by Member Institutions and/or conferences are not third parties. Subcontractors of a Member Institution will not be considered third parties in instances and to the extent they are acting as an agent, facilitator, and/or administrator for a Member Institution whereby they are making payments to student-athletes that originate from/are paid by a Member Institution.

**Section 4.  Mandatory Student-Athlete Reporting.**  All Division I student-athletes will be required to report to (a) the Member Institution in which they are enrolled and/or (b) the Designated Reporting Entity any and all third-party NIL contracts or payments with a total value of six hundred dollars ($600.00) or more on a schedule to be determined by Defendants.  If a student-athlete enters into multiple NIL agreements or receives multiple NIL payments from the same or substantially the same third parties including, by way of example, any affiliates or parties with common ownership, such activities must be disclosed if the aggregate value is at or above six hundred dollars ($600.00).

SECOND AMENDED INJUNCTIVE RELIEF SETTLEMENT
Case Nos. 4:20-CV-03919

01-MenkeER-0023

**Section 5.   Mandatory Member Institution Reporting**.   Each Conference Defendant Member Institution will be required to report each NIL contract or payment reported to the Conference Defendant Member Institution pursuant to Section 4 of this Article to the Designated Reporting Entity on a schedule to be determined by Defendants, with Class Counsel also to receive a copy of such reports.   In addition, each Conference Defendant Member Institution also will be required to report to the Designated Reporting Entity pursuant to Section 4 of this Article, on a schedule to be determined by Defendants:

     i.   any exclusive or non-exclusive license and/or endorsement agreement between a Conference Defendant Member Institution and a student-athlete for a student-athlete's NIL, institutional brand promotion, or other rights including those in which a designee/subcontractor of the Conference Defendant Member Institution (*e.g.*, a local rights holder) acts as an agent, facilitator, administrator, or in any other capacity for a Conference Defendant Member Institution whereby they are making payments to one or more student-athletes that originate from, are funded by, or are otherwise made on behalf of a Conference Defendant Member Institution; and,

     ii.   any other payments or personal benefits (as detailed in Article 3, Section 3, Subsection (d)) that are provided to a student-athlete or the family of a student-athlete by a Conference Defendant Member Institution.

**Section 6.   Non-Defendant Conference Member Institutions.**   All Non-Defendant Conference Member Institutions that choose to provide or facilitate payments or benefits to student-athletes as permitted by this Injunctive Relief Settlement including but not limited to incremental scholarships permitted by Article 3, Section 3(b), shall be bound to the same extent as Conference Defendant Member Institutions by all obligations, benefit limitations, and roster limits set forth in this Injunctive Relief Settlement and as set by the NCAA in Appendix B to the SSA.

SECOND AMENDED INJUNCTIVE RELIEF SETTLEMENT
Case Nos. 4:20-CV-03919

01-MenkeER-0024

# ARTICLE 3

## BENEFITS POOL

**Section 1.  Benefits Pool.**  Current NCAA Division I and Conference Defendant rules will be modified consistent with this Article to permit the following payments and benefits to Division I student-athletes.

(a)     Each Member Institution will be permitted, but not required, to distribute, each Academic Year, additional payments and/or benefits to student-athletes over and above annual existing scholarships and all other benefits currently permitted by NCAA rules as of the date of the filing of the motion for final approval up to a certain amount (the "Pool").

(b)     The Pool will begin in the first Academic Year after Final Approval of the SSA.

(c)     "Shared Revenue" for purposes of the Pool means, for each Member Institution, revenue categories 1, 7, 11, 12, 13, 13A, 15, and 19 from the MFRS as currently detailed in Appendix A of the NCAA 2024 Agreed-Upon Procedures (attached as Attachment 1), regardless of whether a Member Institution owns or has legal title to those revenues.  For purposes of this Injunctive Relief Settlement, Category 1 ("Ticket Sales") shall include actual monetary revenues received by or for the benefit of Member Institutions for suite licenses exclusive of (a) any associated philanthropy (Category 8) and (b) the use of suites for any purposes not related to student athletic events (*e.g.*, concerts).  If any changes are made to the required reporting of revenues in the NCAA Agreed Upon Procedures or the Membership Financial Reporting System, the Parties shall work in good faith to ensure accurate reporting of the revenue categories that are calculated to determine Shared Revenues and the Pool.

(d)     "Average Shared Revenue" for purposes of the Pool shall be calculated as follows. The Shared Revenue for all Conference Defendant Member Institutions, including Notre Dame, from the most recent Membership Financial Reporting System Reports available shall be added together.  That total number will then be divided by the total number of Conference Defendant

SECOND AMENDED INJUNCTIVE RELIEF SETTLEMENT
Case Nos. 4:20-CV-03919

01-MenkeER-0025

Member Institutions plus Notre Dame. The resulting number will be the "Average Shared Revenue."

(e) In the first year in which the Pool is implemented, the Pool shall be twenty-two percent (22%) of the Average Shared Revenue. The Pool will remain at 22% of Average Shared Revenue throughout the Term.

(f) Except as set forth in subsection (h) below, the Average Shared Revenue will be recalculated as set forth in subparagraph (d) above every three (3) years. In the second and third years of each three-year period, the Average Shared Revenue shall increase by 4% over the previous year's amount, subject only to the two exceptions set forth in subsection (h), below.

(g) Accordingly, over the Term, and subject to only the two exceptions set forth in subsection (h), below, the Pool shall be calculated as follows:

| Year 1 | 22% of Average Shared Revenue based on the most recent Membership Financial Reporting System Reports available |
| Year 2 | Year 1 amount x 1.04 |
| Year 3 | Year 2 amount x 1.04 |
| Year 4 | 22% of Average Shared Revenue based on the most recent Membership Financial Reporting System Reports available |
| Year 5 | Year 4 amount x 1.04 |
| Year 6 | Year 5 amount x 1.04 |
| Year 7 | 22% of Average Shared Revenue based on the most recent Membership Financial Reporting System Reports available |
| Year 8 | Year 7 amount x 1.04 |

SECOND AMENDED INJUNCTIVE RELIEF SETTLEMENT
Case Nos. 4:20-CV-03919

01-MenkeER-0026

| Year 9 | Year 8 amount x 1.04 |
| --- | --- |
| Year 10 | 22% of Average Shared Revenue based on the most recent Membership Financial Reporting System Reports available |

(h)　　The two, and only two, exceptions to the procedures set forth in subsections (a)-(g) are as follows.

　　i.　If, during the Term, any new broadcast agreement captured in the Media Rights MFRS Category (#11) has a specific contractual provision setting a year-over-year rights fee escalator greater than 4% that is not contingent on future events at the time of resetting the Pool, in the second and/or third years of each three-year period the average escalator across all of the broadcast agreements captured in Media Rights shall be used for that revenue category in the corresponding contract year(s) in lieu of the four percent (4%) growth rate for that revenue category, provided that, in no circumstances, shall the escalator for the Media Rights revenue category be less than four percent (4%) per year, consistent with Article 3, Section 1(f).

　　ii.　Class Counsel shall have two (2) opportunities within the term of the Injunctive Relief Settlement to accelerate the re-calculation of the Pool based on the most recent Membership Financial Reporting System Reports available.  If Class Counsel wishes to exercise their option, they must provide notice within thirty (30) days of receipt of the Membership Financial Reporting System Reports.  A new three-year period shall commence in the first Academic Year after notice of exercise of the option, with the Pool amount increasing by four percent (4%) in the second and third years of such period.  By way of example, if Class Counsel elected to exercise these options in Years 3 and 8 of the Settlement, the Pool would be calculated as follows over the Term:

11

SECOND AMENDED INJUNCTIVE RELIEF SETTLEMENT
Case Nos. 4:20-CV-03919

01-MenkeER-0027

| Year 1 | 22% of Average Shared Revenue based on the most recent Membership Financial Reporting System Reports available |
|---|---|
| Year 2 | Year 1 amount x 1.04 |
| Year 3 (RESET) | 22% of Average Shared Revenue based on the most recent Membership Financial Reporting System Reports available |
| Year 4 | Year 3 amount x 1.04 |
| Year 5 | Year 4 amount x 1.04 |
| Year 6 | 22% of Average Shared Revenue based on the most recent Membership Financial Reporting System Reports available |
| Year 7 | Year 6 amount x 1.04 |
| Year 8 (RESET) | 22% of Average Shared Revenue based on the most recent Membership Financial Reporting System Reports available |
| Year 9 | Year 8 amount x 1.04 |
| Year 10 | Year 9 amount x 1.04 |

(i)      In the event that there is a nationwide force majeure event, such as the outbreak of a virus, which requires the cancellation of games or the playing of games without fans in attendance, the Parties shall negotiate in good faith as to whether a force majeure change in the Pool calculation is warranted.

**Section 2.  Institutional Decision-Making and Conference-Level Rules**.  Each of the Member Institutions, subject to any independently set conference-level rules or guidelines (*i.e.*, conference-level rules or guidelines imposed by a conference without agreement with the NCAA or any other conferences), shall unilaterally decide/determine whether and how much of any

SECOND AMENDED INJUNCTIVE RELIEF SETTLEMENT
Case Nos. 4:20-CV-03919

01-MenkeER-0028

benefits newly permitted by this Injunctive Relief Settlement to provide to any individual Division I student-athlete (up to the Pool amount).

**Section 3. Counting Benefits Against the Pool.** Any newly permitted amounts or benefits provided to individual student-athletes by Member Institutions (directly, through an exclusive or non-exclusive license between the student-athlete and the Member Institution (*see* Article 2, Section 2), or otherwise)—shall count against the Pool except for proceeds from third-party NIL sublicenses and arrangements as specified in subsection 3(c) of this Article. The following provisions will govern the amounts of other new benefits that will count against the Pool for the Member Institution providing such other benefits:

(a) ***Alston Awards.*** *Alston* academic and graduation incentive awards up to the annual amount payable pursuant to the permanent injunction entered on March 8, 2019 in the matter captioned *In re: National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust Litigation*, Case No. 14-MD-2541 (N.D. Cal.) ("*Alston* case") (currently $5,980 and as may be adjusted in the future) ("*Alston* Awards") will count against the Pool; the amount of such *Alston* Awards that will count against the Pool will be capped at two million five hundred thousand dollars ($2,500,000.00, the "*Alston* Cap") per Member Institution per year in recognition of institutions that pay such awards to a larger number of student-athletes. In the event that the overall value of the Pool has increased over the value of the Pool at the time of the immediately prior Pool recalculation occurring after a three-year period (or earlier, on no more than two occasions, under Article 3, Section 1(h)(ii)), the *Alston* Cap shall be increased for the following three-year period by a proportional amount. There shall be no NCAA Division I limitation on how many students at a school may be awarded an *Alston* Award. For the avoidance of doubt, nothing in this paragraph requires a Member Institution to pay *Alston* Awards, but if the Member Institution chooses to do so, this paragraph will govern how such awards are counted with regard to the Pool.

13

01-MenkeER-0029

(b)    ***New Athletic Scholarships.***  As a result of the elimination of scholarship limits (*see* Article 4, Section 1), Member Institutions will have the option of making incremental athletic scholarships available to student-athletes above the number currently permitted by NCAA Division I rules for a particular sport, subject to the roster limits addressed in Article 4, Section 1. The full cost-of-attendance dollar value of any new or incremental athletic scholarships—that were not previously permitted by NCAA Division I rules—up to two million five hundred thousand dollars ($2,500,000.00) ("the Athletic Scholarship Cap") will count against the Pool (again, in recognition of schools that award a greater number of athletic scholarships). For example, if a school is currently offering 9 scholarships in baseball, versus the 11.7 permitted, and post-Final Approval opts to award 15 scholarships in baseball, the number of new scholarships would be 3.3. Each Member Institution shall certify to the Designated Enforcement Entity whether and to what extent it has provided such new or incremental athletic scholarships.  In the event that the overall value of the Pool has increased over the value of the Pool at the time of the immediately prior recalculation occurring after a three-year period (or earlier, on no more than two occasions, under Article 3, Section 1(h)(ii)), the Athletic Scholarship Cap shall be increased for the following three-year period by a proportional amount.  Other than the roster limits discussed in Article 4, Section 1, there shall be no NCAA Division I limitation on how many new athletic scholarships may be awarded by a school.

(c)    ***Proceeds of Third-Party Arrangements.***  If a Member Institution contracts with any individual student-athlete, directly or through a designee/subcontractor of the Member Institution (*e.g.*, a local rights holder), to act as marketing agent for that student-athlete (as opposed to contracting with the student-athlete directly), third-party payments procured for the student-athlete shall not be counted against the Pool.  If the Member Institution elects to sub-license to a

14

SECOND AMENDED INJUNCTIVE RELIEF SETTLEMENT
Case Nos. 4:20-CV-03919

01-MenkeER-0030

third party any rights it has secured through a direct contract with any individual student-athlete, the proceeds of third-party NIL licenses or sublicenses procured for the student-athlete by the Member Institution or its designee/subcontractor for the student-athlete will not be counted against the Pool, nor will any other third-party payments made directly to a student-athlete be counted against the Pool.

(d)     ***Other Personal Benefits***.  All payments to student-athletes (for NIL, institutional brand promotion, or otherwise) and personal benefits (*e.g.*, vehicles, travel expenses not permitted as of the date of Preliminary Approval by NCAA Division I, and the like) that are provided to a student-athlete or the family of a student-athlete by a Member Institution over and above the payments and personal benefits permitted by the NCAA rules as of the day of Preliminary Approval, shall be counted against the Pool.  However, existing payments or benefits provided through SAF or otherwise to student-athletes or other payments currently permitted by NCAA Division I rules, including compensation or benefits related to education identified in Paragraph 2 of the *Alston* permanent injunction, dated March 8, 2019, shall not count against the Pool except for *Alston* Awards up to the *Alston* Cap.

(e)     ***NCAA Payments/Benefits.***  The value of any benefits or payments provided by the NCAA itself directly to or for the benefit of student-athletes shall not count against the Pool.

**Section 4.  Existing Benefits/Payments.**  Nothing in this Injunctive Relief Settlement will limit, nor shall it be read to limit, the amount of existing benefits or payments currently permitted by NCAA Division I rules to be provided to student-athletes by any Member Institution (except as provided above with respect to payments and benefits counting against the Pool) and Defendants agree that during the Term (including any extension thereof) but subject to the terms of Article 4, Section 3, the NCAA will not create any rules imposing new restrictions on such existing benefits.

SECOND AMENDED INJUNCTIVE RELIEF SETTLEMENT
Case Nos. 4:20-CV-03919

01-MenkeER-0031

This provision does not, however, limit any Member Institution's or any individual conference's ability, subject to Article 4 to independently elect to eliminate or reduce (a) any and all payments or benefits currently provided to student-athletes at that Member Institution or that conference's Member Institutions or (b) any payments or benefits that may be provided in the future. For avoidance of doubt, if a Non-Defendant Conference or a Non-Defendant Conference Member Institution agrees to provide to student-athletes additional benefits permitted by NCAA Division I rules prior to their modification as part of the Injunctive Relief Settlement (such as commencing *Alston* payments for the first time), that will not trigger any reporting requirements pursuant to Article 3, Section 5.

**Section 5.  Pool Payments/Benefits Reporting.**  Within sixty (60) days after the close of each Academic Year during the Term, Member Institutions shall provide information to the Conference Defendants, or in the case of Member Institutions in Non-Defendant Conferences, to the NCAA, sufficient to determine the total and types of payments/benefits the Member Institutions have provided to student-athletes, including but not limited to new and incremental scholarships and payments counting toward the *Alston* Cap, that have been counted against the Pool in accordance with this Injunctive Relief Settlement.  Conference Defendants and the NCAA shall thereafter file a report with the Court and provide same to Class Counsel disclosing that information.

**Section 6.  Revenue Reporting & Audit Rights.**

(a)    Annual MFRS data shall be provided to Class Counsel (or such other individuals/entity as Class Counsel may designate, in writing, during the Term) no later than May 15 of each year of the Injunctive Settlement unless good cause exists for delay.  Class Counsel shall have the right to reasonably audit such data in accordance with this Article 3, Section 6.  The

SECOND AMENDED INJUNCTIVE RELIEF SETTLEMENT
Case Nos. 4:20-CV-03919

01-MenkeER-0032

costs of any audit under this Article 6 shall be initially borne by Class Counsel, subject to Class Counsel seeking reimbursement in accordance with the fee/cost provisions set forth in Paragraphs 27-30 of the SSA. The Parties agree that Defendants shall bear no liability for the accuracy or completeness of information reported by the Member Institutions for inclusion in the MFRS data.

(b)     Class Counsel shall have the right as part of their audit rights in the preceding subsection to receive an accounting from an agreed-upon accounting firm of all revenue categorized by the Member Institutions as Category 18 ("Other Operating Revenue") so as to determine whether, in Class Counsel's opinion, any such reported revenue is more properly reportable as one of the agreed-upon revenue categories and should therefore be included in the Shared Revenue for purposes of the Pool. Any dispute arising over the proper treatment of such revenues with respect to the Pool shall be resolved by the Court or a special master appointed by the Court.

(c)     Class Counsel shall also have the right to receive an accounting from an agreed-upon accounting firm regarding whether any new broadcast agreement captured in MFRS Category (#11) (Media Rights) has a specific contractual provision setting a year-over-year rights fee escalator greater than 4% that is not contingent on future events such that the Pool growth rate calculation for that revenue category is impacted, as described in Article 3, Section 1(h).

(d)     The accounting firm shall also report on any changes in the definition of the revenue categories of the MFRS Reports so as to allow Class Counsel the opportunity to confirm that there has been no reclassification of the revenues currently included in the Pool calculation to excluded revenue categories. If such reclassification occurs, the revenues shall be reallocated back to their original categories (or otherwise included in the Pool calculation), with any dispute to be resolved by the Court or a special master appointed by the Court.

01-MenkeER-0033

(e)    Any disputes between Class Counsel and the Defendants as to the proper categorizations, reclassification, or reallocation of any revenue included in the Pool shall be submitted to the Court, or a special master appointed by the Court, for resolution, pursuant to Article 6, Section 1.

SECOND AMENDED INJUNCTIVE RELIEF SETTLEMENT
Case Nos. 4:20-CV-03919

01-MenkeER-0034

# ARTICLE 4

# NCAA AND CONFERENCE RULES

**Section 1.  Elimination of NCAA Division I Scholarship Limits.**  All NCAA Division I athletic scholarship limits will be eliminated.  The NCAA may adopt Division I roster limits which are subject to revision by the Defendants as permitted by this Injunctive Relief Settlement. Appendix B to the SSA sets forth the roster limits which the NCAA has currently chosen to adopt that apply to Member Institutions that choose to provide or facilitate payments or benefits to student-athletes as permitted by this Injunctive Relief Settlement, including but not limited to incremental scholarships permitted by Article 3, Section 3(b).  All athletic scholarships will be equivalency awards.  Defendants agree that any changes to NCAA Division I or conference rules on roster limits shall not result in the loss of an athletic scholarship for any then-current student-athlete receiving an athletic scholarship.  Nor shall any change in roster limits result in a reduction in the current number of athletic scholarships permissible under current NCAA Division I rules in any sport.  Member Institutions each maintain the right to unilaterally reduce the number of sports, the roster size, and/or the number of athletic scholarships available to student-athletes of any sport. Conferences each maintain the right to unilaterally reduce the number of sports Member Institutions within their respective conferences are required to offer, the number of sports sponsored by the conference, and/or the roster limits within their conference, subject to the limitations noted above that reductions in roster limits will not result in the loss of athletic scholarships for then-current student-athletes and that any change in roster limits shall not result in a reduction in the current number of athletic scholarships permissible under current NCAA Division I rules in any sport.

Member Institutions, in consultation with their athletic departments, shall be permitted, in their discretion, to exceed NCAA or conference roster limits with respect to any "Designated Student-Athletes" for the duration of the Designated Student-Athlete's athletic eligibility.  Each Member Institution must prepare and report a list of its Designated Student-Athletes in good faith

19

SECOND AMENDED INJUNCTIVE RELIEF SETTLEMENT
Case Nos. 4:20-CV-03919

01-MenkeER-0035

within thirty days of Final Approval, with a copy to Class Counsel. For clarity, each Member Institution retains its current discretion to decide independently which student-athletes will be on its rosters, including whether to exceed the roster limits with respect to its Designated Student-Athletes. Nothing in this settlement or NCAA rules restricts the ability of Member Institutions to allow student-athletes who were previously on the Member Institution's roster and who transferred as a result of being told by an institutional staff member that they would be removed from that roster due to the implementation of NCAA or conference roster limits from transferring back as a Designated Student-Athlete for that Member Institution.

**Section 2.  Existing NCAA Compensation Rules.**  Except to the extent that modification or elimination is required by the terms of this Injunctive Relief Settlement, the NCAA's and conferences' existing rules limiting the amount of compensation and benefits to Division I student-athletes may remain in effect. The Parties shall request that the Court approve all existing NCAA rules regarding compensation and benefits that may or may not be provided by Division I conferences or schools to student-athletes, revised as necessary to conform to the terms of this Injunctive Relief Settlement.

**Section 3.  New NCAA and Conference Rules.**  The NCAA and the Conference Defendants may continue, and pass new rules further clarifying and implementing, their existing prohibitions related to NIL transactions involving Associated Entities or Individuals. Such clarifying rule changes may include specifying that the NCAA and/or the Conference Defendants prohibit NIL payments by Associated Entities or Individuals (individually or collectively) to current or prospective student-athletes unless the license/payment is for a valid business purpose related to the promotion or endorsement of goods or services provided to the general public for profit, with compensation at rates and terms commensurate with compensation paid to similarly situated individuals with comparable NIL value who are not current or prospective student-athletes at the Member Institution.

01-MenkeER-0036

The NCAA and the Conference Defendants may likewise adopt or affirm the following additional rules before or in conjunction with Final Approval of this Injunctive Relief Settlement:

(a)      NCAA and conference rules governing the number of seasons/length of time student-athletes are eligible to receive benefits, including scholarships and payments, pursuant to this Injunctive Relief Settlement, including any rule capping the number of years a student-athlete may receive payments at four years, and providing that all four of those years must be played within a consecutive five-year period (with the exception that in the event of a national force majeure event that leads to the cancellation of games, or the absence of fans, the rules may provide for an additional year to be added onto the five-year period);

(b)      NCAA and conference rules requiring that student-athletes continue to make progress toward a degree while enrolled in any Member Institution in order to receive benefits pursuant to this Injunctive Relief Settlement;

(c)      NCAA and conference rules, subject to Class Counsel's review and approval that shall not be unreasonably withheld, permitting student-athletes the ability to seek guidance from the Designated Enforcement Entity prior to entering into a proposed NIL contract or agreement as to whether said contract may constitute a violation of the NCAA rules affirmed, revised, or created pursuant to this Injunctive Relief Settlement;

(d)      NCAA and conference rules, subject to Class Counsel's review and approval that shall not be unreasonably withheld, permitting a student-athlete to retain or regain eligibility by both (a) rescinding or modifying any agreement determined to be non-compliant with the NCAA rules affirmed, revised, or created pursuant to this Injunctive Relief Settlement and (b) returning, as necessary, any compensation or consideration received pursuant to a non-compliant agreement, in order to expunge any violation of the NCAA rules affirmed, revised, or created pursuant to this Injunctive Relief Settlement.  The purpose and intent of such rule is to ensure that student-athletes

SECOND AMENDED INJUNCTIVE RELIEF SETTLEMENT
Case Nos. 4:20-CV-03919

01-MenkeER-0037

have the ability to terminate and/or modify a proposed/executed NIL contract or agreement rather than risk their eligibility; and

(e)     NCAA and conference rules addressing circumvention subject to the procedures set forth in Article 6, Section 3.

SECOND AMENDED INJUNCTIVE RELIEF SETTLEMENT
Case Nos. 4:20-CV-03919

01-MenkeER-0038

# ARTICLE 5

# PROHIBITED AGREEMENTS

**Section 1.  Prohibited Collusive Agreements.**  Conference Defendants or their Member Institutions (except as provided below with respect to conference rules) shall be prohibited from entering into agreements with each other, or with the NCAA, to limit or restrict the amount of benefits that they individually choose to provide to student-athletes at levels below those permitted by the terms of this Injunctive Relief Settlement, other than in the event that a change in law or circumstances permits collective bargaining to take place.  In the event that a change in law or circumstances permits collective bargaining to take place, this Article 5, Section 1 shall not apply to prohibit any bona fide collective bargaining activities of the NCAA, Conference Defendants, and Member Institutions but shall otherwise remain in full force and effect.  Subject to Article 10, Section 5, a violation of this provision shall be remedied by an award of appropriate damages and equitable relief solely against the involved Member Institutions, conferences, or NCAA, as determined by the Court or a special master appointed by the Court.  Notwithstanding the foregoing, individual conferences (acting through their Member Institutions) shall be permitted to adopt and enforce rules applicable to their Member Institutions regarding benefits provided or not provided to student-athletes.  Class Counsel may bring an action to enforce the terms of this provision to seek damages and equitable relief on behalf of any number of Injunctive Class members. For the avoidance of doubt, nothing in the SSA or this Injunctive Relief Settlement, or NCAA or conference rules permitted or approved by the Injunctive Relief Settlement, shall be deemed to be a collusive agreement in violation of this provision.

01-MenkeER-0039

# ARTICLE 6

## ENFORCEMENT

**Section 1.  Enforcement of Injunctive Relief Settlement.**

(a)      Any disputes involving any or all of the Defendants on one side and any Injunctive Class Members on the other side concerning the interpretation or enforcement of this Injunctive Relief Settlement shall, if they cannot be resolved by negotiation and agreement, be submitted to the Court.  For the avoidance of doubt, any disputes regarding enforcement of NCAA or conference rules against student-athletes or Member Institutions that are subject to this Injunctive Relief Settlement, including but not limited to questions of eligibility, shall be governed by Section 2 of this Article.

(b)      The Court shall retain jurisdiction to resolve all disputes that may arise concerning compliance with, the validity of, interpretation or enforcement of the terms and conditions of this Injunctive Relief Settlement, including through appointment of a special master whose decisions shall be appealable to the Court unless the Parties agree in a particular dispute that the special master's ruling shall be final without further appeal.  Absent any such agreement as to a particular dispute, the Parties reserve all appeal rights with respect to special master or Court determinations concerning the interpretation or enforcement of this Injunctive Relief Settlement.

(c)      All claims set forth in subsection (b), immediately above, asserted on behalf of student-athletes shall be prosecuted exclusively by Class Counsel except as provided herein, and Class Counsel has the authority to exclusively monitor and enforce this Injunctive Relief Settlement on behalf of Injunctive Class Members throughout the Term as provided herein.

**Section 2.  Enforcement Authority and Arbitration Process for Enforcement of NCAA/Conference Rules Implementing This Injunctive Relief Settlement**

(a)      Any one or more of the NCAA, Conference Defendants, and Non-Defendant Conferences shall be permitted to (i) adopt rules and procedures consistent with and to enforce this

24
SECOND AMENDED INJUNCTIVE RELIEF SETTLEMENT
Case Nos. 4:20-CV-03919

01-MenkeER-0040

Injunctive Relief Settlement, (ii) require submission of information and documentation from student-athletes and Member Institutions to the NCAA or conferences or designated third parties, and (iii) enforce (including through the Designated Enforcement Entity) NCAA and conference rules implementing the terms of this Injunctive Settlement including rules to be promulgated pursuant to Article 4, by, among other penalties, declaring student-athletes ineligible for competition and/or by reducing distributions to Member Institutions that violate the terms and limitations set forth in this Injunctive Relief Settlement and/or the new or modified NCAA and conference rules.

(b) Prior to the entry of Final Approval, Class Counsel and Defendants shall meet and confer to select neutral arbitrators, whose decisions shall, to the fullest extent permitted by applicable law, be final and binding on the parties to the arbitration, to arbitrate any and all disputes regarding any discipline imposed pursuant to subsection (a) immediately above or any rule(s) promulgated pursuant to Article 4, Section 3. If an arbitrator is terminated by agreement of Class Counsel and Defendants or by the Court, she or he will continue to hear any disputes already pending before the arbitrator but may not hear any new disputes. Class Counsel and Defendants shall promptly agree upon a replacement arbitrator, whenever required. If Class Counsel and Defendants cannot agree on a replacement arbitrator within ten (10) days, they will choose the arbitrator under the alternate striking method from a list of ten (10) non-conflicted arbitrators to be provided by JAMS from its panel of neutral arbitrators in its Sports Law Practice Group.

(c) Arbitrators appointed pursuant to the preceding subsection shall serve a term of three (3) years, unless terminated earlier by agreement of Class Counsel and Defendants (or by the Court) through a written notification. A Member Institution that contests the imposition of discipline on itself or its student-athlete(s), including by directly or indirectly paying the attorneys' fees and costs of such student-athletes(s), pursuant to subsection (a) shall pay the arbitrator's reasonable fees and expenses for proceedings relating to the penalties being challenged. Student-

25
SECOND AMENDED INJUNCTIVE RELIEF SETTLEMENT
Case Nos. 4:20-CV-03919

01-MenkeER-0041

athletes contesting any discipline shall not be charged any arbitration fees or expenses regardless of whether a Member Institution contests the imposition of discipline.

(d)      All arbitrations under this Section 2 shall be completed on an expedited basis, but in no more than forty-five (45) days after commencement of proceedings unless the arbitrator finds good cause for having a longer schedule.  During the pendency of an arbitration, any enforcement of any discipline imposed in connection with the violation that is subject to the arbitration shall be stayed; provided, however, that the arbitrator shall have the ability to lift any such stay for good cause shown.  The decision of the arbitrator shall be final and binding to the fullest extent permitted by applicable law.  The arbitrator may, in an appropriate case, order the production of documents that are determined to be necessary for a fair adjudication of the dispute.  Witnesses may be called at the arbitration and the parties may be represented by counsel of their choice at their own expense. The arbitrator shall promptly issue a written award embodying his or her decision.  Defendants may agree with Class Counsel upon procedural rules governing the arbitration process, provided that all arbitration rules must be consistent with this Section 2 and must apply uniformly to all student-athletes and all Member Institutions that choose to provide or facilitate payments or benefits to student-athletes as permitted by this Injunctive Relief Settlement, including but not limited to incremental scholarships permitted by Article 3, Section 3(b).

(e)      If student-athletes seek to challenge any discipline imposed on them in connection with the terms of this Injunctive Relief Settlement, they shall be required to engage in the arbitration process set forth in this Section 2.  If Member Institutions seek to challenge any discipline imposed on them or their student-athletes in connection with the terms of this Injunctive Relief Settlement, they shall be required to engage in the arbitration process set forth in this Section 2, to the extent such an arbitration requirement is consistent with the state law of the institution involved in the dispute.

01-MenkeER-0042

(f)  Student-athletes will have the right to be represented by counsel of their choosing in any such arbitration regarding the Injunctive Class Member's individual interests.  Class Counsel shall promptly receive copies of all decisions by the arbitrator.

**Section 3.  NCAA or Conference Rules Relating to Circumvention.**  The Defendants may adopt rules that prohibit any transaction, payment, or agreement designed to defeat or circumvent, and with the effect of defeating or circumventing, the intention of the Parties as reflected in the terms of this Injunctive Relief Settlement.  Class Counsel shall receive notice of any such new rules to prevent circumvention and shall have thirty (30) days to file an objection to such rules with the Court or a special master appointed by the Court.  In the event of such an objection, the proposed circumvention rule(s) shall be stayed for four (4) months pending judicial resolution. Upon receiving an objection from Class Counsel, Defendants shall reasonably cooperate with requests for documents in the possession of Defendants sufficient to show the reasons for adopting the rule, the deliberations on the rule, and any committee reports or minutes of meetings relating to the rule, and shall produce those documents to Class Counsel as soon as reasonably possible, but in no event later than two (2) weeks from the date of the objection.  For the avoidance of doubt, the procedure set forth in this Article 6, Section 3, shall apply only to circumvention rules. If a circumvention rule is adopted and then enforced against any Member Institution or student-athlete, such discipline may be appealed by the student-athlete or Member Institution pursuant to the arbitration procedure set forth in Article 6, Section 2.  Class Counsel may file an amicus brief and present argument in such a proceeding upon a determination by the arbitrator, or if Class Counsel believes, that the interests of the Injunctive Class may be adversely impacted by the outcome of the proceeding or that the circumvention arguments being presented are inconsistent with the terms of the Injunctive Relief Settlement; provided, however, that Class Counsel may seek reimbursement of fees and costs, in accordance with Paragraph 27 of the SSA, relating to its participation in no more than two (2) such arbitrations in an Academic Year.

01-MenkeER-0043

# ARTICLE 7

## LEGISLATION & ALTERNATIVE STRUCTURES

**Section 1.  Legislation.**  Class Counsel will use reasonable efforts to support the portions of any proposed federal or state legislation implementing/codifying this Injunctive Relief Settlement, including reasonably cooperating to support antitrust immunity for conduct undertaken by Defendants in compliance with or to implement the terms of this Injunctive Relief Settlement during the Term or any court-approved extension thereof, and preemption of any state law existing before or as of the date of Final Approval in conflict with this Injunctive Relief Settlement.  Class Counsel will not oppose, advocate against, lobby in any way against, or otherwise attempt or seek to undermine legislation implementing/codifying this Injunctive Relief Settlement.  Class Counsel further agree, during the Term, to take no position and thus be neutral on any proposed, pending, or future local (*e.g.*, city/county), state, or federal legislation provisions which would provide student-athletes with benefits in addition to those permitted by this Injunctive Relief Settlement.  Class Counsel will also take no position, and thus be neutral, in all instances and in all forums and venues, on the issue of whether student-athletes should be considered/deemed "employees" or whether collective bargaining should be permitted for compensation of student-athletes.  However, if such collective bargaining for student-athletes is permitted in the future, Class Counsel shall not be precluded from representing any organization engaged in such collective bargaining, including in support of such bargaining activities.

**Section 2.  Alternative Structures.**  Nothing in this Injunctive Relief Settlement shall limit or interfere with the ability of student-athletes and Defendants or Defendants' Member Institutions and Non-Defendant Conferences or Non-Defendant Conference Member Institutions to explore and implement alternative structures for providing benefits to student-athletes, including but not limited to collective bargaining in the event that a change in law or circumstances permits such collective bargaining to take place.  In such a circumstance, the benefits permitted under this Injunctive Relief Settlement may be made part of any collectively bargained compensation

01-MenkeER-0044

package or alternative structure, subject to the negotiations of the relevant parties and all applicable laws, and this Injunctive Relief Settlement shall not preclude the parties to such bargaining from agreeing upon additional, expanded or different benefits than those permitted by this Injunctive Relief Settlement.  Relatedly, if some or all student-athletes are characterized as and/or definitively determined to have employee status under state or federal law and any Defendant or Releasee is required to pay any monies/provide any benefits to student-athletes, or student-athletes otherwise receive benefits as a result, beyond the monies and benefits provided in this Injunctive Relief Settlement, the Defendants shall have the option, but not the obligation, to seek to terminate or modify the injunction contemplated by this Injunctive Relief Settlement or the terms of this Injunctive Relief Settlement (with all releases of Released Claims remaining valid and no claims accruing during the period of the effectiveness of the injunction), but with Class Counsel reserving their rights to oppose any such termination or modification of the injunction contemplated by this Injunctive Relief Settlement or the terms of this Injunctive Relief Settlement.

01-MenkeER-0045

## ARTICLE 8

## NAME, IMAGE & LIKENESS

### Section 1.    Broadcast & Promotional NIL

(a)    Plaintiffs and the Injunctive Classes do not and will not contest during the Term the rights asserted by the Defendants and their Member Institutions, and entities to which rights to broadcast and otherwise distribute audio and video of collegiate games and other competitive collegiate athletic events are licensed by the Defendants and their Member Institutions, to (i) telecast, broadcast, or otherwise distribute or transmit, on a live, delayed, and/or archived basis, in any and all media now known or hereafter developed, any and all college games and competitive events, including clips and highlights thereof, (ii) produce, license, offer for sale, sell, market, or otherwise distribute or transmit on a live, delayed, and/or archived basis, broadcasts and other electronic or digital distributions of any such collegiate athletic games or competitive athletic events, and clips and highlights thereof, in any and all media now known or hereafter developed, including, but not limited to electronic or digital media, and (iii) use, employ, or otherwise transmit or publish student-athletes' NIL for the purpose of promoting the telecasts, broadcasts, and other electronic or digital distributions of games and competitive events, including distribution of clips and highlights thereof, as referenced in this paragraph.

(b)    Nothing herein shall be construed to confer, during or after the Term, any right or authority to use a student-athlete's name, image or likeness in a manner that constitutes an endorsement by that student-athlete of a third-party brand, product, or service ("Endorsement") other than in connection with promotion of games or events that have title sponsors (by way of example only, events such as the "Allstate Sugar Bowl" or the "Las Vegas Bowl presented by GEICO"), including games or events that are organized by or affiliated with a conference with a title sponsor.  Nothing herein shall be construed to grant any publicity rights for use in licensed consumer products, whether traditional or digital (*e.g.*, video games, trading cards, apparel).  For

SECOND AMENDED INJUNCTIVE RELIEF SETTLEMENT
Case Nos. 4:20-CV-03919

01-MenkeER-0046

purposes of clarity, and without limitation, it shall not be an Endorsement to use, or authorize others to use, including without limitation, in third-party advertising and promotional materials, footage and photographs of a student-athlete's participation in college athletic games or competitive athletic events (including clips and highlights thereof) as long as the clips and highlights do not prominently feature an individual student-athlete in connection with a third party product or service, other than in connection with promotion of games or events that have title sponsors or are organized by or affiliated with a conference with a title sponsor as described in this section.

**Section 2. Broadcast NIL Reservation.** The Parties reserve all rights as to the existence, or non-existence, of broadcast name-image-and-likeness ("BNIL") rights (including the use of a person's NIL in or in connection with a broadcast, telecast or other media distribution or transmission, including, without limitation, all forms of television, radio, telephone, internet, and any other communications media, forms of reproduction and other technologies, whether presently existing or not, anywhere in the world, whether live or on any form of delay, including, without limitation, network, local, cable, direct broadcast satellite, and any form of pay television, and all other means of distribution and exploitation, whether presently existing or not and whether now known or hereafter developed). To the extent that any court of competent jurisdiction determines and/or to the extent that any relevant legislative body passes a law providing that student-athletes have such rights, then the Defendants and their Member Institutions, and entities to which rights to broadcast and otherwise distribute college athletic games and competitive athletic event are licensed by the Defendants and their Member Institutions, shall be deemed to have been granted a license to exercise all rights enumerated in Article 8, Section 1, subject to the limitations set forth in that section, for the duration of the Term.

01-MenkeER-0047

# ARTICLE 9

## TERM

**Section 1.  Term.**  The term of this Injunctive Relief Settlement shall be ten (10) Academic Years after the date of Final Approval of the SSA by the Court.

**Section 2.  Potential Extension.**  The Parties will negotiate in good faith, prior to the conclusion of the Term, as to whether to jointly seek an extension of the Term upon its expiration on terms to be agreed upon and approved by the Court, after notice and an opportunity to object by the members of the Injunctive Relief Settlement Class.

**Section 3.  Mutual Reservation of Rights.**  Upon the expiration or termination of this Injunctive Settlement, the Parties shall be free to make any available argument that any conduct occurring after the expiration or termination of this Injunctive Settlement is or is not then a violation of the antitrust laws or any other laws.

01-MenkeER-0048

# ARTICLE 10

## MISCELLANEOUS

**Section 1. Conflicts.**  The provisions of this Injunctive Relief Settlement supersede any conflicting provisions in any rule or policy, or any other document, adopted by Defendants or any of their Member Institutions, affecting the matters addressed herein.

**Section 2. Implementation.**  The Parties will use their best efforts to faithfully carry out the terms and conditions of this Injunctive Relief Settlement.

**Section 3.  Time Periods.**  The specification of any time period in this Injunctive Relief Settlement shall include any non-business days within such period, except that any deadline falling on a Saturday, Sunday, or Federal Holiday shall be deemed to fall on the following business day.

**Section 4.  Delivery of Documents.**  The Parties, shall, upon the request of any Party hereto, execute and deliver such further documents and instruments to take such further steps as are reasonably necessary and appropriate to implement and effectuate the purposes of this Injunctive Relief Settlement.

**Section 5.  Eleventh Amendment and Sovereign Immunity.**  Plaintiffs acknowledge that Defendants do not have the authority to waive or compromise any immunity or protection of any Member Institution pursuant to the Eleventh Amendment to the United States Constitution or any other applicable provisions of the law of the state in which the Member Institution is located. Notwithstanding the above, Plaintiffs and Class Counsel reserve their rights as to whether sovereign immunity has any application to this Injunctive Relief Settlement.

**Section 6.  Compliance with Protective Order.**  All filings submitted to the Court or a special master appointed by the Court relating to or in connection with this Injunctive Relief Settlement shall comply with the protective order entered in the Action (ECF 136), which shall remain in full force and effect for the duration of the Term.

01-MenkeER-0049

# 2024 Agreed-Upon Procedures



01-MenkeER-0050

INTRODUCTION ................................................................................................................. 3

BACKGROUND INFORMATION ...................................................................................... 4

   1.   NCAA LEGISLATION .......................................................................................... 4

      a.   Division I ........................................................................................................ 4

      b.   Division II ....................................................................................................... 5

      c.   Division III ...................................................................................................... 5

   2.   INTERPRETATIONS ............................................................................................. 5

      a.   Objectives of Agreed-Upon Procedures ....................................................... 5

      b.   Organization of Intercollegiate Athletics Programs ..................................... 7

      c.   The Independent Accountant ......................................................................... 8

AGREED-UPON PROCEDURES ...................................................................................... 10

   1.   Athletics Department Statement of Revenues and Expenses .......................... 11

   2.   Minimum Compliance Agreed-Upon Procedures .......................................... 11

   3.   Minimum Agreed-Upon Procedures ............................................................... 12

      a.   Institutional Representations ....................................................................... 13

      b.   Report on Agreed-Upon Procedures .......................................................... 13

         i. Application of Agreed-Upon Procedures .................................................. 13

         ii.   Presentation of the Statement of Revenues and Expenses ............................ 13

         iii.   Notes and Disclosures ................................................................................ 13

MINIMUM AGREED-UPON PROCEDURES FOR AFFILIATED AND OUTSIDE ORGANIZATIONS .......................................................................................................... 15

      a.   Supplemental Procedures for Affiliated and Outside Organizations ........................ 15

APPENDIX A | Revenue Categories ................................................................................. 17

APPENDIX B | Expense Categories .................................................................................. 22

APPENDIX C | Other Reporting Items ............................................................................. 27

APPENDIX D | Minimum NCAA Agreed-Upon Procedures for Revenue, Expenses and Other Reporting Items .......................................................................................................... 28

APPENDIX E | Independent Accountant's Report on Agreed-Upon Procedures ........................ 41

APPENDIX F | Common Questions and Answers ............................................................. 43

APPENDIX G | NCAA Online Financial Reporting Links ................................................... 45

01-MenkeER-0051

## INTRODUCTION

NCAA constitution, Article 2(D)(1)(c) states that all members of the NCAA must submit annually its financial data as determined by the division detailing operating revenues, expenses and capital relating to the intercollegiate athletics program.

Division I:

As mandated under the provisions of NCAA Bylaw 20.2.4.17, NCAA Division I member institutions are required to submit financial data detailing operating revenues, expenses, and capital related to its intercollegiate athletics program to the NCAA on an annual basis. This financial data is subject to agreed-upon procedures performed by a qualified independent accountant and must be presented to the president or chancellor prior to submission to the NCAA via the Membership Financial Reporting System, Bylaw 20.2.4.17.1.

Division II:

As mandated under Bylaw 7.3.1.5.22.1, at least once every three years, NCAA Division II member institutions are required to perform an expenses and revenues review related to its intercollegiate athletics programs which is subject to the agreed-upon procedures. The expenses and revenues review shall be performed by a qualified independent accountant and must be presented to the president or chancellor.

In addition, per the NCAA Constitution Article 2(D)(1)(c), institutions are required to submit financial data annually to the NCAA via the Membership Financial Reporting System. The data collected will be stored within the Institutional Performance Program (IPP) for comparison and reporting purposes.

Division III:

Division III members are provided with two methods in which to meet the constitutional requirement of Article 2(D)(1)(c).

1. Division III institutions can submit financial data annually to the NCAA via the Membership Financial Reporting System for Institutional Performance Program (IPP) purposes. Per the regular financial audit requirements, revenue and expenditures associated with outside groups or individuals shall be included in this audit.

2. Division III institutions can submit the EADA Certificate of Completion to the NCAA via the Membership Financial Reporting System.

The NCAA may use the data collected through the Membership Financial Reporting System to support its research efforts. The NCAA will maintain its policy of not releasing information submitted by individual institutions; only the aggregate results by NCAA division will be made available to membership.

01-MenkeER-0052

## BACKGROUND INFORMATION

1. **NCAA LEGISLATION**

   The NCAA agreed-upon procedure reporting legislation for each of the three membership divisions are contained in each division's manual:

   a. **Division I**

   Bylaw 20.2.4.17. "An active member institution shall submit financial data detailing operating revenues, expenses and capital related to its intercollegiate athletics program to the NCAA on an annual basis in accordance with the financial reporting policies and procedures. The required data shall include, but is not limited to, the following:

   (a) All expenses and revenues for or on behalf of an institution's intercollegiate athletics program, including those by any affiliated or outside organization, agency or group of individuals;

   (b) Salary and benefits data for all athletics positions. The data shall include base salary, bonuses, endorsements, media fees, camp or clinic income, deferred income and other income contractually guaranteed by the institution;

   (c) Capital expenditures (to be reported in aggregate for athletics facilities), including capitalized additions and deletions to facilities during the reporting period, total estimated book value of athletically related plant and equipment net of depreciation, total annual debt service on athletics and university facilities and total debt outstanding on athletics and university facilities;

   (d) Value of endowments at fiscal year-end that are dedicated to the sole support of athletics;

   (e) Value of all pledges at fiscal year-end that support athletics; and

   (f) The athletics department fiscal year-end fund balance."

   Bylaw 20.2.4.17.1. "The report shall be subject to annual agreed-on verification procedures approved by the membership (in addition to any regular financial reporting policies and procedures of the institution) and conducted by a qualified independent accountant who is not a staff member of the institution and who is selected by the institution's chancellor or president or by an institutional administrator from outside the athletics department designated by the chancellor or president. The independent accountant shall verify the accuracy and completeness of the data prior to submission to the institution's chancellor or president and the NCAA. The institution's chancellor or president shall certify the financial report prior to submission to the NCAA. "

01-MenkeER-0053

b. **Division II**
Bylaw 7.3.1.5.22.1. "At least once every three years, all expenses and revenues for or on behalf of a Division II member institution's intercollegiate athletics programs, including those by any affiliated or outside organization, agency or group of individuals (two or more), shall be subject to agreed-on procedures approved by the Division II membership (in addition to any regular financial reporting policies and procedures of the institution) conducted for the institution by a qualified independent accountant who is not a staff member of the institution and who is selected either by the institution's president or chancellor or by an institutional administrator from outside the athletics department designated by the president or chancellor. If, within the last three years, the institution has conducted an overall institutional audit that includes a financial audit of all athletics department funds using the agreed upon procedures, then the institution is not required to perform a separate financial audit of all athletics department expenditures. An institution is not required to use the agreed upon procedures in years outside the once in every three-year cycle."

Bylaw 7.3.1.5.22.1.1. "The report created pursuant to the approved procedures shall be completed and presented to the president or chancellor on or before January 15 after the end of the institution's fiscal year."

Effective August 1, 2025. Bylaw 7.3.1.5.23 "Financial Data Requirement, an active member institution that fails to submit its financial data per NCAA Article 2-D-1-c by the applicable deadline, in a format approved and administered by the Membership Committee, shall forfeit Division II Institutional Equal Distribution Funds for the following academic year."

Effective August 1, 2025. Bylaw 7.3.1.5.23.1 "The Membership Committee may waive the requirement of Bylaw 7.3.1.5.23 if it deems that unusual circumstances warrant such action. The decision of the Membership Committee shall be considered final."

c. **Division III**
Bylaw 20.14.5.3. "All expenditures and revenue for or on behalf of a Division III member institution's intercollegiate athletics programs shall be subject to the institution's regular financial audit. In particular, additional revenue and expenditures associated with outside groups or individuals shall be included in this audit."

2. **INTERPRETATIONS**
a. **Objectives of Agreed-Upon Procedures**
The institution's agreed-upon procedures report shall be presented to the president or chancellor by the independent accountant. The report's primary purpose is to ensure that the president or chancellor is made aware of all financial activity (both internal and external) for athletics purposes and to assist the institution in exercising control over financial activity made by or on behalf of the intercollegiate

Page | 5

01-MenkeER-0054

athletics program. The report should not be filed with the NCAA national office. However, should information supplied as a result of this initiative raise questions or prompt concerns about the proper application of NCAA legislation, an institution's president or chancellor may wish to contact the NCAA administrative services staff for assistance.

The report's secondary purpose is to ensure the accuracy of the data the institution is submitting for sports sponsorship, Pell grants and grants-in-aid, which determines the calculation of several Division I NCAA Revenue Distributions.

The agreed-upon procedures scope of work shall include the reporting of revenue and expenses required in NCAA financial reporting information. The definitions used in the agreed-upon procedures provide a consistent means of reporting intercollegiate athletics finances and will provide the presidents or chancellors and other campus decision makers of our member institutions with empirical data to assist them in making their formal decisions.

Data available for the agreed-upon procedures may vary among institutions as a result of differences in athletics programs' organizational structure, financial resources and accounting and budgetary methods. Information that may prove particularly useful (depending on circumstances noted above) to institutions in evaluating the level of institutional control includes:

(1)     A comparison of actual revenues and expenses related to the intercollegiate athletics program as defined on pages 17-26 (from both internal and external sources) to amounts budgeted;

(2)     The nature of institutional internal controls that affect operations of the intercollegiate athletics program, and

(3)     The relationship of expenses for or on behalf of intercollegiate athletics by affiliated and outside organizations (e.g., booster groups, alumni organizations, independent or affiliated foundations, supporting organizations) to institutional expenses for similar purposes and the nature of internal controls in place to monitor the financial activities of such affiliated and outside organizations.

1. Affiliated Organization: An organization that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with an organization (in this case the institution and/or intercollegiate athletics).

2. Supporting Organization: An organization that provides supporting activities, such as management and general activities, fundraising activities or membership development activities, to a not-for-profit organization (in this case a not-for-profit institution

Page | 6

01-MenkeER-0055

and/or intercollegiate athletics).

The financial information, the existence and appropriateness of the institution's internal controls are the responsibility of the institution. Independent accountants, through the application of agreed-upon procedures, should not provide an opinion or assurance on the reliability of financial information generated by the institution, the existence and functioning of appropriate internal controls. The agreed-upon procedures report presents the findings of the agreed-upon procedures performed by the independent accountant. An understanding of this distinction in role and responsibility is crucial to the president or chancellor's effective use of the information provided as part of the agreed-upon procedures performed.

The NCAA has developed the agreed-upon procedures set forth in this document with the assistance of the National Association of College and University Business Officers (NACUBO) and Association of College and University Auditors (ACUA). These procedures seek to provide flexibility in complying with the provision of Bylaw 20.2.4.17. At a minimum, the institution's president or chancellor should seek information considered consistent with the legislation's purpose and the requirements of professional auditing literature, recognizing reasonable cost and benefit considerations.

An institution's president or chancellor also may request additional information from the institution's athletics department, affiliates and outside groups, as well as the performance of additional agreed-upon procedures in agreement with the independent accountants. Each institution's president or chancellor should consider carefully what approach best serves the institution's needs in evaluating institutional control. The president or chancellor may include a formal assessment of internal controls over intercollegiate athletics programs financial processes.

The independent accountants will not review or include in their reports information concerning the institution's compliance with NCAA legislation. Responsibility for assuring compliance with NCAA legislation is the ultimate responsibility of the institution's president or chancellor, and the information provided as part of the agreed-upon procedures report is intended to assist president or chancellors in their efforts to assure institutional compliance.

While the detection of improper application of NCAA legislation is not the primary function of these procedures, the independent accountants should be alert nonetheless for situations or transactions that may indicate the existence of such conditions. If, during the course of executing the procedures, the independent accountant becomes aware of acts that may indicate a violation of NCAA legislation, the independent accountant shall immediately report the violation to the institution's president or chancellor.

b. **Organization of Intercollegiate Athletics Programs**
Intercollegiate athletics programs vary significantly in scope and complexity

01-MenkeER-0056

among institutions. Financial reporting procedures and controls also vary. For example, some institutions clearly have segregated intercollegiate athletics from other institutional athletics programs and physical education while at other institutions, these activities are integrated with the institution's administrative structure and accounting records.

Likewise, the extent to which institutions receive cash or in-kind contributions from affiliated and outside organizations and the method by which such contributions from affiliated and outside organizations are included in the institution's athletics department's financial statements vary considerably. Institutional accounting practices also differ in areas such as indirect facilities and administrative support, grants-in-aid costs and student-activity fees. Institutions and their independent accountants should be aware of these differences among programs and recognize that NCAA legislation does not mandate particular organizational structure or specific budgetary approaches.

For purposes of these procedures, as applicable, the independent accountant (or, in Division III, the institution's accountant) shall include certain financial information of the following organizations, agencies and groups within the agreed-upon procedures:

(1)     Booster organizations established by or on behalf of an intercollegiate athletics program. For the purposes of this legislation, a booster group may be defined as any organization that has as its principal, or one of their principal purposes, the generating of moneys, goods or services for or on behalf of an intercollegiate athletics program, or the promotion of said program through other means;

(2)     Independent or affiliated foundations or other organizations that have as a principal, or one of their principal purposes, the generating or maintaining of grants-in-aid or scholarship funds, gifts, endowments, or other moneys, goods or services to be used primarily by the intercollegiate athletics program, and

(3)     Alumni organizations that have as a principal, or one of their principal purposes, the generating of moneys, goods or services for or on behalf of an intercollegiate athletics program and that contribute moneys, goods or services directly to an intercollegiate athletics program, booster group, or independent or affiliated foundation as previously noted.

**c.     The Independent Accountant**
In Divisions I and II, the agreed-upon procedures report is required to be conducted by an independent accountant who is not an institutional staff member. This requirement is not intended to question the ability or integrity of institutional accountants or auditors, but rather to emphasize that this is a separate procedure for specific NCAA compliance purposes and to further protect the institution from

01-MenkeER-0057

inferences that the agreed-upon procedures were not objective.  In Division III, an independent accountant is not required.

For the purposes of this legislation in Divisions I and II, an individual employed by the state (or by a state university system) to perform audits for that state's colleges and universities (or for the colleges and universities within a state university system) is considered to be an independent accountant, provided the individual is not a regular employee of the institution.  The procedures undertaken by state auditors in the performance of their duties should meet the minimum standards set forth in these agreed-upon procedures applicable to the revenues and expenses of all independent booster or support organizations.  If state auditors are unable to perform those procedures, the president or chancellor is required to engage an independent accountant to satisfy these procedures.  The approach required by the independent accountant to satisfy these procedures will depend on the scope of the state auditors work and the ability and willingness of the independent accountant to rely on the work performed by the state auditors.

Work performed by internal auditors at Division I and II institutions, even though their responsibility includes an annual financial audit for the entire institution (including intercollegiate athletics and institution-controlled affiliated or outside organizations), would not meet the requirements of this legislation.  Internal auditors may prepare schedules and accumulate data or provide other information for the practitioner's use in performing the agreed-upon procedures.  Accordingly, independent accountants may use work performed by internal auditors.  However, it would be inappropriate for the independent accountant to agree to merely read the internal auditors' report solely to describe or repeat the findings, take responsibility for all or a portion of any procedures performed by the internal auditors by reporting those findings as the practitioner's own, or report in any manner that implies shared responsibility for the procedures with the internal auditors.

01-MenkeER-0058

## AGREED-UPON PROCEDURES

Depending on the institution's existing level of agreed-upon procedures and the organizational structure of the institution's intercollegiate athletics programs and related affiliated or outside organizations, there are several approaches that the independent accountant may use to comply with the agreed-upon procedure requirements for Division I and II institutions.  [Note: In Division III, the completion of the institution's regular financial audit shall satisfy the requirements of Bylaw 20.14.5.3, provided that all expenditures and revenue for or on behalf of a Division III member institution's intercollegiate athletics programs shall be subject to the institution's regular financial audit. In particular, additional revenue and expenditures associated with outside groups or individuals shall be included in this audit.]

Work performed by an independent auditor as part of a Division I or II institution-wide financial audit would comply with the terms of this legislation if the work performed by the independent auditor relative to the institution's department of intercollegiate athletics conforms to the requirements set forth in the section entitled "Minimum Agreed-Upon Procedures."  In using this approach, the independent auditor shall also conduct certain minimum agreed-upon procedures related to the revenues and expenses of affiliated and outside organizations that are not under the accounting control of the institution.  See the "Minimum Agreed-Upon Procedures for Affiliated and Outside Organizations" section for details. Affiliated and outside organizations (e.g., booster clubs, affiliated foundations and alumni groups) are considered to be under the accounting control of the institution when all activities of the organization (including revenues and expenses) are recorded on the books and records of the institution and are subject to the internal control structure. Alternatively, where an institution-wide agreed-upon procedure has been performed, the president or chancellor may elect to comply with these agreed-upon procedures by engaging the independent auditor to perform separate agreed-upon procedures as discussed in the next paragraph.

In the event that an institution-wide independent audit has not been conducted, or the athletics department functions as a separate legal or accounting entity (e.g., a separately incorporated athletics foundation), a Division I or II institution would comply with the terms of this legislation by engaging an independent accountant to perform these agreed-upon procedures on the statement.  To the extent that activities of affiliated and outside organizations are under the accounting control of the institution, those revenues and expenses shall be included in the statement that the independent accountant applies these agreed-upon procedures against. Otherwise, activities of affiliated and outside organizations shall be subject to minimum agreed-upon procedures as set forth in the section entitled "Minimum Agreed-Upon Procedures for Affiliated and Outside Organizations."

01-MenkeER-0059

**This section describes the minimum level of procedures considered to be necessary to achieve the objectives of this legislation.**

1.  **Athletics Department Statement of Revenues and Expenses**
    To provide adequate information for the independent accountant to execute these agreed-upon procedures, the institution must prepare the statement. The statement reports the revenues and expenses of the intercollegiate athletics programs as recorded on the general ledger of the institution. Please note that expenses on behalf of an institution's athletics programs by affiliated and outside organizations not under the accounting control of the institution shall be included in the statement and subject to the agreed-upon procedures set forth in the section entitled "Minimum Agreed-Upon Procedures for Affiliated and Outside Organizations."

    Factors that influence the classification of revenues, expenses and major programs in the statement include:
    a.  The internal account structure of the reporting institution's intercollegiate athletics program;
    b.  The institution's usual treatment of indirect facilities and administrative support related to athletics, and
    c.  The degree to which institutional funds or state appropriations are earmarked or budgeted by the institution for athletics and generally considered to be a part of the department's operating revenue. More detailed discussion of revenue and expenditure classifications is set forth separately in Appendices A thru C.

    The institution shall prepare the statement using the basic accounting and revenue recognition principles set forth in the American Institute of Certified Public Accountants (AICPA) Audit and Accounting Guide entitled "Not-for-Profit Organizations" (the "NFP Audit Guide") and in the NACUBO publication entitled "College and University Business Administration." Please note that the statement presents an excess (deficiency) of revenues over (under) expenses but does not present any fund or net asset balances. In addition, changes in loan, endowment or plant funds related to intercollegiate athletics shall not be included in the statement. Significant additions to restricted funds related to intercollegiate athletics, as well as significant changes to endowment and plant funds, shall be disclosed separately in the notes to the statement.

    After the institution has prepared the statement, the independent accountant shall meet with the institution's president or chancellor (or his or her designees) to identify areas of significant interest and specific agreed-upon procedures related to both internal controls and other specified areas.

2.  **Minimum Compliance Agreed-Upon Procedures**
    The institution, through discussions with the independent accountant, shall identify aspects of the institution's internal control structure unique to the intercollegiate athletics department. Consideration should be given to departmental organization, control consciousness of staff, use of internal auditors in the department, competency of personnel, adequate safeguarding and control of records and assets, controls over

Page | 11

01-MenkeER-0060

interaction with the information technology department, and other relevant matters.

The president or chancellor may include a formal assessment of internal controls over intercollegiate athletics programs financial processes. The independent accountant may test the internal control procedures unique to intercollegiate athletics and internal control procedures for the athletics department. In those situations where the institution's independent accountant performed tests of controls in connection with the audit of the institution's financial statements, the independent accountant may expand the scope of these tests of controls to specifically include transactions from the intercollegiate athletics department.

Regardless of the situation, the independent accountant shall test specific elements of the control environment and accounting systems that are (1) are unique to intercollegiate athletics and (2) have not been addressed in connection with the audit of the institution's financial statements (e.g., the system of accounting for revenues from ticket sales).

Finally, the independent accountant shall perform agreed-upon procedures related to the institution's procedures for gathering information on the nature and extent of affiliated and outside organization activity for or on behalf of the institution's intercollegiate athletics program. The institution must provide the independent accountant with the institution's procedures for gathering information on the nature and extent of affiliated and outside organization activity for on behalf of the institution's intercollegiate athletics program. The independent accountants will then test those procedures. After completing these procedures, independent accountants shall report their findings to the president or chancellor in a format similar to that outlined in Appendix E.

3.   **Minimum Agreed-Upon Procedures**
To identify unusual items, the NCAA has developed minimum agreed-upon procedures for independent accountants to use regarding the accuracy of revenues and expenses of intercollegiate athletics programs. For a complete listing of the minimum agreed-upon procedures, see the sections entitled "Minimum Agreed-Upon Procedures Program for Revenues" and the "Minimum Agreed-Upon Procedures Program for Expenses" in Appendix D to be performed by the independent accountant to comply with this legislation.

The minimum agreed-upon procedures are intended to indicate the nature of the procedures to be performed on the institution's financial systems and records. The institution and their independent accountants should conform to such procedures as appropriate for the institution's systems and records, as well as to professional practice and reporting standards.

Upon approval of the institution, the minimum agreed-upon procedures performed may be tailored by the independent accountant based upon the specific areas of significance to the institution. The institution should keep the objective of the minimum agreed-upon procedures in mind when determining the sufficiency of the procedures to be performed.

Page | 12

01-MenkeER-0061

The institution's president or chancellor may engage the independent accountant to perform supplemental agreed-upon procedures. The independent accountant shall document the scope of the supplemental agreed-upon procedures requested by the president or chancellor in an engagement letter signed in advance by the institution's president or chancellor. The institution, together with the independent accountant, shall determine the extent of the supplemental agreed-upon procedures to be performed.

a. **Institutional Representations**

In an engagement to apply agreed-upon procedures to certain financial and other information of the institution, the independent accountant shall obtain written representations from the institution's management. These representations may be tailored to cover specific assertions and matters unique to the intercollegiate athletics department (e.g., completeness of the schedule of intercollegiate athletics activities, institutional compliance with NCAA legislation and a listing of all known affiliated and outside organizations reported to the independent accountant).

b. **Report on Agreed-Upon Procedures**

i. **Application of Agreed-Upon Procedures**

The independent accountants' report on agreed-upon procedures applied to the institution should be in the form of procedures and findings. Among other things, the report should have a title that includes the word "independent" and identify the specified parties, the subject matter, and the procedures performed (and findings). See Appendix E for a listing of the required elements for a report on agreed-upon procedures. Examples of reports concerning agreed-upon procedures applied to institution's statement and affiliated and outside organizations' records are included as Appendix E.

ii. **Presentation of the Statement of Revenues and Expenses**

The basis of presentation of the statement will vary among institutions. As a result, the institution's statement may be presented in conformity with accounting principles generally accepted in the United States of America (GAAP) or with a comprehensive basis of accounting other than GAAP.

iii. **Notes and Disclosures**

(a) Each individual contribution of moneys, goods or services received directly by an intercollegiate athletics program from any affiliated or outside supporting organization, agency or individuals (e.g., contributions by corporate sponsors) that constitutes 10 percent or more of all contributions received for intercollegiate athletics during the reporting period shall be disclosed in the notes to the statement of athletics department revenues and expenses (the "statement") and included in the agreed-upon procedures report. Disclosure of the source of funds, goods and services, as well as the value associated

Page | 13

01-MenkeER-0062

these items, shall also be made within the notes to the statement. In addition, as part of the minimum agreed-upon procedures, the independent accountant shall obtain and review documentation for each such contribution.

(b) A description of the institution's policies and procedures for acquiring, approving, depreciating, and disposing of intercollegiate athletics-related assets, shall be included in the notes to the statement.

(c) The independent accountant shall also obtain repayment schedules for all outstanding intercollegiate athletics debt maintained by the institution during the reporting period. At a minimum, the independent accountant shall recalculate annual maturities (consisting of principal and interest) provided in the schedules obtained. The independent accountant shall then agree the total annual maturities to documentation and the institution's general ledger, as applicable. The repayment schedule(s) shall be included in the notes to the statement.

01-MenkeER-0063

# MINIMUM AGREED-UPON PROCEDURES FOR AFFILIATED AND OUTSIDE ORGANIZATIONS

Following are minimum agreed-upon procedures that independent accountants and institutions shall use in applying agreed-upon procedures related to expenses for or on behalf of intercollegiate athletics programs by affiliated and outside organizations not under the institution's accounting control. The results of these procedures may be reported and included within the agreed-upon procedures report on the institution. See Appendix E.

1.  The institution shall identify all intercollegiate athletics-related affiliated and outside organizations and obtain those organizations' statements for the reporting period. Once the institution has made these statements available, the independent accountant shall agree the amounts reported in the statement to the organization's general ledger or, alternatively, confirm revenues and expenses directly with a responsible official of the organization. In addition, the institution shall prepare a summary of revenues and expenses for or on behalf of intercollegiate athletics programs affiliated and outside organizations to be included with the agreed-upon procedures report.

2.  The independent accountant shall obtain and review the audited financial statements of the organization and any additional reports regarding internal control matters if the organization is audited independent of the agreed-upon procedures required by NCAA legislation. The institution's independent accountant shall also inquire of institutional and organizational management as to corrective action taken in response to comments concerning internal control structure (if any).

    The institution may tailor these procedures based upon the areas of significance to the institution. The institution should keep the objective of the agreed-upon procedures in mind when determining the sufficiency of the procedures to be performed.

    a.  **Supplemental Procedures for Affiliated and Outside Organizations**

        (1)  Compare and agree a sample of operating revenue categories reported in the organization's statement during the reporting period to supporting schedules provided by the organization;

        (2)  Compare and agree a sample of operating revenue receipts obtained from the above operating revenue schedule to adequate supporting documentation;

        (3)  Compare and agree each operating expense category reported in the organization's statement during the reporting period to supporting schedules provided by the organization;

        (4)  Compare and agree a sample of operating expenses obtained from the above operating expense supporting schedules to adequate supporting documentation;

Page | 15

01-MenkeER-0064

(5) Directly confirm cash balances recorded at the end of the reporting period by the organization and review the related year-end bank reconciliation(s);

(6) Obtain and inspect minutes of the organizations' governing bodies during the reporting period;

(7) Select a sample of financial transactions discussed in the minutes and compare and agree each selection to the organizations' accounting records, as applicable, and

(8) Obtain documentation of the internal controls in place surrounding revenues and expenses related to the organization.

Page | 16

01-MenkeER-0065

## APPENDIX A | 2024 Revenue Categories

Sources of revenue for the athletics program will vary among institutions; however, typical sources of intercollegiate athletics revenues, each followed by a comprehensive definition, are outlined below:

| ID | Category | Definition |
|---|---|---|
| 1 | Ticket Sales | Input revenue received for sales of admissions to athletic events. This may include:<br>• Public and faculty sales.<br>• Student sales.<br>• Shipping and Handling fees.<br>• Registration fees.<br><br>Please report amounts paid in excess of ticket's face value to obtain preferential seating or priority in Category 8 (Contributions). |
| 2 | Direct State or Other Government Support | Input state, municipal, federal and other appropriations made in support of athletics.<br><br>This amount includes funding specifically earmarked for the athletics department by government agencies for which the institution cannot reallocate.<br><br>This amount also includes state funded employee benefits.  Corresponding expenses should be reported in Categories 22 and 24.<br><br>Any state or other government support appropriated to the university, for which the university determines the dollar allocation to the athletics department shall be reported in Category 4. |
| 3 | Student Fees | Input student fees assessed and restricted for support of intercollegiate athletics. |
| 4 | Direct Institutional Support | Input direct funds provided by the institution to athletics for the operations of intercollegiate athletics including:<br>• Unrestricted funds allocated to the athletics department by the university (e.g. state funds, tuition, tuition discounts/waivers, transfers).<br>• Federal work study support for student workers employed by athletics.<br>• Endowment unrestricted income, spending policy distributions and other investment income distributed to athletics in the reporting year to support athletic operations. Athletics restricted endowment income for athletics should be reported in Category 17. |

01-MenkeER-0066

| ID | Category | Definition |
|---|---|---|
| 5 | Less – Transfers to Institution | If the institution allocated funds to athletics as represented in Categories 3 and 4, while the athletics department provided a transfer of funds back to the institution in the reporting year, then report the transfer amount as a negative in this category. The transfer amount may not exceed the total of Categories 3 and 4.  Transfers back to the institution in excess of Categories 3 and 4 should be reported in Category 50. |
| 6 | Indirect Institutional Support | Input value of costs covered, and services provided by the institution to athletics but not charged to athletics including:<br>• Administrative services provided by the university to athletics, but not charged such as HR, Accounting, and IT.<br>• Facilities maintenance.<br>• Security.<br>• Risk Management.<br>• Utilities.<br><br>Do not include depreciation.<br><br>Note: This category should equal Category 36. If the institution is paying for debt service, leases, or rental fees for athletic facilities, but not charging to athletics, include those amounts in Category 6A. |
| 6A | Indirect Institutional Support – Athletic Facilities Debt Service, Lease and Rental Fees | Input debt service payments (principal and interest, including internal loan programs), leases and rental fees for athletics facilities for the reporting year provided by the institution to athletics, but not charged to athletics.<br><br>Do not report depreciation.<br><br>Note: If the institution is paying for all athletic facilities debt service, lease and rental fees and not charging to athletics, this category will equal Category 34.  If athletics or other entities are also paying these expenses or the institution is charging directly to athletics, this category will <u>not</u> equal Category 34. |
| 7 | Guarantees | Input revenue received from participation in away games. This includes payments received due to game cancellations. |
| 8 | Contributions | Input contributions <u>provided and used by athletics</u> in the reporting year including:<br>• Amounts received from individuals, corporations, associations, foundations, clubs, or other organizations used for the operations of the athletics program.<br>• Funds contributed by outside contributors for the payment of debt service, lease payments or rental fee expenses for athletic facilities in the reporting year.<br>• Amounts received above face value for tickets used within the reporting year.<br><br>Contributions shall include cash and marketable securities.<br><br>Do not report:<br>• Pledges until funds are provided to athletics for use.<br>• Contributions to be used in future reporting years. |

01-MenkeER-0067

| ID | Category | Definition |
|----|----------|------------|
| 9 | In-Kind | Input market value of in-kind contributions in the reporting year including:<br>• Dealer-provided automobiles.<br>• Equipment.<br>• Services.<br>• Nutritional product.<br><br>All in-kind contributions that are made as a result of a licensing or sponsorship agreement should be reported in Category 15.<br><br>Please offset in-kind values in the appropriate expense category. |
| 10 | Compensation and Benefits provided by a third party | Input all benefits provided by a third party and contractually guaranteed by the institution, but not included on the institution's W-2. These may include:<br>• Car stipend.<br>• Country club membership.<br>• Allowances for clothing, housing, and entertainment.<br>• Speaking fees.<br>• Camps compensation.<br>• Media income.<br>• Shoe and apparel income.<br><br>The total of this category should equal expense Categories 23 and 25 combined. |
| 11 | Media Rights | Input all revenue received for radio, television, internet, digital and e-commerce rights, including the portion of conference distributions related to media rights, if applicable.<br><br>Consult with your conference offices if you do not have the media rights distribution amount available. |
| 12 | NCAA Distributions | Input revenues received from the NCAA which could include revenue distributions, grants, NCAA championships travel reimbursements and payments received from the NCAA for hosting a championship.<br><br>In some cases, NCAA distributions may be provided by the conference office. Consult with the conference office for the amount received to include in this category. |
| 13 | Conference Distributions (Non Media and Non-Football Bowl) | Input all revenues received by conference distribution, excluding portions of distribution relating to media rights, reported in Category 11, or NCAA distributions, reported in Category 12.<br><br>Note: Conference distributions of revenue generated by a post-season football bowl to conference members are to be recorded in Category 13A. Distributions for reimbursement of post-season football bowl expenses are to be recorded in Category 19. |

01-MenkeER-0068

| ID | Category | Definition |
|---|---|---|
| 13A | Conference Distributions of Football Bowl Generated Revenue | Input conference distributions of revenue generated by a post-season football bowl to conference members.<br><br>Note: Distributions for reimbursement of post-season football bowl expenses should be included in Category 19. Portions of the distribution related to media rights are reported in Category 11, NCAA distributions are reported in Category 12 and all other conference distributions are reported in Category 13. |
| 14 | Program, Novelty, Parking and Concession Sales | Input revenues from:<br>• Game Programs.<br>• Novelties.<br>• Food and Concessions.<br>• Parking.<br><br>Advertising should be included in Category 15. |
| 15 | Royalties, Licensing, Advertisement and Sponsorships | Input revenues from:<br>• Sponsorships.<br>• Licensing Agreements.<br>• Advertisement.<br>• Royalties.<br>• In-kind products and services as part of sponsorship agreement.<br><br>An allocation may be necessary to distinguish revenues generated by athletics versus the university if payments are combined. |
| 16 | Sports Camp Revenues | Input amounts received by the athletics department for sports camps and clinics. |
| 17 | Athletics Restricted Endowment and Investments Income | Please report spending policy distributions from athletics restricted endowments and investment income used for athletics operations in the reporting year.<br><br>This category only includes restricted investment and endowment income used for the operations of intercollegiate athletics; institutional allocations of income from unrestricted endowments qualify as "Direct Institutional Support" and should be reported in Category 4.<br><br>Note: Please make sure amounts reported are only up to the amount of expenses covered by the endowment for the reporting year. |
| 18 | Other Operating Revenue | Input any operating revenues received by athletics in the report year which cannot be classified into one of the stated categories.<br><br>If the figure is greater than 10% of total revenues, please report the top three activities included in this category in the comments section. |

01-MenkeER-0069

| ID | Category | Definition |
|---|---|---|
| 19 | Football Bowl Revenues | Input all amounts received related to participation in a post-season football bowl game, including:<br>• Expense reimbursements.<br>• Ticket sales. |
|  | Total Operating Revenues | Total of Categories 1 through 19. |

01-MenkeER-0070

## APPENDIX B | 2024 Expense Categories

Expenses for the athletics program will vary among institutions; however, typical sources of intercollegiate athletics expenses, each followed by a comprehensive definition, are outlined below:

| ID | Category | Definition |
|----|----------|------------|
| 20 | Athletic Student Aid | Input the total dollar amount of athletic student aid for the reporting year including:<br>• Summer school.<br>• Tuition discounts and waivers (unless it is a discount or waiver available to the general student body).<br>• Aid given to student-athletes who are inactive (medical reasons) or no longer eligible (exhausted eligibility).<br>• Other expenses related to attendance (e.g., stipend).<br><br>Note: Division I Grants-in-aid equivalencies are calculated by using the revenue distribution equivalencies by sport and in aggregate. (Athletic grant amount divided by the full grant amount).<br>Other expenses related to attendance (also known as cost of attendance) should not be included in the grants-in-aid revenue distribution equivalencies. Only tuition, fees, living expenses, and course related books are countable for grants-in-aid revenue distribution per Bylaw 20.02.10.<br><br>Athletics aid awarded to non-athletes (student- managers, graduate assistants, trainers) should be reported as Expenses Not Related to Specific Teams. It is permissible to report only dollars in the Expenses Not Related to Specific Teams row as long as you have reported non-zero entries for Equivalencies, Number of Students, and Dollars (all 3 required for at least one sport).<br><br>Note: Pell grants are provided by the government, not the institution or athletics department, and therefore should be excluded from reporting in this category.<br><br>Note: This information can be managed within the NCAA's Compliance Assistant (CA) software. The equivalencies entered into CA will automatically populate to the athletic student aid section within the NCAA Financial Reporting System when the CA import feature is selected. |
| 21 | Guarantees | Input amounts paid to visiting participating institutions, including per diems and/or travel and meal expenses. This includes payments made due to game cancellations. |

01-MenkeER-0071

| ID | Category | Definition |
|---|---|---|
| 22 | Coaching Salaries, Benefits and Bonuses paid by the University and Related Entities | Input compensation, bonuses and benefits paid to all coaches reportable on the university or related entities W-2 and 1099 forms, as well as non-taxable benefits (1098T), inclusive of:<br>• Gross wages and bonuses.<br>• Taxable and non-taxable benefits include: allowances, speaking fees, retirement, stipends, memberships, media income, tuition reimbursement/exemptions (for self or a dependent) and earned deferred compensation, including those funded by the state.<br><br>Place any severance payments in Category 26.<br><br>Note: Bonuses related to participation in a post-season football bowl game should be included in Category 41A. |
| 23 | Coaching Salaries, Benefits and Bonuses paid by a Third Party | Input compensation, bonuses and benefits paid to all coaches by a third party and contractually guaranteed by the institution, but not included on the institutions W-2, as well as any non-taxable benefits, including:<br>• Car stipend.<br>• Country club membership.<br>• Allowances for clothing, housing, and entertainment.<br>• Speaking fees.<br>• Camps compensation.<br>• Media income.<br>• Shoe and apparel income.<br><br>Expense Category 23 and 25 should equal Category 10.<br><br>Note: Bonuses related to participation in a post-season football bowl game should be included in Category 41A. |
| 24 | Support Staff/ Administrative Compensation, Benefits and Bonuses paid by the University and Related Entities | Input compensation, bonuses and benefits paid to all administrative and support staff reportable on the university or related entities (e.g., foundations or booster clubs) W-2 and 1099 forms, as well as any non-taxable benefits, inclusive of:<br>• Gross wages and bonuses.<br>• Benefits including allowances, speaking fees, retirement, stipends, memberships, media income, tuition reimbursement/exemptions and earned deferred compensation, including those funded by the state.<br><br>Staff members responsible for the gender-specific athletics department, but not a specific sport (e.g., athletic director, assistant athletic director, compliance coordinator), will have their compensation figures reported as Expenses Not Related to Specific Teams fields. Athletics department staff members who assist both men's and women's teams (e.g., sports information director, academic advisor) will be reported as Not Allocated by Gender column. |

01-MenkeER-0072

| ID | Category | Definition |
|----|----------|------------|
| 25 | Support Staff/ Administrative Compensation, Benefits and Bonuses paid by Third Party | Input compensation, bonuses and benefits paid to administrative and support staff by a third party and contractually guaranteed by the institution, but not included on the institutions W-2, as well as non-taxable benefits, including:<br>• Car stipend.<br>• Country club membership.<br>• Allowances for clothing, housing, and entertainment.<br>• Speaking fees.<br>• Camps compensation.<br>• Media income.<br>• Shoe and apparel income.<br><br>Expense Category 23 and 25 should equal Category 10. |
| 26 | Severance Payments | Input severance payments and applicable benefits recognized for past coaching and administrative personnel. |
| 27 | Recruiting | Input transportation, lodging and meals for prospective student-athletes and institutional personnel on official and unofficial visits, telephone call charges, postage, and such. Include value of use of institution's own vehicles or airplanes as well as in-kind value of loaned or contributed transportation. |
| 28 | Team Travel | Input air travel, ground travel, lodging, meals, and incidentals (including housing costs incurred during school break period) for competition related to preseason, regular season and non-football bowl postseason. Amounts incurred for food and lodging for housing the team before a home game also should be included. Use of the institution's own vehicles or airplanes as well as in-kind value of donor-provided transportation.<br><br>Note: Expenses related to post-season football bowls should be included in Category 41. |
| 29 | Sports Equipment, Uniforms and Supplies | Input items that are provided to the teams only. Equipment amounts are those expended from current or operating funds. Include value of in-kind equipment provided.<br><br>Note: Expenses related to post-season football bowls should be included in Category 41. |
| 30 | Game Expenses | Input game-day expenses other than travel which are necessary for intercollegiate athletics competition, including officials, security, event staff, ambulance, etc. Input any payments back to the NCAA for hosting a championship or conference for hosting a tournament.<br><br>Note: Expenses related to post-season football bowls should be included in Category 41. |

01-MenkeER-0073

| ID | Category | Definition |
|----|----------|------------|
| 31 | Fund Raising, Marketing and Promotion | Input costs associated with fund raising, marketing and promotion for media guides, brochures, recruiting publications, etc. |
| 32 | Sports Camp Expenses | Input all expenses paid by the athletics department, including non-athletics personnel salaries and benefits, from hosting sports camps and clinics.<br><br>Note: Athletics personnel salaries and benefits should be reported in Categories 22 through 25. |
| 33 | Spirit Groups | Include support for spirit groups including bands, cheerleaders, mascots, dancers, etc.<br><br>Note: Expenses related to post-season football bowls should be included in Category 41. |
| 34 | Athletic Facilities Debt Service, Leases and Rental Fees | Input debt service payments (principal and interest, including internal loan programs), leases and rental fees for athletics facilities for the reporting year regardless of entity paying (athletics, institution or other).<br><br>Do not report depreciation.<br><br>Note: If the institution is paying for all debt service, leases, or rental fees for athletic facilities but not charging to athletics, this category should equal Category 6A. If athletics or other entities are paying these expenses or the institution is charging directly to athletics, this category will not equal Category 6A. |
| 35 | Direct Overhead and Administrative Expenses | Input overhead and administrative expenses paid by or charged directly to athletics including:<br>• Administrative/Overhead fees charged by the institution to athletics.<br>• Facilities maintenance.<br>• Security.<br>• Risk Management.<br>• Utilities.<br>• Equipment Repair.<br>• Telephone.<br>• Other Administrative Expenses. |
| 36 | Indirect Institutional Support | Input overhead and administrative expenses not paid by or charged directly to athletics including:<br>• Administrative/Overhead fees not charged by the institution to athletics.<br>• Facilities maintenance.<br>• Security.<br>• Risk Management.<br>• Utilities.<br>• Equipment Repair.<br>• Telephone.<br>• Other Administrative Expenses.<br><br>Do not report depreciation.<br>Note: This category should equal Category 6. |

01-MenkeER-0074

| ID | Category | Definition |
|---|---|---|
| 37 | Medical Expenses and Insurance | Input medical expenses and medical insurance premiums for student-athletes. |
| 38 | Memberships and Dues | Input membership, conference, and association dues. |
| 39 | Student-Athlete Meals (non-travel) | Include meal allowance and food/snacks provided to student-athletes.<br><br>Note: Meals provided during team travel should be reported in Category 28. |
| 40 | Other Operating Expenses | Input any operating expenses paid by athletics in the report year which cannot be classified into one of the stated categories, including:<br>• Non-team travel (conferences, etc.).<br>• Team banquets and awards.<br><br>If the figure is greater than 10% of total expenses, please report the top three activities included in this category in the comments section. |
| 41 | Football Bowl Expenses | Input all expenditures related to participation in a post-season football bowl game, including:<br>• Team travel, lodging and meal expenses.<br>• Bonuses related to football bowl participation.<br>• Spirit groups.<br>• Uniforms.<br><br>Note: All post-season football bowl related coaching compensation/bonuses should be reported in Category 41A. |
| 41A | Football Bowl Expenses – Coaching Compensation/ Bonuses | Input all coaching bonuses related to participation in a post-season football bowl game.<br><br>Note: All other post-season football bowl related expenses should be reported in Category 41. |
|  | Total Operating Expenses | Total of Categories 20 through 41A. |

01-MenkeER-0075

APPENDIX C | Other Reporting Items

Please input the following other reporting items below, **if applicable**:

| ID | Category | Definition |
|---|---|---|
| 50 | Excess Transfers to Institution | Input the amount of athletic-related funds for the reporting year that are contributed back to your institution that were not applicable to be counted or are in excess of those funds allowable to be counted in Category 5. |
| 51 | Conference Realignment Expenses | Input one-time amounts paid by athletics and by the institution above normal operating expenses for conference realignment (e.g., exit fees, consulting fees, legal fees, signage, advertising, public relations).  Ensure all regular operating expenses such as team travel are reported in the normal expense categories above. Any new revenues should be reported in Category 13. The amount submitted in this category should not be included in operating expense reporting Categories 20 through 41 above. |
| 52 | Total Athletics Related Debt | Input value of athletics debt at the end of the reporting year.<br><br>Note: This is the total value of athletics debt. Category 34 above represents payments made against debt held during the current reporting period. |
| 53 | Total Institutional Debt | Input total value of institutional debt at the end of the reporting year.  Ensure athletics related debt is included in the total figure, regardless of the athletics department structure. |
| 54 | Value of Athletics Dedicated Endowments | Input total fair market value of athletics dedicated endowments at the end of the reporting year. |
| 55 | Value of Institutional Endowments | Input total fair market value of institutional endowments at the end of the reporting year. |
| 56 | Total Athletics Related Capital Expenditures | Input additions only for cost of athletics related capital expenditures for the reporting year. |

Page | 27

01-MenkeER-0076

## APPENDIX D | Minimum NCAA Agreed-Upon Procedures for Revenue, Expenses and Other Reporting Items

**MINIMUM AGREED-UPON PROCEDURES PROGRAM FOR REVENUES**
Following is a complete listing of the minimum agreed-upon procedures for revenues, by category, to be performed to the statement by the independent accountant.

Before the commencement of fieldwork, the independent accountant should ensure that the amounts reported on the statement agree to the institution's general ledger. For all revenue categories perform the minimum agreed-upon procedures set forth below.

- Compare and agree each operating revenue category reported in the statement during the reporting period to supporting schedules provided by the institution. If a specific reporting category is less than 4.0% of the total revenues, no procedures are required for that specific category.

- Compare and agree a sample of operating revenue receipts obtained from the above operating revenue supporting schedules to adequate supporting documentation.

- Compare each major revenue account over 10% of the total revenues to prior period amounts and budget estimates. Obtain and document an explanation of any variations greater than 10%. Report the analysis as a supplement to the final Agreed-Upon procedures report.

1. **Ticket Sales**

   a. Compare tickets sold during the reporting period, complimentary tickets provided during the reporting period and unsold tickets to the related revenue reported by the Institution in the statement and the related attendance figures and recalculate totals.

2. **Direct State or Other Governmental Support**

   a. Compare direct state or other governmental support recorded by the institution during the reporting period with state appropriations, institutional authorizations and/or other corroborative supporting documentation and recalculate totals.

3. **Student Fees**

   a. Compare and agree student fees reported by the institution in the statement for the reporting period to student enrollments during the same reporting period and recalculate totals.

   b. Obtain documentation of institution's methodology for allocating student fees to intercollegiate athletics programs.

   c. If the athletics department is reporting that an allocation of student fees should be

01-MenkeER-0077

countable as generated revenue, recalculate the totals of their methodology for supporting that they are able to count each sport. Tie the calculation to supporting documents such as seat manifests, ticket sales reports and student fee totals.

4. **Direct Institutional Support**

   a. Compare the direct institutional support recorded by the institution during the reporting period with the institutional supporting budget transfers documentation and other corroborative supporting documentation and recalculate totals.

5. **Less – Transfers to Institution**

   a. Compare the transfers back to institution with permanent transfers back to institution from the athletics department and recalculate totals.

6. **Indirect Institutional Support (6 and 6A)**

   a. Compare the indirect institutional support recorded by the institution during the reporting period with expense payments, cost allocation detail and other corroborative supporting documentation and recalculate totals.

7. **Guarantees**

   a. Select a sample of settlement reports for away games during the reporting period and agree each selection to the institution's general ledger and/or the statement and recalculate totals.

   b. Select a sample of contractual agreements pertaining to revenues derived from guaranteed contests during the reporting period and compare and agree each selection to the institution's general ledger and/or the statement and recalculate totals.

8. **Contributions**

   a. Any contributions of moneys, goods or services received directly by an intercollegiate athletics program from any affiliated or outside organization, agency or group of individuals (two or more) not included above (e.g., contributions by corporate sponsors) that constitutes 10 percent or more in aggregate for the reporting year of all contributions received for intercollegiate athletics during the reporting periods shall obtain and review supporting documentation for each contribution and recalculate totals.

9. **In-Kind**

   a. Compare the in-kind recorded by the institution during the reporting period with a schedule of in-kind donations and recalculate totals.

Page | 29

01-MenkeER-0078

10. **Compensation and Benefits Provided by a Third-Party**

   a. Obtain the summary of revenues from affiliated and outside organizations (the "Summary") as of the end of the reporting period from the institution and select a sample of funds from the Summary and compare and agree each selection to supporting documentation, the institution's general ledger and/or the Summary and recalculate totals.

11. **Media Rights**

   a. Obtain and inspect agreements to understand the institution's total media (broadcast, television, radio) rights received by the institution or through their conference offices as reported in the statement.

   b. Compare and agree the media rights revenues to a summary statement of all media rights identified, if applicable, and the institution's general ledger and recalculate totals. Ledger totals may be different for total conference distributions if media rights are not broken out separately.

12. **NCAA Distributions**

   a. Compare the amounts recorded in the revenue and expense categories reporting to general ledger detail for NCAA distributions and other corroborative supporting documents and recalculate totals.

13. **Conference Distributions and Conference Distributions of Football Bowl Generated Revenue (13 and 13A)**

   a. Obtain and inspect agreements related to the institution's conference distributions and participation in revenues from tournaments during the reporting period for relevant terms and conditions.

   b. Compare and agree the related revenues to the institution's general ledger, and/or the statement and recalculate totals.

14. **Program Sales, Concessions, Novelty Sales, and Parking**

   a. Compare the amount recorded in the revenue reporting category to a general ledger detail of program sales, concessions, novelty sales and parking as well as any other corroborative supporting documents and recalculate totals.

15. **Royalties, Licensing, Advertisements and Sponsorships**

   a. Obtain and inspect agreements related to the institution's participation in revenues from royalties, licensing, advertisements, and sponsorships during the reporting period for relevant terms and conditions.

01-MenkeER-0079

b. Compare and agree the related revenues to the institution's general ledger, and/or the statement and recalculate totals.

16. **Sports Camp Revenues**

a. Inspect sports camp contract(s) between the institution and person(s) conducting institutional sports-camps or clinics during the reporting period to obtain documentation of the institution's methodology for recording revenues from sports-camps.

b. Obtain schedules of camp participants and select a sample of individual camp participant cash receipts from the schedule of sports- camp participants and agree each selection to the institution's general ledger, and/or the statement and recalculate totals.

17. **Athletics Restricted Endowment and Investment Income**

a. Obtain and inspect endowment agreements, if any, for relevant terms and conditions.

b. Compare and agree the classification and use of endowment and investment income reported in the statement during the reporting period to the uses of income defined within the related endowment agreement and recalculate totals.

18. **Other Operating Revenue**

a. Perform minimum agreed-upon procedures referenced for all revenue categories and recalculate totals.

19. **Football Bowl Revenues**

a. Obtain and inspect agreements related to the institution's revenues from post-season football bowl participation during the reporting period to gain an understanding of the relevant terms and conditions.

b. Compare and agree the related revenues to the institution's general ledger, and/or the statement and recalculate totals.

01-MenkeER-0080

**MINIMUM AGREED-UPON PROCEDURES PROGRAM FOR EXPENSES**

Following is a complete listing of the minimum agreed-upon procedures for expenses, by category, to be performed to the statement by the independent accountant. Before the commencement of fieldwork, the independent accountant should ensure that the amounts reported on the statement agree to the institution's general ledger.

- Compare and agree each expense category reported in the statement during the reporting period to supporting schedules provided by the institution. If a specific reporting category is less than 4.0% of the total expenses, no procedures are required for that specific category.

- Compare and agree a sample of expenses obtained from the above operating expense supporting schedules to adequate supporting documentation.

- Compare each major expense account over 10% of the total expenses to prior period amounts and budget estimates. Obtain and document an explanation of any variations greater than 10%. Report the analysis as a supplement to the final Agreed-Upon procedures report.

**20. Athletic Student Aid**

a.  Using the criteria below select a sample of student-athletes receiving athletic aid during the reporting period. Data should be captured by the institution through the creation of a squad/eligibility list for each sport sponsored.

- If using the NCAA's Compliance Assistant (CA) application, select 10% of the total student-athletes with a maximum sample size of 40.

- If using a compliance application other than the NCAA's CA application, select 20% of total student-athletes with a maximum sample size of 60).

*Note: The Division I revenue distribution equivalencies (athletic grant amount divided by the full grant amount) should only include tuition, fees, living expenses and required course-related books, per Bylaw 20.02.10. Cost of Attendance or Other Expenses Related to Attendance are **not** countable for revenue distribution purposes.*
*Note: The Calculation of Revenue Distribution Equivalencies Report (CRDE) within Compliance Assistant should provide equivalencies that do not contain Cost of Attendance or Other Expenses Related to Attendance.*

b.  Obtain individual student-athlete account detail for each selection. Reconcile the total athletic aid reported by the institution to the student-athlete's account detail reported in CA or the institution report that reconciles to the NCAA Membership Financial Reporting System.

c.  **Division I Institutions Only:** Perform a check of each student selected to ensure their information was reported accurately in either the NCAA's CA software or entered

01-MenkeER-0081

directly into the NCAA Membership Financial Reporting System using the following criteria:

- Grants-in-aid is calculated by using the revenue distribution equivalencies, athletic grant amount divided by the full grant amount.

- Other expenses related to attendance (also known as cost of attendance) should **not** be included in grants-in-aid revenue distribution equivalencies. Only tuition, fees, living expenses, and course-related books are countable for grants-in-aid revenue distribution per Bylaw 20.02.10.
  Note: For compliance purposes equivalencies may include other expenses related to attendance per Bylaw 15.02.2.  However, other expenses related to attendance are **not** allowed to be included for revenue distribution equivalencies. If using the NCAA CA application, the Calculation of Revenue Distribution Equivalencies Report (CRDE) should provide equivalencies that do not include other expenses related to attendance.

- Full grant amount should be entered as a full year of tuition, not a semester or quarter.

- Student-athletes are to be counted once, regardless of multiple sport participation, and should **not** receive a revenue distribution equivalency greater than 1.00.

- Athletics grants are valid for revenue distribution purposes only in sports in which the NCAA conducts championships competition, emerging sports for women and football bowl subdivision football.

- Grants-in-aid are valid for revenue distribution purposes in NCAA sports that do not meet the minimum contests and participants' requirements of Bylaw 20.10.6.3.

- Institutions providing grants to student-athletes listed on the CRDE as "Exhausted Eligibility (fifth year)" or "Medical" receive credit in the grants-in-aid component.

- The athletics aid equivalency cannot exceed maximum equivalency limits. However, the total revenue distribution equivalency can exceed maximum equivalency limits due to exhausted eligibility and medical equivalencies, Bylaw 15.5.3.1.
  Note:  The NCAA Membership Financial Reporting System's Revenue Distribution data entry webpage will automatically reduce the Total Revenue Distribution Equivalencies Awarded column to adhere to Bylaw 15.5.3.1.

- If a sport is discontinued and athletic aid is still being awarded/honored by the institution, the athletic aid is countable for revenue distribution purposes.
  Note: The discontinued sport will need to be added to the NCAA

01-MenkeER-0082

Membership Financial Reporting System's Revenue Distribution data entry Webpage.

- All equivalency calculations should be rounded to two decimal places.

- If a selected student received a Pell Grant, ensure the value of the grant is not included in the calculation of equivalencies or the total dollar amount of student athletic aid expense for the institution.

- If a selected student received a Pell Grant, ensure the student's grant was included in the total number and total dollar value of Pell Grants reported for Revenue Distribution purposes in the NCAA Membership Financial Reporting System.

    **d.** Recalculate totals for each sport and overall.

## 21. Guarantees

    **a.** Obtain and inspect visiting institution's away-game settlement reports received by the institution during the reporting period and agree related expenses to the institution's general ledger and/or the statement and recalculate totals.

    **b.** Obtain and inspect contractual agreements pertaining to expenses recorded by the institution from guaranteed contests during the reporting period.  Compare and agree related amounts expensed by the institution during the reporting period to the institution's general ledger and/or the statement and recalculate totals.

## 22. Coaching Salaries, Benefits, and Bonuses Paid by the University and Related Entities

    **a.** Obtain and inspect a listing of coaches employed by the institution and related entities during the reporting period.  Select a sample of coaches' contracts that must include football, and men's and women's basketball from the listing.

    **b.** Compare and agree the financial terms and conditions of each selection to the related coaching salaries, benefits, and bonuses recorded by the institution and related entities in the statement during the reporting period.

    **c.** Obtain and inspect payroll summary registers for the reporting year for each selection. Compare and agree payroll summary registers from the reporting period to the related coaching salaries, benefits and bonuses paid by the institution and related entities expense recorded by the institution in the statement during the reporting period.

    **d.** Compare and agree the totals recorded to any employment contracts executed for the sample selected and recalculate totals.

01-MenkeER-0083

23. **Coaching Salaries, Benefits, and Bonuses Paid by a Third-Party**

   a. Obtain and inspect a listing of coaches employed by third parties during the reporting period. Select a sample of coaches' contracts that must include football, and men's and women's basketball from the listing.

   b. Compare and agree the financial terms and conditions of each selection to the related coaching other compensation and benefits paid by a third party and recorded by the institution in the statement during the reporting period.

   c. Obtain and inspect reporting period payroll summary registers for each selection. Compare and agree related payroll summary register to the coaching other compensation and benefits paid by a third-party recorded by the institution in the statement during the reporting period and recalculate totals.

24. **Support Staff/Administrative Compensation, Benefits, and Bonuses Paid by the University and Related Entities**

   a. Select a sample of support staff/administrative personnel employed by the institution and related entities during the reporting period.

   b. Obtain and inspect reporting period summary payroll register for each selection. Compare and agree related summary payroll register to the related support staff administrative salaries, benefits and bonuses paid by the institution and related entities expense recorded by the institution in the statement during the reporting period and recalculate totals.

25. **Support Staff/Administrative Compensation, Benefits, and Bonuses Paid by a Third-Party**

   c. Select a sample of support staff/administrative personnel employed by the third parties during the reporting period.

   d. Obtain and inspect reporting period payroll summary registers for each selection. Compare and agree related payroll summary registers to the related support staff administrative other compensation and benefits expense recorded by the institution in the statement during the reporting period and recalculate totals.

26. **Severance Payments**

   a. Select a sample of employees receiving severance payments by the institution during the reporting period and agree each severance payment to the related termination letter or employment contract and recalculate totals.

Page | 35

01-MenkeER-0084

27. **Recruiting**

  a. Obtain documentation of the Institution's recruiting expense policies.

  b. Compare and agree to existing institutional- and NCAA-related policies.

  c. Obtain general ledger detail and compare to the total expenses reported and recalculate totals.

28. **Team Travel**

  a. Obtain documentation of the Institution's team travel policies.

  b. Compare and agree to existing institutional- and NCAA-related policies.

  c. Obtain general ledger detail and compare to the total expenses reported and recalculate totals.

29. **Sports Equipment, Uniforms, and Supplies**

  a. Obtain general ledger detail and compare to the total expenses reported. Select a sample of transactions to validate existence of transaction and accuracy of recording and recalculate totals.

30. **Game Expenses**

  a. Obtain general ledger detail and compare to the total expenses reported. Select a sample of transactions to validate existence of transaction and accuracy of recording and recalculate totals.

31. **Fund Raising, Marketing and Promotion**

  a. Obtain general ledger detail and compare to the total expenses reported. Select a sample of transactions to validate existence of transaction and accuracy of recording and recalculate totals.

32. **Sports Camp Expenses**

  a. Obtain general ledger detail and compare to the total expenses reported. Select a sample of transactions to validate existence of transaction and accuracy of recording and recalculate totals.

33. **Spirit Groups**

  a. Obtain general ledger detail and compare to the total expenses reported. Select a sample of transactions to validate existence of transaction and accuracy of recording

01-MenkeER-0085

and recalculate totals.

## 34. Athletic Facilities Debt Service, Leases and Rental Fees

a. Obtain a listing of debt service schedules, lease payments and rental fees for athletics facilities for the reporting year. Compare a sample of facility payments including the top two highest facility payments to additional supporting documentation (e.g., debt financing agreements, leases, rental agreements).

b. Compare amounts recorded to amounts listed in the general ledger detail and recalculate totals.

## 35. Direct Overhead and Administrative Expenses

a. Obtain general ledger detail and compare to the total expenses reported. Select a sample of transactions to validate existence of transaction and accuracy of recording and recalculate totals.

## 36. Indirect Institutional Support

a. Tested with revenue section- Indirect Institutional Support.

## 37. Medical Expenses and Insurance

a. Obtain general ledger detail and compare to the total expenses reported. Select a sample of transactions to validate existence of transaction and accuracy of recording and recalculate totals.

## 38. Memberships and Dues

a. Obtain general ledger detail and compare to the total expenses reported. Select a sample of transactions to validate existence of transaction and accuracy of recording and recalculate totals.

## 39. Student-Athlete Meals (non-travel)

a. Obtain general ledger detail and compare to the total expenses reported. Select a sample of transactions to validate existence of transaction and accuracy of recording and recalculate totals.

## 40. Other Operating Expenses

a. Obtain general ledger detail and compare to the total expenses reported. Select a sample of transactions to validate existence of transaction and accuracy of recording and recalculate totals.

01-MenkeER-0086

41. **Football Bowl Expenses (41 and 41A)**

    a.  Obtain general ledger detail and compare to the total expenses reported. Select a sample of transactions to validate existence of transaction and accuracy of recording and recalculate totals.

## ADDITIONAL MINIMUM AGREED-UPON PROCEDURES

In order for the NCAA to place reliance on the **<u>Division I</u>** financial reporting to calculate the Division I NCAA revenue distributions, which is a financial benefit to the institution, the following procedure are **<u>required</u>**:

1. **Grants-in-Aid:**
    a. Compare and agree the sports sponsored reported in the NCAA Membership Financial Reporting System to the Calculation of Revenue Distribution Equivalencies Report (CRDE) from Compliance Assistant (CA) or other report that supports the equivalency calculations from the institution. The NCAA Membership Financial Reporting System populates the sports from the NCAA Sports Sponsorship and Demographics Form as they are reported by the institution between April and June. If there is a discrepancy in the sports sponsored between the NCAA Membership Financial Reporting System and the CRDE or other report that supports the equivalency calculations, inquire about the discrepancy, and report the justification in the AUP report.

    b. Compare current year Grants-in-Aid revenue distribution equivalencies to prior year reported equivalencies per the Membership Financial Report submission. Inquire and document an explanation for any variance great than +/- 4%. The submitted data is reviewed by NCAA staff. Providing a detailed variance explanation will assist with the review process.

2. **Sports Sponsorship:**
    a. Obtain the institution's Sports Sponsorship and Demographics Form submitted to NCAA Research for the reporting year. Validate that the countable NCAA sports reported by the institution met the minimum requirements, set forth in Bylaw 20.10.6.3, related to the number of contests and the number of participants. If the institution requested and/or received a waiver related to minimum contests or minimum participants for a sport, that sport would **not** qualify as a sponsored sport for the purposes of revenue distribution. Also, only sports in which the NCAA conducts championships competition, emerging sports for women and bowl subdivision football are eligible. Once the countable sports have been validated, ensure that the institution has properly reported these sports as countable for revenue distribution purposes within the NCAA Membership Financial Reporting System. Any discrepancies MUST be resolved within the NCAA Membership Financial Reporting System prior to the report being submitted to the NCAA.

    b. Compare current year number of Sports Sponsored to prior year reported total per

01-MenkeER-0087

the Membership Financial Report submission. Inquire and document an explanation for any variance. The submitted data is reviewed by NCAA staff. Providing a detailed variance explanation will assist with the review process.

3. **Pell Grants:**
   a. Agree the total number of Division I student-athletes who, during the academic year, received a Pell Grant award (e.g. Pell Grant recipients on Full Athletic Aid, Pell Grant recipients on Partial Athletic Aid and Pell Grant recipients with no Athletic Aid) and the total dollar amount of these Pell Grants reported in the NCAA Membership Financial Reporting System to a report generated out of the institutions financial aid records of all student-athlete Pell Grants.
      • Note 1: Only Pell Grants for sports in which the NCAA conducts championships competition, emerging sports for women and bowl subdivision football are countable.
      • Note 2: Student-athletes should only be counted once even if the athlete participates in multiple sports.
      • Note 3: Individual student-aid file testing in step 31 above should tie any selected student athletes who received Pell Grants back to the report of all student athlete Pell Grants to test the completeness and accuracy of the report.
   b. Compare current year Pell Grants total to prior year reported total per the Membership Financial Report submission. Inquire and document an explanation for any variance greater than +/- 20 grants. The submitted data is reviewed by NCAA staff. Providing a detailed variance explanation will assist with the review process.

# MINIMUM AGREED-UPON PROCEDURES PROGRAM FOR OTHER REPORTING ITEMS

Following is a complete listing of the minimum agreed-upon procedures for other reporting items, by category, to be performed to the statement by the independent accountant. Before the commencement of fieldwork, the independent accountant should ensure that the amounts reported on the statement agree to the institution's general ledger.

50. **Excess Transfers to Institution**

    a. Obtain general ledger detail and compare to the total expenses reported. Select a sample of transactions to validate existence of transaction and accuracy of recording and recalculate totals.

51. **Conference Realignment Expenses**

    a. Obtain general ledger detail and compare to the total expenses reported. Select a sample of transactions to validate existence of transaction and accuracy of recording and recalculate totals.

Page | 39

01-MenkeER-0088

52. **Total Athletics Related Debt**

   a. Obtain repayment schedules for all outstanding intercollegiate athletics debt during the reporting period. Recalculate annual maturities (consisting of principal and interest) provided in the schedules obtained.

   b. Agree the total annual maturities and total outstanding athletic related debt to supporting documentation and the institution's general ledger, as applicable.

53. **Total Institutional Debt**

   a. Agree the total outstanding institutional debt to supporting documentation and the institution's audited financial statements, if available, or the institution's general ledger.

54. **Value of Athletics Dedicated Endowments**

   a. Obtain a schedule of all athletics dedicated endowments maintained by athletics, the institution, and affiliated organizations. Agree the fair market value in the schedule(s) to supporting documentation, the general ledger(s) and audited financial statements, if available.

55. **Value of Institutional Endowments**

   a. Agree the total fair market value of institutional endowments to supporting documentation, the institution's general ledger and/or audited financial statements, if available.

56. **Total Athletics Related Capital Expenditures**

   a. Obtain a schedule of athletics related capital expenditures made by athletics, the institution, and affiliated organizations during the reporting period, additions only.

   b. Obtain general ledger detail and compare to the total expenses reported. Select a sample of transactions to validate existence of transaction and accuracy of recording and recalculate totals.

01-MenkeER-0089

## APPENDIX E | Independent Accountant's Report on Agreed-Upon Procedures

The independent accountant's report on agreed-upon procedures should be in the form of procedures and findings. The report should contain the following elements:

1.  A title that includes the word "independent";

2.  Identification of the specified parties;

3.  Identification of the subject matter (or the written assertion related thereto), including the period and point in time addressed and a reference to the character of the engagement;

4.  Identification of the responsible party;

5.  A statement that the subject matter is the responsibility of the responsible party;

6.  A statement that the procedures performed was those agreed to by the specified parties identified in the report;

7.  For compliance-attestation engagements, a statement that the procedures, which were agreed to by the specified parties identified in the report, were performed to assist the specified parties in evaluating the entity's compliance with specified requirements or the effectiveness of its internal control over compliance;

8.  A statement that the agreed-upon procedures engagement was conducted in accordance with attestation standards established by the American Institute of Certified Public Accountants;

9.  A statement that the sufficiency of the procedures is solely the responsibility of the specified parties and a disclaimer of responsibility for the sufficiency of those procedures;

10. A list of the procedures performed (or reference thereto) and related findings;

11. Where applicable, a description of any agreed-upon materiality limits;

12. A statement that the practitioner was not engaged to and did not conduct an examination of the subject matter, the objective of which would be the expression of an opinion, a disclaimer of opinion on the subject matter, and a statement that if the practitioner had performed additional procedures, other matters might have come to the practitioner's attention that would have been reported;

13. A statement of restrictions on the use of the report because it is intended to be used solely by the specified parties;

14. Where applicable, reservations or restrictions concerning procedures or findings;

01-MenkeER-0090

15.     Where applicable, a description of the nature of the assistance provided by a specialist;

16.     The manual or printed signature of the practitioner's firm and

17.     The date of the report.

01-MenkeER-0091

## APPENDIX F | Common Questions and Answers

Q:    Can an internal auditor of one member institution conduct the required independent audit for another member institution in the same state system?

A:    Yes, provided the individual is an independent certified auditor and is not a staff member of that institution.

Q:    Can a member institution seek an extension of the deadline for completion of the annual agreed-upon procedures?

A:    No. NCAA legislation does not contain a provision under which the deadline may be extended or waived.

Q:    Are agreed-upon procedures performed by the internal audit division of a state system of higher education considered independent?

A:    Yes, since individuals who perform the work are employees of the state system reporting to the system's director of internal audits, provided the internal audit division performs the minimum agreed-upon procedures in a manner consistent with NCAA agreed-upon procedures for each institution.

Q:    How does a Division II institution satisfy the agreed-upon procedures requirement if the institution sponsors a sport(s) at the Division I level?

A:    The NCAA Interpretations Committee determined during its June 30, 1993, conference call that a Division II member institution that sponsors a Division I sport(s) shall not be subject to agreed-upon procedures (Based on Division II legislative action August 2004) for the Division I sport(s).  This interpretation supersedes the previous legislative staff interpretation of January 15, 1992.

Q:    Does an independent group or organization that does not constitute a booster organization by name only (e.g., alumni association, foundation) need to have its athletically related financial activities included in the institution's financial audit (i.e., tested by the auditor and reported to the institutional auditor)?

A:    Any agency or group of individuals (two or more) that has as its principal purpose the generation of moneys, goods, or services for or on behalf of an intercollegiate athletics program should be included in the annual agreed-upon procedures.

01-MenkeER-0092

Q:      Once affiliated and outside organizations (e.g., independent groups, affiliated foundations), such as those that do not fall under the purview of direct institutional oversight, are identified, how is their financial data to be included in the agreed-upon procedures?

A:      Either the organization's statements of revenues and expenses should be procured or, if audited independently of the institution, agreed-upon procedures and any reports to management related to the internal control structure need to be obtained and reviewed. Also, a schedule of expenses by the affiliated and/or outside organization for or on behalf of the institution's athletics program should be obtained and reconciled with the revenues recorded in the athletics program's accounting records.

Q:      What are the criteria used in compiling the total dollars generated for or on behalf of an athletics program?

A:      An institution must disclose in a footnote to the statement of athletics department revenues and expenses contributions from any outside source (not included as an agency, organization or group as indicated in the NCAA agreed-upon procedures in the section entitled "organization of intercollegiate athletics programs") that constitutes more than 10 percent of all contributions received (e.g., contributions by corporate sponsors). The source  from which such funds are received also shall be disclosed in a footnote to the statement of revenues and expenses.

Q:      For an institution with a fiscal year-end which would preclude a timely report, how can an exception be granted to report on the most recent fiscal year that is completed?

A:      The institution should contact the NCAA Administrative Services group for guidance.

For  a complete list of Common Questions and Answers, please reference the FAQ document located on the NCAA Membership Financial Reporting System webpage within ncaa.org.

01-MenkeER-0093

## APPENDIX G | NCAA Online Financial Reporting Links

Helpful links and resources located on the Membership Financial Reporting System website:
- Logon to the NCAA Financial Reporting System (FRS).
- FY2024 Agreed-Upon Procedures.
- FRS Help Video.
- NCAA AUP and FRS FAQs.
- FY2024 FRS Supplemental Tool.
- List of key dates for FY2024 reporting.
- List of key resources and contacts.
- Single Source Sign-On (NCAA My Apps) Quick Start Guide and Users Guide.

**If you need assistance in accessing the NCAA Membership Financial Reporting System, please contact your on-campus Single Source Sign-on (NCAA My Apps) administrator.**

01-MenkeER-0094

**APPENDIX B – ROSTER LIMITS**

# ARTICLE I

**Section 1.  Initial Roster Limits.** The NCAA has currently determined that during the first Academic Year following Final Approval, the NCAA Division I roster limits for Member Institutions that choose to provide or facilitate payments or benefits to student-athletes as permitted by the Injunctive Relief Settlement including but not limited to incremental scholarships permitted by Article 3, Section 3(b) shall be as follows:

| SPORT | ROSTER LIMIT |
|---|---|
| Acrobatics and Tumbling (women's) | 55 |
| Baseball | 34 |
| Basketball (men's) | 15 |
| Basketball (women's) | 15 |
| Beach Volleyball (women's) | 19 |
| Bowling (women's) | 11 |
| Cross Country (men's) | 17 |
| Cross Country (women's) | 17 |
| Equestrian (women's) | 50 |
| Fencing (men's) | 24 |
| Fencing (women's) | 24 |
| Field Hockey (women's) | 27 |
| Football | 105 |
| Golf (men's) | 9 |
| Golf (women's) | 9 |
| Gymnastics (men's) | 20 |

| Sport | Roster Limit |
|---|---|
| Gymnastics (women's) | 20 |
| Ice Hockey (men's) | 26 |
| Ice Hockey (women's) | 26 |
| Indoor Track and Field (men's) | 45 |
| Indoor Track and Field (women's) | 45 |
| Lacrosse (men's) | 48 |
| Lacrosse (women's) | 38 |
| Outdoor Track and Field (men's) | 45 |
| Outdoor Track and Field (women's) | 45 |
| Rifle | 12 |
| Rowing (women's) | 68 |
| Rugby (women's) | 36 |
| Skiing (men's) | 16 |
| Skiing (women's) | 16 |
| Soccer (men's) | 28 |
| Soccer (women's) | 28 |
| Softball | 25 |
| Stunt | 65 |
| Swimming & Diving (men's) | 30 |
| Swimming & Diving (women's) | 30 |
| Tennis (men's) | 10 |
| Tennis (women's) | 10 |

01-MenkeER-0097

| SPORT | ROSTER LIMIT |
|---|---|
| Triathlon (women's) | 14 |
| Volleyball (men's) | 18 |
| Volleyball (women's) | 18 |
| Water Polo (men's) | 24 |
| Water Polo (women's) | 24 |
| Wrestling (men's) | 30 |
| Wrestling (women's) | 30 |

**Section 2.  Subsequently Added Sports.**  During the Term of the Injunctive Relief Settlement, Defendants may agree upon roster limits for any sports not identified in Section 1 of this Article that become officially sponsored NCAA Division I sports.

**Section 3.  Changes to Roster Limits.**  During the Term of the Injunctive Relief Settlement, Defendants may increase or decrease the roster limits in each or any of the sports identified in Section 1 or subsequently added by Section 2 of this Article, provided that any such changes must comply with the Injunctive Relief Settlement and the SSA.  In accordance with Article 4, Section 1 of the Injunctive Relief Settlement, individual Member Institutions each maintain the right to unilaterally reduce the number of sports, the roster size, and/or the number of athletic scholarships available to student-athletes of any sport. Individual Conferences each maintain the right to unilaterally reduce the number of sports Member Institutions within their respective conferences are required to offer, the number of sports sponsored by the conference, and/or the roster limits within their conference, subject to the limitations that reductions in roster limits will not result in the loss of athletic scholarships for then-current student-athletes and that

any change in roster limits shall not result in a reduction in the number of athletic scholarships permissible under the current NCAA Division I rules in any sport.

**Section 4.  Effect on Non-NCAA-sponsored Sports.**  Nothing in this Appendix B should be read to limit, in any way, the right of individual Member Institutions (subject to conference rules) or individual conferences from unilaterally increasing or decreasing the roster sizes of sports not identified in Section 1 or added during the Term in accordance with Section 2.

01-MenkeER-0099

## ARTICLE 2

## MISCELLANEOUS

**Section 1.  Defined Terms.**  All capitalized terms in this Appendix B shall have the same definition as set forth in the Stipulation and Settlement Agreement and/or Injunctive Relief Settlement, as appropriate, if not otherwise defined herein.

**Section 2.  Conflicts.**   The provisions of this Appendix supersede any conflicting provisions in any rule or policy, or any other document, adopted by Defendants or any of their Member Institutions, affecting the matters addressed herein.  Any conflict between this Appendix B and the SSA and/or the Injunctive Relief Settlement ("IRS") shall be resolved in favor of the SSA and/or IRS, as applicable.

01-MenkeER-0100

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | Case No. 4:20-cv-03919-CW<br><br>[~~PROPOSED~~] **ORDER GRANTING PLAINTIFFS' MOTION FOR FINAL SETTLEMENT APPROVAL AS MODIFIED**<br><br>Hon. Claudia Wilken |

01-MenkeER-0101

This matter has come before the Court to determine whether there is any cause why this Court should not approve the Plaintiffs' Fourth Amended Stipulation and Settlement Agreement with Defendants National Collegiate Athletic Association ("NCAA"), Atlantic Coast Conference ("ACC"), The Big Ten Conference, Inc. ("Big Ten"), The Big 12 Conference, Inc. ("Big 12"), Pac-12 Conference ("Pac-12") and Southeastern Conference ("SEC") (collectively, the "Defendants"). The Court, having reviewed Plaintiffs' Motion for Final Settlement Approval and Omnibus Response to Objections (ECF No. 717, "Motion"), all subsequent submissions by the parties, including the Supplemental Submission in Support of Final Approval of Class Action Settlement (ECF No. 958), the Fourth Amended Stipulation and Settlement Agreement (ECF No. 958-1, "Fourth Amended Settlement Agreement" or "Settlement"), the pleadings and other papers on file in this action, including the valid and timely objections to the Settlement and all other briefing submitted by the objectors with the Court's leave, the statements of counsel and the parties, and all statements made at the final approval hearing held on April 7, 2025, hereby finds that the Fourth Amended Settlement Agreement should be approved. Accordingly, the Court enters this Order of Final Approval.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1. The Court has jurisdiction over the subject matter of this litigation, and all actions within this litigation (collectively, the "Action") and over the parties to the Fourth Amended Settlement Agreement, including all members of the Settlement Classes, as defined below, and the Defendants.

2. For purposes of this Order, except as otherwise set forth herein, the Court incorporates the definitions contained in the Fourth Amended Settlement Agreement. *See* ECF No. 958-1. The Court hereby finally approves and confirms the Settlement set forth in the Fourth Amended Settlement Agreement, and finds that said Settlement is, in all respects, fair, reasonable, and adequate to the Settlement Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, including with respect to each of the factors enumerated in Rule 23(e)(2), and orders that it be consummated pursuant to its terms and conditions.

3. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Court certifies, for purposes of effectuating this Settlement, a Settlement Class as follows, hereinafter referred to as the "Injunctive Relief Settlement Class":

- 1 -

> All student-athletes who compete on, competed on, or will compete on a Division I athletic team at any time between June 15, 2020 through the end of the Injunctive Relief Settlement Term.[1]  This Class excludes the officers, directors, and employees of Defendants.  This Class also excludes all judicial officers presiding over this action and their immediate family members and staff.

4.     Pursuant to Federal Rule of Civil Procedure 23(g), the Court confirms that Grant House, DeWayne Carter, Nya Harrison, Sedona Prince, and Nicholas Solomon are appointed to serve as the Class Representatives for the Injunctive Relief Settlement Class.

5.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Court also certifies, for purposes of effectuating this Settlement, a Settlement Class as follows, hereinafter referred to as the "Football and Men's Basketball Class":

> All student-athletes who have received or will receive full GIA scholarships and compete on, competed on, or will compete on a Division I men's basketball team or an FBS football team, at a college or university that is a member of one of the Power Five Conferences (including Notre Dame), and who have been or will be declared initially eligible for competition in Division I at any time from June 15, 2016 through September 15, 2024.  This Class excludes the officers, directors, and employees of Defendants.  This Class also excludes all judicial officers presiding over this action and their immediate family members and staff.

6.     Pursuant to Federal Rule of Civil Procedure 23(g), the Court confirms that Tymir Oliver and DeWayne Carter are appointed to serve as the Class Representatives for the Football and Men's Basketball Class.

7.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Court also certifies, for purposes of effectuating this Settlement, a Settlement Class as follows, hereinafter referred to as the "Women's Basketball Class":

> All student-athletes who have received or will receive full GIA scholarships and compete on, competed on, or will compete on a Division I women's basketball team at a college or university that is a member of one the Power Five Conferences (including Notre Dame), and who have been or will be declared initially eligible for competition in Division I at any time from June 15, 2016 through September 15, 2024.  This Class excludes the officers, directors, and employees of Defendants.  This Class also excludes all judicial officers presiding over this action and their immediate family members and staff.

---

[1] The Injunctive Relief Settlement Term is the ten (10) Academic Years from the date of Final Approval of the Settlement.

- 2 -

8.      Pursuant to Federal Rule of Civil Procedure 23(g), the Court confirms that Sedona Prince is appointed to serve as the Class Representative for the Women's Basketball Class.

9.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Court also certifies, for purposes of effectuating this Settlement, a Settlement Class as follows, hereinafter referred to as the "Additional Sports Class":

> Excluding members of the Football and Men's Basketball Class and members of the Women's Basketball Class, all student-athletes who compete on, competed on, or will compete on a Division I athletic team and who have been or will be declared initially eligible for competition in Division I at any time from June 15, 2016 through September 15, 2024. This Class excludes the officers, directors, and employees of Defendants. This Class also excludes all judicial officers presiding over this action and their immediate family members and staff.

10.     Pursuant to Federal Rule of Civil Procedure 23(g), the Court confirms that Grant House, Nya Harrison, and Nicholas Solomon are appointed to serve as the Class Representatives for the Additional Sports Class.

11.     The Court will refer to the Injunctive Relief Settlement Class, Football and Men's Basketball Class, the Women's Basketball Class, and the Additional Sports Class collectively as the "Settlement Classes."  The Court will refer to the Football and Men's Basketball Class, the Women's Basketball Class, and the Additional Sports Class collectively as the "Damages Settlement Classes."

12.     The Court finds the prerequisites to a class action under Federal Rule of Civil Procedure 23(a) have been satisfied for settlement purposes only by the Settlement Classes in that:

(a) there are at least tens of thousands of geographically dispersed members of the Settlement Classes, making joinder of all members impracticable;

(b) there are questions of law and fact common to the Settlement Classes which predominate over individual issues;

(c) the claims or defenses of the Class Representatives are typical of the claims or defenses of the Settlement Classes;

(d) the Class Representatives have fairly and adequately protected the interests of the Settlement Classes and will continue to do so, and have retained counsel

- 3 -

01-MenkeER-0104

experienced in antitrust class action litigation who have, and will continue to, adequately represent the Settlement Classes.

13. The Court further finds that this Action may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(2), for settlement purposes only, because: Defendants have acted on grounds that apply generally to the Injunctive Relief Settlement Class, so that final injunctive and corresponding declaratory relief is appropriate respecting the Injunctive Relief Settlement Class as a whole.

14. The Court further finds that this Action may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3), for settlement purposes only, because: (i) questions of fact and law common to members of the Damages Settlement Classes predominate over any questions affecting only the claims of individual members; and (ii) a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

15. Pursuant to Federal Rule of Civil Procedure 23(g), the Court hereby confirms that Hagens Berman Sobol Shapiro, LLP and Winston & Strawn LLP are appointed as Class Counsel for the Settlement Classes.

16. Plaintiffs' notice of the Settlement to the Settlement Classes was the best notice practicable under the circumstances. The notice satisfied due process, provided adequate information to the Settlement Classes of all matters relating to the Settlement, and satisfied the requirements of Federal Rules of Civil Procedure 23(c)(2) and (e)(1).

17. The Court has reviewed and considered the valid and timely objections to the Settlement and finds them to be without merit.

18. Certain members of the Settlement Classes timely and validly requested exclusion from the Damages Settlement Classes, and therefore they are excluded from the Damages Settlement Classes. These persons and entities are reflected in the attached **Exhibit A** to this order. Such persons and entities are not included in or bound by this Order as it relates to the Settlement for which they opted out. Such persons and entities are not entitled to any recovery of the settlement proceeds obtained through this Settlement.

- 4 -

19.     The Court orders that the injunction contemplated by Appendix A to the Fourth Amended Settlement Agreement, the Second Amended Injunctive Relief Settlement, be entered into pursuant to its terms and conditions.

20.     Without affecting the finality of this Order in any way, this Court hereby retains continuing, exclusive jurisdiction over the Settlement and the Fourth Amended Settlement Agreement, including:

(a) implementation and execution of the Settlement and Fourth Amended Settlement Agreement;

(b) during the Injunctive Relief Settlement Term, review, consideration, and disposition of any objections to continuation of the Second Amended Injunctive Relief Settlement filed following the notice contemplated by paragraph 14 of the Fourth Amended Settlement Agreement;

(c) review, consideration, and disposition of any claims filed by Class Counsel for enforcement, or violations, of the Fourth Amended Settlement Agreement, including, but not limited to, the anti-collusion provisions of Article 5, Section 1 of the Second Amended Injunctive Relief Settlement;

(d) disposition of the Gross Settlement Fund and distribution to members of the Settlement Classes pursuant to further orders of this Court;

(e) determining service awards and attorneys' fees, costs, expenses, and interest;

(f) the Action until Final Judgment contemplated hereby has become effective and each and every act agreed to be performed by the parties all have been performed pursuant to the Fourth Amended Settlement Agreement;

(g) hearing and ruling on any matters relating to the plan of allocation of settlement proceeds;

(h) all parties to the Action, Releasors, and Releasees, for the purpose of enforcing and administering the Fourth Amended Settlement Agreement and the mutual releases and other documents contemplated by, or executed in connection with, the Fourth Amended Settlement Agreement; and

- 5 -

01-MenkeER-0106

(i)  any other proceedings concerning the administration, interpretation, consummation, and enforcement of this settlement.

21.    The Court finds, pursuant to Rules 54(a) and (b) of the Federal Rules of Civil Procedure, that Final Judgments of Dismissal with prejudice as to Defendants ("Judgment") should be entered forthwith and further finds that there is no just reason for delay in the entry of the Judgment, as a Final Judgment, in accordance with the Fourth Amended Settlement Agreement.

**IT IS SO ORDERED.**

DATED: June 6, 2025

_____
HONORABLE CLAUDIA WILKEN
UNITED STATES DISTRICT JUDGE

- 6 -

01-MenkeER-0107

# EXHIBIT A

01-MenkeER-0108



**College Athlete Compensation Settlement**

**OPT OUTS HOUSE**

Count | 353

| | ClaimID | First1 | Last1 |
|---|---|---|---|
| 1 | 10185748201 | AARON | HOLIDAY |
| 2 | 10183380501 | AARON | SABATO |
| 3 | 9000008601 | AARON | SCHUNK |
| 4 | 10064367001 | AARON DEVON | EPPS |
| 5 | 10575357901 | AARON JOSHUA | NESMITH |
| 6 | 10298903501 | AASHARI | CROSSWELL |
| 7 | 10266507201 | ABIGAIL | HOOD |
| 8 | 10168453801 | ABIGAIL | SIMINSKI |
| 9 | 10169368001 | ADAM | KUNKEL |
| 10 | 10095957001 | ADDISON | OOMS |
| 11 | 10264966201 | ADRIAN | DEL CASTILLO |
| 12 | 10132544701 | AIDAN | ROBBINS |
| 13 | 10105793301 | AKAYLEB AI | EVANS |
| 14 | 10117632601 | ALARIC | JACKSON |
| 15 | 10624939301 | ALERICK | SOULARIE |
| 16 | 10132110701 | ALEVA | HIFO |
| 17 | 10293841601 | ALEX | FONTENOT |
| 18 | 10327506001 | ALEX JEFFREY | HORNIBROOK |
| 19 | 10429454101 | ALEXANDER | BACHMANN |
| 20 | 10072300701 | ALEXANDER CARL | SHAW |
| 21 | 10301716101 | ALEXANDER JORDAN | PERRY |
| 22 | 10059430001 | AL-MALIK | HAUSMAN |
| 23 | 10551825601 | AMANI | ORUWARIYE |
| 24 | 20000646501 | AMARI | CATCHINGS |
| 25 | 9000045201 | AMARVEER | SINGH |
| 26 | 10272678401 | AMBER C | MELGOZA |
| 27 | 10132381501 | AMMON | HANNEMANN |
| 28 | 9000013601 | ANDREW | ABBOTT |
| 29 | 10105591201 | ANDREW STEPHEN | LOCK |
| 30 | 20001783101 | ANTHONY | GILL |
| 31 | 10174446801 | ANTHONY | GOULD |
| 32 | 10059595901 | ANTHONY | PANDY |
| 33 | 10266685401 | ASA | LACY |
| 34 | 10138756801 | AUSTIN | SEIBERT |
| 35 | 10670843001 | AUSTIN CEDRIC | MONTGOMERY |
| 36 | 10073653101 | AVA JOYCE | ANDERSON |

01-MenkeER-0109

| 37 | 10130570901 | AZEEZ O | OJULARI |
| 38 | 10132309801 | BAYLOR | ROMNEY |
| 39 | 10122106001 | BELLA SARA KRISTIANA | FISCO |
| 40 | 10132370001 | BENJAMIN | BYWATER |
| 41 | 60013067301 | BENJAMIN | RICHARDSON |
| 42 | 10081666601 | BENJAMIN JAMES | BOULWARE |
| 43 | 10132377301 | BLAKE | FREELAND |
| 44 | 10132286001 | BRACKEN | EL-BAKRI |
| 45 | 10264683101 | BRADLEY | KAAYA |
| 46 | 9000044001 | BRADY | MCCONNELL |
| 47 | 10215885001 | BRADY | OCONNELL |
| 48 | 10132091701 | BRAYDEN | ELBAKRI |
| 49 | 10264679001 | BREVIN | JORDAN |
| 50 | 10292247001 | BRITTANY | BREWER |
| 51 | 60014250701 | BRYAN | SCHOR |
| 52 | 10423123301 | BRYCE P | LOVE |
| 53 | 10672726601 | BRYCE RAYMOND | NZE |
| 54 | 10406819001 | CADE MICHAEL | MCNAMARA |
| 55 | 10289394901 | CADE P | CUNNINGHAM |
| 56 | 10093737801 | CADEN | HAWS |
| 57 | 9000004501 | CAITLIN S | DRISCOLL |
| 58 | 10138853601 | CALEB | WILLIAMS |
| 59 | 10074765601 | CAMERON | ECHOLS-LUPER |
| 60 | 10098444701 | CAMERON | KRUTWIG |
| 61 | 10089020901 | CAMERON | TAYLOR BRITT |
| 62 | 10577546001 | CAMERON | VALLADARES |
| 63 | 10271516601 | CAMERON DAVID | SERIGNE |
| 64 | 10256068701 | CAMERON JAMES | RISING |
| 65 | 10146449601 | CARMEN ALEXANDER | MLODZINSKI |
| 66 | 10266372501 | CARSON | GREEN |
| 67 | 10537993101 | CARSON | STRONG |
| 68 | 50004102401 | CARTER | CUNNINGHAM |
| 69 | 10267690201 | CASSIUS JEROME | STANLEY |
| 70 | 10279788201 | CAYDEN B | WALLACE |
| 71 | 10107554601 | CHAD | KELLY |
| 72 | 10115364801 | CHARLES | MATTHEWS |
| 73 | 10131242801 | CHARLES KENT | WOERNER |
| 74 | 10265213201 | CHARLESTON | RAMBO |
| 75 | 9000037401 | CHASE | STRUMPF |
| 76 | 10132279301 | CHAZ | AH YOU |
| 77 | 10183911001 | CHAZZ | SURRATT |
| 78 | 10147798301 | CHLOE LEE | KITTS |
| 79 | 9000011001 | CHRIS | MCMAHON |
| 80 | 10119475401 | CLEVELAND ALAN | JACKSON |

| 81 | 10181757501 COLBY | PARKINSON |
|---|---|---|
| 82 | 10267103501 COLTON | PRATER |
| 83 | 10244072401 CONNOR FRANCIS | PRIELIPP |
| 84 | 10304358501 CORNELIS | VAN EYK |
| 85 | 9000012301 CURTIS | WEAVER |
| 86 | 10264461501 DAMUZHEA | BOLDEN |
| 87 | 10072106001 DANIEL VIRGIL | MILLS |
| 88 | 10119482101 DAVID | BELL |
| 89 | 10250173701 DAVION KNEAL | ERVIN-POINDEXTER |
| 90 | 9000022701 DAVIS MCKEE | WENDZEL |
| 91 | 10132342601 DAX | MILNE |
| 92 | 10399824001 DAXTER | MILES |
| 93 | 10292504501 DEMARCUS | FIELDS |
| 94 | 10535880001 DEMETRIS | HARRIS |
| 95 | 10248268801 DENZEL R | MIMS |
| 96 | 10259482001 DEONTAY | ANDERSON |
| 97 | 10399792101 DEREK | CULVER |
| 98 | 10617204901 DERRICK | BARNES |
| 99 | 10292998101 DERRICK | WHITE |
| 100 | 10068863901 DESTINY | SLOCUM |
| 101 | 10031731501 DIBAJI | WALKER |
| 102 | 9000039001 DIXIE | WOOTEN III |
| 103 | 9000041101 DONELL | PASTER |
| 104 | 10406872301 DONOVAN | PEOPLES-JONES |
| 105 | 10461244701 DONOVAN JOHN | CLINGAN |
| 106 | 10115393401 DONTAIE | ALLEN |
| 107 | 60013159901 DONTE | INGRAM |
| 108 | 10081682401 DORIAN SCOTT | ODANIEL |
| 109 | 10174134001 DREW | EUBANKS |
| 110 | 10407075401 DUNCAN | ROBINSON |
| 111 | 10243871701 DYLAN M | SMITH |
| 112 | 10132258601 EARL | MARINER |
| 113 | 10577020601 EDGAR | BURROLA |
| 114 | 10022943801 ELIJAH | BLADES |
| 115 | 10682167201 ELIZA | EKSTRAND |
| 116 | 10265601001 ELLE | MEZZIO |
| 117 | 10088111701 EMMA | ROWLAND |
| 118 | 10669726201 EMMALINE M | EKSTRAND |
| 119 | 10096015701 ERIC | STRIKER |
| 120 | 10108474201 ERICK | HALLETT |
| 121 | 10427953901 ERICK BERNARD | NEAL |
| 122 | 10584208401 ERIK | STEVENSON |
| 123 | 10585939401 EVERETT | HUNTER |
| 124 | 10236602001 FILIP | PETRUSEV |

| | | | |
|---|---|---|---|
| 125 | 10282698501 | FRANK | MASON |
| 126 | 10407087001 | FRANZ JACOB | WAGNER |
| 127 | 10138382401 | GABE | BRKIC |
| 128 | 10093788301 | GABREYL SALE AH YOU | SUMMERS |
| 129 | 10093002501 | GAVIN | CROSS |
| 130 | 10558999801 | GRANT | HALEY |
| 131 | 10301568101 | GREGORY MICHEAL | FRANCIS |
| 132 | 9000023001 | GRIFFIN | CONINE |
| 133 | 10132347501 | GUNNER | ROMNEY |
| 134 | 9000040901 | HANNAH | CROFUT |
| 135 | 10132299901 | HARRIS | LACHANCE |
| 136 | 10297108001 | HARRY | ALLEN |
| 137 | 10228253501 | HASAHN | FRENCH |
| 138 | 10670832601 | HASHEM | ASADALLAH |
| 139 | 10132254901 | HAYDEN | LIVINGSTON |
| 140 | 10148109301 | HAYDEN RANDLE | HURST |
| 141 | 10308612201 | HAYDEN THOMAS | HOWERTON |
| 142 | 10176924601 | HUNTER | LONG |
| 143 | 10059357401 | HUNTER ALEXANDER | ECHOLS |
| 144 | 10113611001 | HUNTER HARKINS | BARCO |
| 145 | 10407039001 | HUNTER RYAN | DICKINSON |
| 146 | 10641051901 | IKEM | OKEKE |
| 147 | 10132393101 | ISAAC | REX |
| 148 | 10132134001 | ISAIAH | KAUFUSI |
| 149 | 50004112101 | ISHMAEL | HYMAN |
| 150 | 10132337201 | JACKSON | KAUFUSI |
| 151 | 10272933501 | JACOB | BROWNING |
| 152 | 10273003901 | JACOB | EASON |
| 153 | TBD | JACOB | EVANS |
| 154 | 50018889001 | JACOB | HUFF |
| 155 | 10181975401 | JACOB | LOWE |
| 156 | 9000036101 | JACOB | MCCARTHY |
| 157 | 10132262801 | JACOB | OLDROYD |
| 158 | 10060818801 | JACOB B | CURHAN |
| 159 | 10561625401 | JACOB THOMAS-MICHAEL | COX |
| 160 | TBD | JAIME | JAQUEZ JR |
| 161 | 10271230001 | JAKE MATTHEW | BENZINGER |
| 162 | 10259328001 | JAMAL | SHEAD |
| 163 | 10132287201 | JAMES | EMPEY |
| 164 | 10108582501 | JAMES | MORRISSEY |
| 165 | 10399833001 | JAMES | OKONKWO |
| 166 | 10248570701 | JAMES H | LYNCH |
| 167 | 10338679801 | JAMES K | BLACKMON |
| 168 | 10115744701 | JAMES LANDON | YOUNG |

01-MenkeER-0112

| | | | |
|---|---|---|---|
| 169 | 10168550601 | JAMISON ATHENS | GORDON |
| 170 | 10266489401 | JARED | HOCKER |
| 171 | 10132296301 | JARED | KAPISI |
| 172 | 10558965201 | JASON | CABINDA |
| 173 | 9000007301 | JASON | PRESTON |
| 174 | 10071952101 | JAWON CORTEZ | JOHNSON |
| 175 | 10273007601 | JAXSON | KIRKLAND |
| 176 | 10448489501 | JAYDEN | CURRY |
| 177 | 10174287301 | JAYDON | GRANT |
| 178 | 10107952701 | JAYLON | ROBINSON |
| 179 | 10267671901 | JAYSON | TATUM |
| 180 | 10278942301 | JEREMIAH J | LEDBETTER |
| 181 | 10399801901 | JERMAINE | HALEY |
| 182 | 10119661101 | JERRON NEHEMIAH | CAGE |
| 183 | 10072511901 | JIMMY | BELL |
| 184 | 10271615801 | JOHN | COLLINS |
| 185 | 10115270001 | JOHN | RHODES |
| 186 | 10411288801 | JOHN MICHAEL | SCHMITZ |
| 187 | 10327022001 | JOHN STEPHEN | CICHY |
| 188 | 10271590701 | JOHN THOMAS | WOLFORD |
| 189 | 10354014301 | JOHNNY | JUZANG |
| 190 | 10132213601 | JONAH | TRINNAMAN |
| 191 | 10132154501 | JONATHAN | LINEHAN |
| 192 | 10624822401 | JORDAN | BECK |
| 193 | 10399822601 | JORDAN | MCCABE |
| 194 | 10267680001 | JORDAN LEWIS | TUCKER |
| 195 | 10181709501 | JOSE | ARCEGA-WHITESIDE |
| 196 | TBD | JOSH | SMITH |
| 197 | 10323348901 | JOSH JAMES | WHYLE |
| 198 | 10115747201 | JOSHUA | ALI |
| 199 | 10160109801 | JOSHUA ANDREAS | PIERRE-LOUIS |
| 200 | 10064645101 | JOSHUA NOAH | GRAY |
| 201 | 10297394501 | JULIUS | BRENTS |
| 202 | 10132444301 | JUSTEN DEAN | SMITH |
| 203 | 20000008901 | JUSTIN | RAGIN |
| 204 | 9000042401 | KAHLIL | JOHNSON |
| 205 | 10119512601 | KAMERON DREW | WILLIAMS |
| 206 | 10168563401 | KARISSA ROSE | QUENICHET |
| 207 | 10095954401 | KATELYN | OHASHI |
| 208 | 10118798101 | KATHLEEN | DOYLE |
| 209 | 10182876701 | KATHRYN | MEYER |
| 210 | 10288431601 | KATHRYN E | WESTBELD |
| 211 | 10267399801 | KEATON | SUTHERLAND |
| 212 | 10132232001 | KEENAN | ELLIS |

| | | | |
|---|---|---|---|
| 213 | 10303728701 | KEIR | THOMAS |
| 214 | 10419992101 | KELLAN | GRADY |
| 215 | 10181753801 | KEVIN | COSTELLO |
| 216 | 10266791301 | KEVIN | MARFO |
| 217 | 10174670201 | KEVIN TYLER | ABEL |
| 218 | 10576958701 | KHALIL | TATE |
| 219 | 9000035901 | KHYRI | THOMAS |
| 220 | 9000033301 | KRISTOPHER FARRELL | JENKINS |
| 221 | 10354769101 | KYLA | ROSS |
| 222 | 10071888701 | KYLIN JATAVIAN | HILL |
| 223 | 10228833101 | LAMONT | EVANS |
| 224 | 10248828901 | LAUREN | COX |
| 225 | 10081650201 | LOGAN JAMES | TISCH |
| 226 | 20000538201 | LOPINI | KATOA |
| 227 | 10132234301 | LORENZO | FAUATEA |
| 228 | 10098639001 | LUCAS | WILLIAMSON |
| 229 | 10115486001 | MADELYNNE | SCHERR |
| 230 | 10354757501 | MADISON | KOCIAN |
| 231 | 10139005101 | MAGGIE | NICHOLS |
| 232 | 10399793301 | MALIK | CURRY |
| 233 | 10661535001 | MALIQUE | JACOBS |
| 234 | 10119518701 | MARC CRANDALL | LOVING |
| 235 | TBD | MARCUS | ALLEN |
| 236 | 9000038701 | MARCUS | WALLACE II |
| 237 | 10280054601 | MARCUS ANDREW | ZEGAROWSKI |
| 238 | 10168636501 | MARGARET MARY | OTOOLE |
| 239 | 9000026801 | MARQUES | TOWNES |
| 240 | 10132401701 | MASEN | WAKE |
| 241 | 10671858701 | MASON | MOSES |
| 242 | 10357112701 | MASSIMILIANO C | BORGHI |
| 243 | 10304146101 | MATHEU | NELSON |
| 244 | 10624048101 | MATTHEW | BUTLER |
| 245 | 10308323601 | MATTHEW | CROSS |
| 246 | 10185683001 | MATTHEW | MCLAIN |
| 247 | 10607526301 | MAURICE | ODUM |
| 248 | 10535918001 | MEKHI | LAPOINTE |
| 249 | 60004611701 | MICAH | PARTEN |
| 250 | 60004638901 | MICHAEL | HARLEY |
| 251 | 10132397901 | MICHAEL | TANUVASA |
| 252 | 10671862901 | MICHAEL | VAN RAAPHORST |
| 253 | 10577147801 | MICHAEL | WILEY |
| 254 | 10181802601 | MICHAEL | WILSON |
| 255 | 10119848601 | MICHAEL DONOVAN ALEXANDER | JORDAN |
| 256 | 10168421601 | MICHAEL LOGAN | MENNING |

| 257 | 10185813901 | MICHAELA NNE | ONYENWERE |
| 258 | 10095968401 | MIKAYLA | PIVEC |
| 259 | 10282996201 | MONTELL H | COZART |
| 260 | 10186277501 | MORRELL ALEXANDER | OSLING III |
| 261 | 10294012501 | MYA | HOLLINGSHED |
| 262 | 10138565101 | MYKEL | JONES |
| 263 | 10131645801 | NAKOBE RASHOD | DEAN |
| 264 | 20000942801 | NATE | SAVINO |
| 265 | 10399777501 | NATHAN | ADRIAN |
| 266 | 10183413501 | NATHANIEL | BRITT |
| 267 | 10225092301 | NATHANIEL | PIERRE-LOUIS |
| 268 | 10064572001 | NAZREON NYRU | REID |
| 269 | 10132263001 | NEIL | PAUU |
| 270 | 60016300801 | NICHOLAS | DINARDI |
| 271 | 10335992801 | NICHOLAS | SWINEY |
| 272 | 10071770601 | NICHOLAS DYLAN | FITZGERALD |
| 273 | 10249039901 | NICHOLAS J | LOFTIN |
| 274 | 10390868701 | NIGEL | JOHNSON |
| 275 | 10551039701 | NKOSI | PERRY |
| 276 | 10264308801 | NYSIER | BROOKS |
| 277 | 10168639001 | OWEN WILLIAM | SCHWEBACH |
| 278 | 10119745701 | PALAIE TOFAU | GAOTEOTE |
| 279 | 10125674701 | PARKER | MESSICK |
| 280 | 10169921901 | PAUL | STAMM |
| 281 | 10139462701 | PAYTN BLISS | MONTICELLI |
| 282 | 10132360801 | PAYTON | WILGAR |
| 283 | 10168582801 | QUINCI GRACE | THOMAS |
| 284 | 10406853001 | QUINN RICHARD | NORDIN |
| 285 | 10228421001 | RASHAD | WILLIAMS |
| 286 | 10406638601 | RASHAN ABDUL | GARY |
| 287 | 9000043701 | RASHARD | DAVIS |
| 288 | 10076433201 | RILEY | CORNELIO |
| 289 | 10123600101 | ROMANE JOELLE | LONGUEVILLE |
| 290 | 10200954501 | ROMAR | REID |
| 291 | 10404494901 | RON | TIAVAASUE |
| 292 | 9000010801 | RYAN | ROLISON |
| 293 | 10627241001 | RYAN ALAN | MILLER |
| 294 | 10353654101 | SADDIQ | BEY |
| 295 | 10345876101 | SARAH JESSICA | FULLER |
| 296 | 10114970001 | SAVANNA J | FAULCONER |
| 297 | 10400107001 | SEAN | ALLISON |
| 298 | 10553320801 | SEAN | CLIFFORD |
| 299 | 9000019201 | SEAN | HJELLE |
| 300 | 10226992001 | SETH D | HENIGAN |

| 301 | 10319845301 | SHAQUEM | GRIFFIN |
| 302 | 10319846501 | SHAQUILL | GRIFFIN |
| 303 | 9000020101 | SHEA | LANGELIERS |
| 304 | 10406869301 | SHEA CHRISTOPHER | PATTERSON |
| 305 | 10264964901 | SLADE | CECCONI |
| 306 | 10106258801 | SOPHIE ELIZABETH | CUNNINGHAM |
| 307 | 10399818401 | SPENCER | MACKE |
| 308 | 10345715001 | SPENCER GEORGE | JONES |
| 309 | 10441953201 | STANLEY | DYE |
| 310 | 10186006701 | STEPHAN | BLAYLOCK |
| 311 | 10339048001 | STEPHEN DEON | CARR |
| 312 | 10399844501 | TAJZMEL | SHERMAN |
| 313 | 10411041701 | TANNER | MORGAN |
| 314 | 10264744601 | TATHAN | MARTELL |
| 315 | 9000025501 | TAYLER | PERSONS |
| 316 | 10272954201 | TAYLOR | RAPP |
| 317 | 10168612201 | TEEGAN MAKAY | MADARA |
| 318 | 60004591901 | TEVIN | BROYLES |
| 319 | 10174492401 | TIMMY | HERNANDEZ |
| 320 | 10060763901 | TIMOTHY CHAD | HANSEN |
| 321 | 10559025301 | TRACE | MCSORLEY |
| 322 | 10132179001 | TRAJAN ATOA JAMES | PILI |
| 323 | 10082362201 | TRENTON | SIMPSON |
| 324 | 10539467101 | TREVIS | GIPSON |
| 325 | 10174410901 | TREVON | BRADFORD |
| 326 | 10393269001 | TREVON | SIDNEY |
| 327 | 9000024201 | TREVOR | SCOTT |
| 328 | 10569283901 | TREY | LANCE |
| 329 | 60000015001 | TRISTAN | NICKELSON |
| 330 | 10322162101 | TROY | CAUPAIN |
| 331 | 10327318901 | TROY CHARLES | FUMAGALLI |
| 332 | 10126474401 | TRU | THOMPSON |
| 333 | 10088826401 | TYJON | LINDSEY |
| 334 | 60004098401 | TYLER | BAUM |
| 335 | 10115387901 | TYLER | HERRO |
| 336 | 10264878501 | TYREE | ST LOUIS |
| 337 | 10132151001 | URIAH | LEIATAUA |
| 338 | 10329114301 | VALENTINO | DALTOSO |
| 339 | 10278788801 | VANCE | JACKSON |
| 340 | 10407086901 | VICTOR MORITZ | WAGNER |
| 341 | 20001203001 | VINCENT | SAMPSON |
| 342 | 10399825101 | VINCENT TREVON | MITCHELL |
| 343 | 10071816401 | WESTIN BRANNING | GRAVES |
| 344 | 10115926201 | WILL | LEVIS |

| 345 | 10130617901 | WILLIAM JACOB | FROMM |
| 346 | 10038339701 | XAVIER | SIMPSON |
| 347 | 10559630901 | YETUR | GROSS-MATOS |
| 348 | 9000021401 | ZACHARY | GELOF |
| 349 | 10132297501 | ZACHARY | KATOA |
| 350 | 10132317701 | ZACHARY | WILSON |
| 351 | 10132084001 | ZACHARY G | DAWE |
| 352 | 10407053501 | ZAKARIE | IRVIN |
| 353 | 10234469301 | ZION | BETHEA |

| 354 | SETH BEER (pursuant to Court order) |
| 355 | BENJAMIN BURR-KIRVEN (pursuant to Court order) |
| 356 | YOELI CHILDS (pursuant to Court order) |
| 357 | JAMES OKONKWO (pursuant to Court order) |

01-MenkeER-0117

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: COLLEGE ATHLETE NIL
LITIGATION

Case No. 20-cv-03919 CW

**OPINION REGARDING ORDER
GRANTING MOTION FOR FINAL
APPROVAL OF SETTLEMENT
AGREEMENT**

(Re: Dkt. No. 717)

Plaintiffs[1] are current and former Division I student-athletes who played various Division I sports during the relevant period. Defendants are the National Collegiate Athletic Association (NCAA) and Conference Defendants Pac-12 Conference, Big Ten Conference, Big 12 Conference, Southeastern Conference, and Atlantic Coast Conference.

Plaintiffs bring this antitrust class action to challenge various of the NCAA's rules that restrict or prohibit student-athlete compensation. In particular, they seek to challenge the set of rules that restrict or prohibit compensation that Division I student-athletes can receive: from third parties for the use of their name, image, or likeness (NIL); from schools or conferences for the use of their NIL, including in broadcasts; and from schools and conferences for their athletic services. They also challenge NCAA restraints setting a maximum number or amount of scholarships that schools can provide to Division I student-athletes in each sport. Plaintiffs contend that these rules

---

[1] Plaintiffs are Grant House, Sedona Prince, Tymir Oliver, Nya Harrison, DeWayne Carter, and Nicholas Solomon.

01-MenkeER-0118

violate the Sherman Act, because Plaintiffs would receive greater compensation in the absence of these collusive restraints. Defendants deny this charge and assert that the challenged rules are procompetitive.

Now before the Court is a motion for final approval of a settlement agreement that would resolve all of Plaintiffs' claims for monetary and injunctive relief. Plaintiffs represent that there are 389,700 current members of the settlement classes. If approved, the settlement agreement would result in the distribution of $2.576 billion in damages for members of the settlement classes who have been unable to receive compensation for the use of their NIL and for their athletic services. It would also result in ground-breaking changes in NCAA rules that govern student-athlete compensation, which would enable NCAA schools to share their athletic revenues with Division I college student-athletes for the first time in the history of the NCAA and would eliminate NCAA limits on scholarships. This is expected to open the door for Division I student-athletes to receive, in the aggregate, approximately $1.6 billion dollars in new compensation and benefits per year, with that amount increasing over the next ten years.

The NCAA has governed college sports for more than a century, and it has faced legal challenges to its regulations throughout its history. The present action follows a line of class actions that have attacked prior iterations of some of the NCAA restraints that are now at issue here. This Court presided over two of those prior class actions. The successes and failures of those prior class actions against the NCAA and its conferences have informed the parties' settlement negotiations in this case, as well as the Court's evaluation of the fairness and reasonableness of the settlement agreement now before it.

In *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 7 F. Supp. 3d 955, 963 (N.D. Cal. 2014), *aff'd in part*, 802 F.3d 1049 (9th Cir. 2015), a class of student-athletes challenged NCAA restrictions on NIL compensation and prevailed at trial. However, that success resulted in an order that merely increased the limit on education-related compensation that schools could offer student-athletes to the cost of attendance, and that permitted NCAA members to provide $5,000 per year in deferred cash compensation to student-athletes for the use of their NIL. The Ninth Circuit affirmed the increase on the limit on education-related compensation to the cost of attendance, but

United States District Court<br>Northern District of California

it reversed the aspect of the Court's ruling that permitted NCAA members to provide $5,000 per student-athlete per year in deferred cash compensation for the use of their NIL. The circuit court based its opinion on the ground that the cash compensation was not tethered to education and the amount constituted a "quantum leap" from the status quo. *See O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1078 (9th Cir. 2015), *cert. denied.*, 580 U.S. 815 (2016).

In *Alston*, a different class of student-athletes challenged NCAA restrictions on compensation for athletic services and education-related benefits. The class lost at trial in challenging the NCAA rules that prohibited compensation for athletic services. *See In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig. (Alston)*, 375 F. Supp. 3d 1058, 1061-1110 (N.D. Cal. 2019). Accordingly, those rules have remained in place to this day. The class prevailed in its challenge to NCAA rules restricting education-related compensation. However, the remedy that this Court issued was constrained by the Ninth Circuit's reversal in *O'Bannon* of the $5,000 in deferred cash compensation allowed. In light of the Ninth Circuit's holdings in *O'Bannon*, the Court issued an order in *Alston* that enjoined restrictions on non-cash education-related benefits but permitted the NCAA to continue to limit cash-equivalent education-related compensation at $5,980 per student-athlete per year.[2] *See id.* The Ninth Circuit affirmed that decision, and the Supreme Court did so unanimously, as well. *See In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239 (9th Cir. 2020); *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021).

In both *O'Bannon* and *Alston*, the partial success of the plaintiffs did not result in an order that completely enjoined the challenged restrictions on student-athlete compensation even though that had been the relief that the plaintiffs had sought in the complaint.

The settlement agreement here reflects compromises that were made in light of those legal precedents, which demonstrate that success at trial can mean that student-athlete compensation restrictions may be lessened but not eliminated. Despite some compromises, the settlement

---

[2] The amount was originally $5,600 but it was increased to $5,980 in December 2020. *See In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, No. 14-MD-2541 CW, 2020 WL 9422404, at *3 (N.D. Cal. Dec. 30, 2020).

United States District Court
Northern District of California

agreement nevertheless will result in extraordinary relief for members of the settlement classes. If approved, it would permit levels and types of student-athlete compensation that have never been permitted in the history of college sports, while also very generously compensating Division I student-athletes who suffered past harms. The reaction of settlement class members has been very favorable, as only a very small fraction of them have opted out or objected. The Court will, therefore, grant final approval of the settlement agreement for the reasons below.

## I.      Procedural History

This consolidated litigation began as two separate actions in 2020: (1) *House v. National Collegiate Athletic Association*, 4:20-cv-03919 (*House*); and (2) *Oliver v. National Collegiate Athletic Association*, 4:20-cv-04527 (Oliver). House was brought by named Plaintiffs Sedona Prince, a current Division I student-athlete who competed for the University of Oregon's women's basketball team, and Grant House, a current Division I student-athlete who competed for the Arizona State University's men's swimming and diving team. Oliver was brought by named Plaintiff Tymir Oliver, a former Division I student-athlete who competed for the University of Illinois' men's football team. In each of the two actions, Plaintiffs asserted claims against Defendants arising out of injuries they allegedly suffered as a result of certain NCAA rules, which are set and enforced by agreement of Defendants. Those rules restrict the compensation that student-athletes can receive in exchange for the commercial use of their NIL, and prohibit NCAA member conferences and schools from sharing with student-athletes the revenue they receive from third parties for the commercial use of student-athletes' NIL.

Defendants jointly moved to dismiss all claims in *House* and *Oliver*. On June 24, 2021, the Court granted that motion only with respect to named Plaintiff Oliver's individual claims for injunctive relief. *See Grant House v. Nat'l Collegiate Athletic Ass'n*, 545 F. Supp. 3d 804, 818 (N.D. Cal. 2021). The Court otherwise denied the motions. *See id.*

On July 14, 2021, the Court adopted a stipulation to consolidate *House* and *Oliver* and to permit Plaintiffs to file a consolidated complaint under the caption *In re College Athlete NIL Litigation*, Case No. 20-cv-03919. Docket No. 154. Plaintiffs filed a consolidated complaint shortly thereafter. Docket No. 164.

On September 22, 2023, the Court granted Plaintiffs' motion for certification of an injunctive relief class and appointed Hagens Berman Sobol Shapiro LLP and Winston & Strawn LLP as Co-Lead Class Counsel for that class. Docket No. 323. On November 3, 2023, the Court granted Plaintiffs' motion for certification of three damages classes and again appointed Hagens Berman Sobol Shapiro LLP and Winston & Strawn LLP as Co-Lead Class Counsel for those classes. Docket No. 387. Defendants filed a petition under Rule 23(f) for permission to file an interlocutory appeal of those certification orders, and the Ninth Circuit denied the request.

Merits discovery closed in October 2023.

On December 7, 2023, a proposed class action was filed in this district captioned *Carter v. National Collegiate Athletic Association* (*Carter*), Case No. 3:23-cv-06325 (N.D. Cal.), which alleged that the NCAA's rules prohibiting payments for athletic services (i.e., pay-for-play) violate the antitrust laws.

On April 3, 2024, Plaintiffs filed a motion for summary judgment in this case. Docket No. 414. While that motion was pending, on May 30, 2024, the Court stayed all case deadlines pending the resolution of the present settlement agreement.

In the operative complaint, which is the Third Consolidated Amended Complaint, Docket No. 533-1, the claims that were asserted in the *Carter* case were consolidated with the claims in this case, and the named Plaintiffs in *Carter*, namely DeWayne Carter and Nya Harrison, became named Plaintiffs in this action.

In the operative complaint, Plaintiffs challenge four types of NCAA restraints on student-athlete compensation:

(1)     Restraints that prohibit or limit compensation that Division I student-athletes can receive from schools or conferences for the use of their NIL (including NIL in broadcasts, or BNIL). Plaintiffs allege that, in the absence of those restraints, they would have received compensation from schools and conferences for the use of their NIL (hereinafter, BNIL claims).

(2)     Restraints that prohibit or limit compensation that Division I student-athletes can receive from third parties for their NIL (including NIL in video games or other merchandise).

Plaintiffs allege that, in the absence of those restraints, they would have received compensation from third parties for the use of their NIL (hereinafter third-party NIL claims).

(3)     Restraints that prohibit or limit compensation that Division I student-athletes can receive from schools or conferences for their athletic services.  Plaintiffs allege that, in the absence of those restraints, they would have received compensation from their schools or conferences for their athletic services above the value of a scholarship (hereinafter, pay-for-play or athletics services claims).

(4)     Restraints that set a maximum number or amount of scholarships that can be provided in each sport to Division I student-athletes.  Plaintiffs allege that, in the absence of those restraints, they would have received more scholarship money from NCAA member schools (hereinafter, scholarship caps or partial scholarship claims).

On July 26, 2024, Plaintiffs moved for preliminary approval of the settlement agreement. Docket No. 450.  The Court held a hearing on that motion on September 5, 2024.  After the parties made some clarifications in the settlement agreement, the Court granted preliminary approval of the SA, and approved the dissemination of the notice to the settlement classes, on October 7, 2024. Docket No. 544.  The Court set the deadlines for filing claims, objections, and opting out for January 31, 2025, 105 days after the notice date.

On December 17, 2024, Plaintiffs filed a motion for attorneys' fees and costs, and service awards.  Docket No. 583.

On March 3, 2025, Plaintiffs filed a motion for final approval of the SA.  Docket No. 717.

On April 7, 2025, the Court held a final approval hearing.  The hearing lasted six hours and counsel for the classes, Defendants, and objectors, as well as pro se objectors, were heard in person and remotely.

After the final approval hearing, the Court issued an order in which it expressed concern that some settlement class members could be impacted negatively by the immediate implementation of certain provisions of the SA.  The Court set a deadline for the parties to modify those provisions of the SA with the assistance of their mediator, Professor Eric Green.  The Court

United States District Court
Northern District of California

asked three objector groups, represented by Laura Reathaford, Steven F. Molo, and the Buchalter firm, to express their views on the proposed changes through the mediation process.

On May 7, 2025, the parties filed the Fourth Amended Stipulation and Settlement Agreement, which is the operative version of the settlement agreement (SA). Docket No. 958-1. It contains some modifications to the provisions about which the Court expressed concern. On the same date, the parties renewed their request for the entry of an order granting final approval of the SA.

## II.     Settlement Agreement

The SA was negotiated at arm's length before Professor Green, a highly respected mediator who has significant experience mediating disputes involving challenges to the NCAA's compensation rules. *See* Berman Decl. ¶ 4. The parties conducted multiple negotiation sessions over the course of more than one year. The negotiations included discussions of NIL and compensation for athletic services, as of August 2023. *Id.* ¶ 6. After this Court certified damages classes and an injunctive relief class in the fall of 2023, the settlement discussions continued, with the parties participating in lengthy mediation sessions on April 24 and 25, 2024. The essential elements of the settlement agreement were memorialized in settlement terms sheets signed on May 23-24, 2024. *See id.* ¶¶ 8-9. Throughout, the settlement discussions were structured and sequenced to compartmentalize negotiations separately based on different relief and different claims. *See id.* ¶¶ 4, 6, 8-9.

Below is a summary of the key terms of the SA.

### A.     Settlement Classes

The SA seeks to bind members of several classes proposed for certification for settlement purposes only.[3] The SA would bind three different damages classes and one injunctive relief class (collectively, the settlement classes).

---

[3] Each of the classes excludes the officers, directors, and employees of Defendants, and judicial officers presiding over this action and their immediate family members and staff.

United States District Court
Northern District of California

The three proposed damages classes under Rule 23(b)(3) (Damages Settlement Classes) are:

> **Football and Men's Basketball Class**: All student-athletes who have received or will receive full GIA scholarships and compete on, competed on, or will compete on a Division I men's basketball team or an FBS football team, at a college or university that is a member of one of the Power Five Conferences (including Notre Dame), and who have been or will be declared initially eligible for competition in Division I at any time from June 15, 2016 through September 15, 2024.

The proposed representatives for this class are Tymir Oliver and DeWayne Carter.

> **Women's Basketball Class**: All student-athletes who have received or will receive full GIA scholarships and compete on, competed on, or will compete on a Division I women's basketball team at a college or university that is a member of one the Power Five Conferences (including Notre Dame), and who have been or will be declared initially eligible for competition in Division I at any time from June 15, 2016 through September 15, 2024.

The proposed representative for this class is Sedona Prince.

> **Additional Sports Class**: Excluding members of the Football and Men's Basketball Class and members of the Women's Basketball Class, all student-athletes who compete on, competed on, or will compete on a Division I athletic team and who have been or will be declared initially eligible for competition in Division I at any time from June 15, 2016 through September 15, 2024.

The proposed representatives for this class are Grant House, Nya Harrison, and Nicholas Solomon.

The proposed class for injunctive relief under Rule 23(b)(2) is:

> **Injunctive Relief Settlement Class**: All student-athletes who compete on, competed on, or will compete on a Division I athletic team at any time between June 15, 2020 through the end of the Injunctive Relief Settlement Term.

The proposed named representatives for this class are Grant House, DeWayne Carter, Nya Harrison, Sedona Prince, and Nicholas Solomon. The Injunctive Relief Settlement Term is defined in the SA as ten Academic Years from the date of Final Approval of the SA. *See* SA ¶ 1(cc).

United States District Court
Northern District of California

8

01-MenkeER-0125

The settlement classes above differ from the classes that the Court certified in September 2023 and November 2023. Accordingly, the Court will conduct a certification analysis for settlement purposes below.

Plaintiffs represent that there are an estimated 389,700 current class members in all settlement classes. *See* Docket No. 717 at 21.

**B.      Recovery Under the SA**

**1.      Damages**

Pursuant to the SA, Defendants have agreed to pay $2.576 billion in total to compensate members of the damages classes. Damages payments will be paid yearly over the course of ten years following the Effective Date. *See* SA ¶¶ 3-4.

The SA calls for the creation of a fund of $1.976 billion labeled as "NIL Claims Settlement Amount" in the SA, but referred to in the parties' filings as the "NIL Settlement Fund." This fund will be distributed pursuant to Plaintiffs' proposed allocation plan, which is based on the economics analysis of Dr. Daniel Rascher. Dr. Rascher was Plaintiffs' economics expert in *Alston*, as well as in this case. Plaintiffs' proposed plan calls for distribution of the fund to members of the damages classes who have valid claims for NIL-related injuries, including BNIL, videogame NIL, and third-party NIL. The fund will be distributed as follows:

(1)      $71.5 million (before deducting a proportional share of any amounts approved by the Court for fees and costs, awards, and administrative expenses) will be distributed pro rata to members of the Football and Men's Basketball Class, and of the Additional Sports Class if they played football or basketball, based on the sport and years they played, for Video Game NIL injuries (Videogame Settlement Fund). Rascher Decl. ¶¶ 20-22.

(2)      $1.815 billion (before deducting a proportional share of any amounts approved by the Court for fees and costs, awards, and administrative expenses) will be distributed pro rata to members of the Football and Men's Basketball Class and Women's Basketball Class based on the sport, conference, and years played, for broadcast NIL injuries (BNIL Net Settlement Fund). Rascher Decl. ¶¶ 27-28.

United States District Court
Northern District of California

(3)    $89.5 million (before deducting a proportional share of any amounts approved by the Court for fees and costs, awards, and administrative expenses) will be distributed for third-party NIL injuries to members of the Football and Men's Basketball Class, Women's Basketball Class, and Additional Sports Class who received third-party NIL payments after July 2021 and who played their sports during certain years of eligibility prior to July 2021, based on Dr. Rascher's before-and-after damages methodology (Lost Opportunities Net Settlement Fund).  *See* Rascher Decl. ¶¶ 31-32.

The SA also calls for the creation of a $600 million fund, which is labeled as the "Additional Compensation Claims Settlement Amount" in the SA and in the parties' filings.  This fund will be distributed to class members pursuant to Plaintiffs' proposed allocation plan, which is based on Dr. Rascher's economic analyses, to members of any of the damages settlement classes who have pay-for-play (i.e., athletic services) claims.  That fund will be divided into two portions:

(1)    95% of the Additional Compensation Claims Settlement Fund (before deducting a proportional share of any amounts approved by the Court for fees, costs, awards, and administrative expenses) will be allocated to the "Power Five Football and Basketball Portion," which in turn will be distributed in a ratio of 75/15/5% to athletes across the three sports (football, men's basketball, and women's basketball).  Within each sport, damages amounts will be calculated using a formula that includes a standardized minimum amount, and that makes individualized adjustments based on seniority, recruiting star rating, and certain performance metrics.  *See* Docket No. 450 at 22-23; Rascher Decl. ¶¶ 50-81.

(2)    The remaining 5% of the Additional Compensation Net Settlement Fund (before deducting a proportional share of any amounts approved by the Court for fees, costs, awards, and administrative expenses) will be allocated to the "General Portion" proportionally among Additional Sports Class claimants who received a partial or full GIA from the 2019-20 school year through the end of the class period.  Class members eligible for distributions out of this fund will receive an expanded share if they played certain sports at certain schools outside of the Power Five where their school's team is among the highest revenue generating.  *See* Docket No. 450 at 22-23; Rascher Decl. ¶¶ 67-81.

10

Together, the NIL Claims Settlement Amount and the Additional Compensation Claims Settlement Amount are referred to in the SA as the "Gross Settlement Fund." SA ¶ 1(x). No money from the Gross Settlement Fund will be allocated to compensate settlement class members who may have suffered injury as a result of the challenged NCAA scholarship caps.

The amounts that members of the damages settlement classes are expected to receive under the SA are set forth in a chart filed by Plaintiffs as Exhibit A to their motion for preliminary approval of the SA. Docket No. 450.

### 2. Injunctive Relief Settlement

The SA also provides for injunctive relief for members of the Injunctive Relief Class. The injunctive relief aspect of the SA is referred to as the "Second Amended Injunctive Relief Settlement" (Injunctive Relief Settlement or IRS), which is set forth in Appendix A to the SA. It permits the NCAA and its members to modify existing NCAA rules and to enact new rules that govern student-athlete compensation and rosters over a ten-year period following the approval of the SA. *See* SA ¶ 1(cc). The rule modifications that the IRS permits will apply only to NCAA members that choose to participate in the Injunctive Relief Settlement. Some of these modifications are described below.

First, the IRS permits the NCAA to modify current rules to permit schools to provide additional direct benefits and compensation to Division I student-athletes that are worth up to 22% of the Power Five schools' average athletic revenues each year, subject to specified yearly increases (hereinafter, the "Pool"). *See* IRS Art. 3. The SA sets forth how the yearly Pool cap will be calculated, as well as which types of benefits and compensation will count against the Pool and in what amounts. *See* IRS Art. 3, §§ 1-4. Dr. Rascher estimates that the annual Pool cap will start at more than $20 million per school in the 2025-26 school year and grow to $32.9 million per school in 2034-35. For all Power Five Schools, that would allow for additional spending of up to $1.6 billion for 2025-26, growing to $2.3 billion in 2034-35, and totaling at least $19.4 billion for the 10-year period of the IRS. *See* Rascher Decl. ¶ 85 & Ex. 25.

Second, the IRS requires the NCAA to modify its rules to eliminate the scholarship limits challenged in the operative complaint. Dr. Rascher estimates that the elimination of the

01-MenkeER-0128

scholarship limits could result in more than 115,000 additional scholarships being made available to Division I athletes on an annual basis. *See* Rascher Final Approval Decl. ¶ 74 & Ex. 5. Each school will be able to award scholarships to Division I athletes above the number permitted under current NCAA rules, subject to the roster limits addressed in Article 4, Section 1 of the Injunctive Relief Settlement. *See* IRS Art. 3, § 3(b).

Third, the IRS permits the NCAA to continue its prohibitions on NIL payments to student-athletes, except that the prohibitions permitted under the IRS will be narrower than the prohibitions under existing NCAA rules. Specifically, under the IRS, the NCAA will be permitted to prohibit class members from receiving payments for their NIL from a limited set of third parties that are labeled as Associated Entities or Individuals. *See* IRS Art. 1, § 1(c). The SA does not permit the NCAA to prohibit NIL payments from other third parties that are not Associated Entities or Individuals. By contrast, under its existing rules, the NCAA may prohibit NIL payments to student-athletes by *any* third party. An Associated Entity is one that is closely affiliated with an NCAA member school for the purpose of promoting the school's athletics program or its student-athletes. *See* IRS Art. 1, §1(c). An Associated Individual is an individual who is a member of an Associated Entity or who has contributed more than $50,000 over their lifetime to a particular NCAA member school, or an Associated Entity, to promote their athletics program or student-athletes, or who has assisted a school in the recruitment or retention of student-athletes. *See* IRS Art. 1, § 1(c). Payments from Associated Entities or Individuals can be prohibited by the NCAA only if they are not for a "valid business purpose" related to the promotion or endorsement of goods or services provided to the general public for profit, with compensation "at rates and terms commensurate with compensation paid to similarly situated individuals with comparable NIL value who are not current or prospective student-athletes at the Member Institution."[4] *See id.*

---

[4] Associated Entities and Individuals will be allowed to make indirect payments to student-athletes for their NIL by making contributions to the schools, which can then make payments to student-athletes.

01-MenkeER-0129

12

The IRS requires that any disputes arising out of NCAA members' enforcement of the third-party NIL restrictions that are permissible under the IRS be resolved via neutral arbitration. *See* IRS Art. 6, § 2. This is in contrast to the system currently in place, which vests all authority in the NCAA to make enforcement decisions and to resolve disputes in connection with the prohibitions on third-party NIL payments. The neutral arbitration required under the IRS will be accompanied by due process protections and a degree of transparency that settlement class members do not have under current NCAA rules. Those protections include provisions requiring that no penalties can be imposed on a student-athlete while arbitration is pending, absent the arbitrator's finding of good cause, and that the arbitrator issue a written decision. *See* IRS Art. 6, § 2(d).

Fourth, the SA permits the NCAA to adopt roster limits for Division I sports. *See* IRS Art. 4, § 1. After the final approval hearing, the parties modified the SA to provide that settlement class members whose roster spots were taken away or would have been taken away because of the immediate implementation of the SA will be exempt from roster limits at any Division I school for the duration of their college athletics careers. This means that the class members in question will not count toward any school's roster limit for the remainder of their Division I athletic eligibility. The parties agreed that (1) within thirty days of final approval, each Division I school would use good-faith efforts to identify for Class Counsel Division I student-athletes who were on a 2024-25 roster or were recruited to be on a 2025-26 roster and who were removed or would have been removed from the roster for 2025-26 due to the implementation of the roster limits (the student-athletes in question will be deemed "Designated Student-Athletes"); (2) Class Counsel will make information about who was identified as a Designated Student-Athlete to class members; (3) the Designated Student-Athletes will not count toward any Division I school's roster limits for the duration of their remaining Division I athletic eligibility; and (4) nothing in the NCAA rules will restrict schools from allowing Designated Student-Athletes who transferred because of the immediate implementation of the roster limits to transfer back to their original school. *See* IRS, Art. 4, § 1; *see also* Docket Nos. 958, 967.

**C.     Effective Date of the SA**

The Effective Date of the SA is the date when the judgment becomes final and all appeals have been resolved. *See* SA ¶ 32. The Injunctive Relief Settlement will go into effect on the date on which the Court grants final approval of the SA, regardless of whether there is an appeal. *See* SA ¶ 18.

**D.     Interpretation of the SA**

The SA provides that the Court shall retain jurisdiction to resolve all disputes that may arise concerning compliance with, the validity of, interpretation of, or enforcement of the terms and conditions of the SA, including through appointment of a special master whose decisions shall be appealable to the Court. *See* SA ¶ 45.

**E.     Releases**

In exchange for the recovery that the SA will provide for settlement class members, those class members will release the following claims.

The named Plaintiffs and members of the Damages Settlement Classes who do not opt out will release the Released Damages Class Claims, which are claims that were raised or could have been raised in this action prior to Final Approval "(1) on account of, arising out of, or resulting from any and all previously existing NCAA and conference rules regarding monies and benefits that may be provided to student-athletes by the NCAA, Division I conferences and/or Division I Member Institutions, or (2) relating in any way to any NCAA or conference limitations on the numbers of scholarships allowed or permitted in any sport[.]" *See* SA ¶ 1(pp).

The named Plaintiffs and members of the Injunctive Relief Class will release the Released Injunctive Relief Class Claims, which are all declaratory and injunctive relief claims that were raised or could have been raised in this action prior to Final Approval or during the Injunctive Relief Settlement Term arising out of "the continuation of existing (at the time of filing for preliminary approval of the Injunctive Relief Settlement) NCAA and conference rules, as well as new or revised NCAA and conference rules agreed to as part of the Injunctive Relief Settlement, regarding (1) monies and benefits that may be provided to student-athletes by the NCAA, Division I conferences, and/or Division I Member Institutions under NCAA or conference rules; (2) NCAA

14

01-MenkeER-0131

roster and scholarship limits as agreed to in the Injunctive Relief Settlement; or (3) the subjects addressed by the Related Injunctive Relief NCAA & Conference Rules (collectively, the 'Injunctive Rules')[.]" *See* SA ¶ 1(qq). The Released Injunctive Relief Class Claims do not include damages claims.

The SA provides that certain claims, denominated Unreleased Claims, will not be released because they are not covered by either of the two release clauses described above. *See* SA ¶ 1(ww). Unreleased Claims include those that arise out of the Fair Labor Standards Act or other federal or state labor laws, and claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*., other than those arising out of or relating to the distribution of the Gross Settlement Fund. *See id.*

After the final approval hearing, in response to some objections, the parties modified the SA (1) to clarify that future members of the Injunctive Relief Settlement Class who will compete in Division I for the first time after the SA is approved will not release their injunctive and declaratory relief claims until they have received notice and an opportunity to object to the continuation of the SA and any objections they make are addressed by the Court. *See* SA ¶ 1(aa); *id.* ¶¶ 14, 19-21, 36.

### F. Method of Notice for Current Class Members

The Court approved the parties' proposed notice plan in its order granting preliminary approval of the SA. The notice plan involved a digital media campaign, press releases, and notice by email and post card. Peak Decl. ¶¶ 10-26. Prior to approving the notice plan, the Court reviewed and edited the notices to ensure that they informed class members of the nature of the action, the definitions of the settlement classes, the claims and issues in the litigation, that class members could enter an appearance through an attorney if they so desired, that the Court would exclude class members who requested exclusion by the exclusion deadline, and the binding effect of a class judgment on the members of the settlement classes. The notice that the Court approved also specified the details of Plaintiffs' proposed allocation plan for each type of claim. *See* Docket No. 544.

15

After the Court granted preliminary approval of the SA, Defendants notified Division I institutions to provide the claims administrator with data about class members, including NCAA EC IDs, names, addresses, email addresses, sports played, and other information. Based on the information, the claims administrator disseminated 372,838 unique class member email notices and 91,084 postcard notices, totaling over 463,922 notices to class members. *See* Peak Decl. ¶¶ 14, 19-20. Wherever possible, the claims administrator contacted class members through both email and postcard notices. Before mailing each notice, the claims administrator checked the potential class members' names and addresses against the U.S. Postal Service's National Change of Address database to identify any address changes. *Id.* ¶ 7. Before e-mailing each notice, the Settlement Administrator cleansed and validated each email address to verify its existence with Internet Service Providers. *Id.* ¶ 17. One week prior to the claim-filing deadline, the claims administrator sent out an additional email notice to settlement class members reminding them of the deadline. *Id.* ¶ 22.

The claims administrator also disseminated a digital notice by purchasing over 72 million impressions on numerous digital platforms used extensively by the settlement class members.

The claims administrator issued a press release on October 18, 2024, to AP News, and to a College Media Influencer List consisting of journalists specifically reporting on college news, which was viewed 9,859 times and picked up by over 910 news outlets nationwide. *Id.* ¶ 24. The claims administrator distributed a second press release on January 21, 2025, to alert class members of the pending deadline to opt out, object, or submit claims. *Id.* ¶ 26.

### G. Method of Notice for Future Class Members

The SA provides that, during the term of the IRS, NCAA members "shall take reasonable steps to" provide notice of the Injunctive Relief Settlement in a form approved by the Court and Class Counsel to all incoming members of the Injunctive Relief Settlement Class at or before the time they first enroll at a Division I member school or later join, for the first time, a Division I member school athletic team. SA ¶ 14. All such class members will have the right to file written objections to a continuation of the Injunctive Relief Settlement with the Court within sixty days of receiving such notice. The releases contained in the SA shall not be effective against incoming

student-athletes, not currently attending a school, until after they have been provided the notice and the sixty-day objection period has expired or, if they file an objection, until their objection has been heard and ruled upon. *See id.*

### H. Method of Distributing Damages Relief

To receive payment for damages claims, some members of the damages classes were not required to submit a claim form, namely Power Five FBS Football, Men's Division I Basketball, and Power Five Women's Basketball student-athletes who received a full-GIA scholarship, as well as any Division I student-athlete who competed in the same sport prior to and after July 1, 2021, and had an NIL deal after July 1, 2021, that was provided to Plaintiffs by their school. See Notice, Docket No. 544-4 at 11. Those class members automatically qualified for a distribution from the damages funds if they confirmed their contact and payment information with the claims administrator. *See id.*; Peak Decl. ¶ 33. The rest of the members of the damages classes were required to submit a claim form to receive a distribution from the damages funds. *See id.* Claim forms could be submitted online or downloaded from the settlement website to be mailed to the settlement administrator. Class members were provided with 105 days from the notice date, i.e., until January 31, 2025, to submit their contact and payment information or a claim form.

Damages distributions to members of the Damages Settlement Classes who submitted valid and timely claims, or who provided updated contact and payment information to the claims administrator, will be paid yearly over the course of ten years following the Effective Date. *See* SA ¶¶ 3-4. The SA does not contain any provisions that unclaimed portions of the settlement funds that were intended for the settlement classes will revert to Defendants.

A total of 101,935 class members submitted a claim form or updated their payment information, which represents approximately 26.2% of the estimated 389,700 current members of the settlement classes. *See* Peak Decl. ¶¶ 28, 35; Docket No. 717 at 21.

### I. Opt Outs

Class members wishing to opt out were required to submit an opt-out request within 90 days of the date the Court granted preliminary approval of the SA, i.e., by January 31, 2025. There are a total of 357 opt outs.

17

01-MenkeER-0134

**J.    Attorneys' Fees and Costs**

Under the SA, Class Counsel may apply for an award of fees and costs in connection with the damages aspect of the case and the Injunctive Relief Settlement, respectively.

With respect to the damages aspect of the case, Class Counsel may apply for fees and costs for distribution from the Gross Settlement Fund.  *See* SA ¶¶ 28-29.

With respect to the Injunctive Relief Settlement, Class Counsel may apply for three different sets of fees and costs, as follows: (1) an "upfront injunctive fee and cost award" of $20 million; (2) an award of a percentage of the total amount spent by Division I institutions under the Pool for each academic year, which shall start at .75% and increase by .25% no more than three times when the Pool is reset, for as long as the SA remains in effect without material modification; (3) fees and costs for monitoring and enforcing compliance with the SA.  *See* SA ¶ 27.

In their motion for final approval of the SA, Class Counsel request an award of attorneys' fees equivalent to 20% of the NIL Claims Settlement Fund ($395.2 million), 10% of the Additional Compensation Claims Fund ($60 million), an upfront injunctive relief award of $20 million to be paid by Defendants, the right to apply to the Court or special master for an award of a percentage of the total amount spent by Division I member institutions under the Pool for each academic year (with the percentage increasing from .75 to a maximum of 1.25%), and the right to apply to the Court or special master for an award of fees and costs for their ongoing work in monitoring and enforcing compliance with the IRS.  Class Counsel also request reimbursement of $9,081,356.70 to cover the out-of-pocket litigation expenses incurred in connection with prosecuting this litigation.  The Court will rule on this motion in a separate order.

**K.    Service Awards**

Class Counsel ask the Court to approve service awards for the named Plaintiffs, as follows: $125,000 each for Grant House, Sedona Prince, and Tymir Oliver; $10,000 each for DeWayne Carter and Nya Harrison; and $5,000 for Plaintiff Nicholas Solomon.  The Court will rule on this motion in a separate order.

**L.     Class Member Response**

As of the date of Plaintiffs' motion for final approval, more than 73,115 class members who needed to file claims in order to receive damages payments did so, and more than 28,816 class members who needed only to update their contact and payment information did so. Peak Decl. ¶ 33. Thus, a total of 101,935 class members submitted a claim form or updated their payment information, which represents approximately 26.2% of the estimated 389,700 current members of the settlement classes. *See* Peak Decl. ¶¶ 28, 35; Docket No. 717 at 21.

As noted, only 357 class members opted out, and there were only 73 valid, timely objections filed by class members, as discussed in more detail below. *See* Berman Decl., Ex. A, Docket No. 717-1.

**M.     Class Action Fairness Act (CAFA)**

Defendants filed a declaration on the docket attesting that they served the notices required under CAFA. Docket No. 550.

**LEGAL STANDARD**

"The claims, issues, or defenses of a certified class—or a class proposed to be certified for purposes of settlement—may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). The approval of a settlement involves a preliminary approval stage, during which the Court directs notice to class members and then holds a fairness hearing to determine whether final approval of the settlement agreement is warranted under Rule 23(e).

"[S]trong judicial policy . . . favors settlements, particularly where complex class action litigation is concerned." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). "The purpose of Rule 23(e) is to protect the unnamed members of the class from unjust or unfair settlements affecting their rights." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008).

//

United States District Court
Northern District of California

01-MenkeER-0136

19

**DISCUSSION**

**I.      Class Certification**

A court may certify a class for the purpose of entering judgment on a proposed settlement agreement under Rule 23(e) if the requirements of Rule 23(a) have been met.  Specifically, Rule 23(a) requires a showing that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

The party moving for certification also must show that the class can be certified based on at least one of the grounds in Rule 23(b).  *See* Fed. R. Civ. P. 23(b).  As relevant here, certification of damages classes under Rule 23(b)(3) is appropriate if Plaintiffs show that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Certification of an injunctive relief class under Rule 23(b)(2) is appropriate where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

Where the Court is evaluating a settlement under Rule 23 and it previously certified a class, the Court must consider "whether the proposed settlement calls for any change in the class certified, or of the claims, defenses, or issues regarding which certification was granted."  Fed. R. Civ. P. 23 Advisory Committee's Note to 2018 Amendment.

Here, the Court previously certified damages classes and an injunctive relief class, and the Ninth Circuit denied Defendants' request for an interlocutory appeal of that order.  However, the SA calls for a change in the classes that the Court certified in 2023.  Accordingly, the Court will conduct a new class certification inquiry for the settlement classes for settlement purposes.

Where, as here, the Court must conduct a new class certification inquiry for the purpose of determining whether to approve a proposed settlement, the Court must examine the proposed

20

01-MenkeER-0137

settlement with a "higher level of scrutiny for evidence of collusion or other conflicts of interest." *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 976 (9th Cir. 2011) ("Prior to formal class certification, there is an even greater potential for a breach of fiduciary duty owed the class during settlement. Accordingly, such agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest[.]"); *see also Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (holding that the "specifications of [Rule 23]—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context. Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold").

### A.    Rule 23(a)

#### 1.    Numerosity

The requirement of numerosity looks to whether the proposed class is "so numerous that joinder of all members individually is impracticable." Fed. R. Civ. P. 23(a)(1). "Although there is no exact number, some courts have held that numerosity may be presumed when the class comprises forty or more members." *See Krzesniak v. Cendant Corp.*, No. 05-05156, 2007 WL 1795703, at *7 (N.D. Cal. June 20, 2007) (citations omitted).

Here, Plaintiffs represent, and no objector or party has disputed, that each of the settlement classes contains tens of thousands of members. *See* Docket No. 717 at 21.

Because this is undisputed, and because it would be impracticable to join them all, the Court finds that the numerosity requirement is satisfied with respect to each of the settlement classes. *See In re Nat'l Collegiate Athletic Ass'n Athletic Grant-In-Aid Cap Antitrust Litig.*, 311 F.R.D. 532, 539 (N.D. Cal. 2015) (finding that the numerosity requirement was met because "the proposed classes comprise thousands of potential members").

#### 2.    Commonality

Commonality requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy the commonality requirement, "[e]ven a single [common] question will do." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). The common question must be of

United States District Court
Northern District of California

"such nature that it is capable of class-wide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Id.* at 350. The requirements of Rule 23(a)(2) have been construed "permissively," and "[a]ll questions of fact and law need not be common to satisfy the rule." *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) (citation omitted).

"[T]he court must make a 'rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the [class-wide] evidence to prove' the common question in one stroke." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 666 (9th Cir. 2022). "In determining whether the 'common question' prerequisite is met, a district court is limited to resolving whether the evidence establishes that a common question is capable of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Id.* at 666-67. This analysis may "entail some overlap with the merits of the plaintiff's underlying claim." *Id.* at 667 (citations and internal quotation marks omitted). Where that is the case, the "[m]erits questions may be considered [only] to the extent [ ] that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied[.]" *Id.*

Here, several questions of law and fact that pertain to the existence of an antitrust violation are common to members of each of the proposed settlement classes, including (1) whether the rules challenged in the operative complaint constitute a horizontal agreement, contract, or combination that caused significant anticompetitive effects in the relevant markets for student-athletes' labor services; (2) whether Defendants' procompetitive justifications for the challenged NCAA rules are valid; and (3) whether any procompetitive justifications for the challenged NCAA rules can be achieved with less restrictive alternatives. No objector or party argues that the commonality requirement is not met with respect to the settlement classes. Accordingly, the Court finds that the commonality requirement is satisfied.

### 3.    Typicality

The typicality requirement looks to whether the claims or defenses of the representative parties are typical of the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). "Typicality

22

United States District Court
Northern District of California

refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Hanon v. Dataproducts Corp*., 976 F.2d 497, 508 (9th Cir. 1992) (internal citation and quotation marks omitted). "In the antitrust context, generally, typicality will be established by plaintiffs and all class members alleging the same antitrust violation by defendants." *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-In-Aid Cap Antitrust Litig.*, 311 F.R.D. at 539 (citation and internal quotation marks omitted).

Here, the claims of the named Plaintiffs Grant House, Sedona Prince, Tymir Oliver, DeWayne Carter, Nya Harrison, and Nicholas Solomon are typical of those of the members of the proposed settlement classes each seeks to represent because all named Plaintiffs are or were Division I student-athletes and allege the same antitrust violations as the members of the proposed settlement classes, namely that the challenged restrictions are anticompetitive and caused them cognizable antitrust injury by depriving them of compensation they would have received if the rules had not been in place. No objector or party argues that the typicality requirement is not met with respect to the settlement classes. Accordingly, the Court finds that the typicality requirement is met.

### 4. Adequacy of Representation

The requirement of adequate representation requires a showing that the representative parties "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requires inquiry into whether the representatives (i) have any conflicts of interest with class members and (ii) will prosecute the action vigorously on behalf of the class. *See Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). Rule 23(g)(2) imposes a similar adequacy requirement on class counsel. *See* Fed. R. Civ. P. 23(g)(2) (providing that the court may appoint class counsel if counsel will fairly and adequately represent the interests of the class based on factors that include the work of counsel, their experience in handling the types of claims asserted in the action, their knowledge of the applicable law, and the resources they will commit to the class).

Here, Plaintiffs have shown that named Plaintiffs House, Prince, Oliver, Carter, Harrison, and Solomon are adequate representatives for each of the proposed settlement classes they seek to represent, because their interests are aligned with members of those classes in securing a more

United States District Court
Northern District of California

competitive market for the labor of Division I student-athletes and in achieving greater compensation for Division I student-athletes via this litigation. The Court finds that each of the named Plaintiffs has prosecuted this action vigorously to the benefit of all members of the settlement classes. Some objectors argue that the named Plaintiffs are not adequate representatives for some segments of the settlement classes; however, the Court will reject those arguments for the reasons discussed in more detail in the objections section of this order. The Court finds that the named Plaintiffs satisfy the adequacy of representation requirement with respect to the settlement classes they seek to represent.

The Court further finds that Hagens Berman Sobol Shapiro LLP and Winston & Strawn LLP satisfy the requirements for appointment as Class Counsel for the proposed settlement classes. Both were previously appointed lead counsel for college student-athletes in complex antitrust actions and have achieved significant success in that role. For example, the Court appointed Hagens Berman Sobol Shapiro LLP and Winston & Strawn LLP to represent student-athletes who asserted both damages and injunctive relief claims in *Alston*, 375 F. Supp. 3d at 1058, on a contingency basis, and they achieved great results in that case. Before the parties reached a settlement agreement in this case, the Court appointed those firms in 2023 to serve as co-class counsel on behalf of damages and injunctive-relief classes of student-athletes in this action. The Court is now very familiar with both of these firms given that the Court presided over *Alston* and now this case. The Court finds that their work and experience in representing student-athletes has been excellent. Accordingly, the Court finds that these firms would be and have been outstanding representatives for the members of all of the settlement classes here.

Some objectors argue that Hagens Berman Sobol Shapiro LLP and Winston & Strawn LLP have conflicts of interests with some members of the proposed settlement classes but, for the reasons discussed in more detail below in the objections section of this order, the Court will reject those arguments. The Court is persuaded that Hagens Berman Sobol Shapiro LLP and Winston & Strawn LLP have prosecuted this action vigorously and fairly on behalf of those classes and that they satisfy the requirements of Rule 23(a)(4) and Rule 23(g)(2).

United States District Court
Northern District of California

**B.      Rule 23(b)(3)**

Under Rule 23(b)(3), a plaintiff must show that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) requires a court to consider whether a class action would be a superior method of litigating the claims of the proposed class members by taking into account (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3).

Here, the Court finds that the predominance requirement is met with respect to all of the proposed settlement damages classes. The questions that are central to Plaintiffs' claims under Section 1 of the Sherman Act are capable of resolution on a classwide basis with common proof, including whether the challenged NCAA rules violate Section 1 and whether the members of the proposed classes suffered antitrust injury as a result of that violation. No objector or party argues otherwise.

The Court further finds that a class action is superior to other methods of adjudicating the claims of members of the settlement damages classes. Members of the settlement damages classes are unlikely to want to pursue individual actions given that the amount of damages that each class member can recover is likely too low relative to the costs of litigating a complex antitrust class action against Defendants, who are repeat litigants. Further, litigating the action in this forum is desirable because this Court has presided over several other actions involving antitrust challenges to NCAA rules and involving the same Defendants. The manageability of litigating the claims of the damages settlement class members at trial is irrelevant for the purpose of certification for settlement purposes. *See In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 558 (9th Cir. 2019) ("[I]n deciding whether to certify a settlement-only class, a district court need not inquire

whether the case, if tried, would present intractable management problems.") (citation and internal quotation marks omitted).

### C.     Rule 23(b)(2)

Rule 23(b)(2) permits certification of an injunctive relief class when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).  The Ninth Circuit has explained that the Rule 23(b)(2) requirements "are unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." *Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014) (citation omitted).  "That inquiry does not require an examination of the viability or bases of the class members' claims for relief, does not require that the issues common to the class satisfy a Rule 23(b)(3)-like predominance test, and does not require a finding that all members of the class have suffered identical injuries." *Id.* (footnote omitted).  "Rather, as the text of the rule makes clear, this inquiry asks only whether 'the party opposing the class has acted or refused to act on grounds that apply generally to the class.'" *Id.* (quoting Fed. R. Civ. P. 23(b)(2)).

Here, the Court finds that the requirements of Rule 23(b)(2) are met with respect to the Injunctive Relief Settlement Class because the NCAA restraints on student-athlete compensation that are challenged in the operative complaint apply generally to the entire class such that final injunctive relief from the challenged restraints is appropriate with respect to the entire class.

Some objectors have argued that, in their view, the Injunctive Relief Settlement's roster limits provisions will cause injury to some members of the Injunctive Relief class.  It is not clear whether these objectors challenge certification of the Injunctive Relief Settlement Class for failure to comply with Rule 23(b)(2)'s requirements on those grounds, but to the extent that they do, the Court rejects their objections, as discussed in more detail in the objections section below.

Some objectors also have argued that the inclusion of future Division I student-athletes in the Injunctive Relief Settlement Class is inappropriate because their claims are not yet ripe.  It is not clear whether these objectors challenge certification of the Injunctive Relief Settlement Class

for failure to comply with Rule 23(b)(2)'s requirements on those grounds, but to the extent that they do, the Court rejects their objections, for the reasons discussed in more detail below in the objections section of this order.

## II.     Fairness of the Settlement Agreement

In determining whether the SA can be approved under Rule 23(e)(2), the Court must consider the factors set forth in that rule to determine whether the settlement is fair, reasonable, and adequate, namely whether (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorneys' fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

For the reasons set forth below, the Court finds that the SA satisfies the requirements for approval under Rule 23(e)(2).

### A.     Adequate Representation

As discussed above, Class Counsel have represented classes of student-athletes in multiple litigations challenging NCAA restraints on student-athlete compensation, and they have achieved extraordinary results.  Class Counsel's representation of the settlement class members here is no exception.  The relief that Class Counsel achieved on behalf of the settlement classes is exceptional, as will be discussed in more detail below.  Further, the record shows that Class Counsel have prosecuted this litigation vigorously on behalf of all settlement class members. They conducted substantial discovery; they successfully opposed a motion to dismiss; and they successfully obtained certification of three damages classes and an injunctive relief class despite significant opposition from Defendants, and they successfully defended the class certification decision on appeal.  Those are remarkable results, not least because prior attempts to certify damages classes challenging NCAA compensation restrictions had failed.

United States District Court
Northern District of California

27

In light of the excellent results that Class Counsel have achieved to date on behalf of settlement class members, and their substantial experience in prosecuting complex class actions challenging NCAA restrictions on student-athlete compensation, the Court finds that Class Counsel were well informed about the strengths and weaknesses of class members' claims before and during their settlement negotiations and were well-positioned to negotiate a fair settlement on behalf of the settlement classes. *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 967 (9th Cir. 2009) ("[W]e have held that [p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation" and this weighs "in favor of approval") (citation and internal quotation marks omitted).

The Court finds that Class Counsel have adequately represented settlement class members throughout this litigation, and that this factor weighs in favor of granting final approval.

**B.      Whether the Settlement Agreement was Negotiated at Arm's Length**

As discussed above, the SA was negotiated at arm's length before Professor Eric Green, a highly respected mediator who has significant experience mediating disputes involving challenges to the NCAA's compensation rules. *See* Berman Decl., ¶ 4. The parties conducted multiple negotiation sessions over the course of more than one year. Throughout, the settlement discussions were structured and sequenced to compartmentalize negotiations separately based on different relief and different claims. *See id.* ¶¶ 4, 6, 8-9. The parties first focused on negotiations regarding settling the injunctive relief claims. Only after agreeing to the principal terms of the Injunctive Relief Settlement did the parties turn to discussions of damages. Plaintiffs then made separate demands for damages relating to NIL damages and additional compensation damages (and a demand relating to damages in the *Hubbard v. National Collegiate Athletic Association* matter, Case No. 4:23-cv-01593-CW). The demands, subsequent negotiations, and ultimate agreed-upon settlement amounts took into account the different damages estimates, procedural postures, and risks and strengths of the respective claims. *Id.* The parties negotiated attorneys' fees after all material terms of the SA had been agreed upon.

The Court finds that the SA is the product of arm's length negotiations given: the participation of a neutral and highly respected and experienced mediator, the back-and-forth

between the parties as to the terms of the SA for more than a year, and the parties' decision to structure settlement discussions to compartmentalize negotiations separately based on different relief and different claims and to negotiate attorneys' fees after all other terms had been agreed upon. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011) (holding that participation of a mediator is not dispositive but is "a factor in favor of a finding of non-collusiveness"); *see also Youth Just. Coalitions v. City of Los Angeles*, No. 2-16-CV-07932-VAPRAOX, 2020 WL 9312377, at *3 (C.D. Cal. Nov. 17, 2020) ("The sustained back and forth negotiations between the parties indicate that the Settlement Agreement was the result of a process that was fair and full of adversarial vigor.") (citation and internal quotation marks omitted). The Court has carefully reviewed the record and finds no indication of fraud, overreaching, or collusion.

Accordingly, the Court finds that this factor weighs in favor of granting final approval. The SA's provisions relating to Class Counsel's attorneys' fees and costs do not alter this finding, for the reasons discussed in more detail below.

## C.    Whether the Relief Provided for the Class Is Adequate

Rule 23 requires that a court consider whether the relief provided for the class is adequate in determining whether to approve a settlement. In considering whether the relief provided to the class is adequate, the Court accounts for: (i) the costs, risks, and delay of a jury trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorneys' fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3). *See* Fed. R. Civ. P. 23(e)(2)(C).

The Court finds that the relief that Class Counsel achieved on behalf of settlement class members is outstanding.

Class Counsel secured a total of $2.576 billion dollars for distribution to eligible members of the damages classes. Based on the economic analyses of Dr. Rascher, the $1.976 billion that Class Counsel secured for the "NIL Claims Settlement Amount" represents 67.4% of the estimated damages for the settlement classes for NIL-related injuries (BNIL, videogame NIL, and

third-party NIL). Rascher Decl. ¶¶ 7, 33. The Court is very well acquainted with Dr. Rascher's work, as he filed numerous reports and provided testimony as Plaintiffs' economics expert in *Alston* and has filed multiple reports in this litigation. The $1.976 will be split into sub-funds for each of the three types of NIL-related injuries in a manner that is proportionate to their estimated single damages, so that the recipients of each of type of NIL claims will also receive, in gross, 67.4% of their estimated single damages (i.e., $1.815 billion for BNIL, $71.5 million for videogame NIL, and $89.5 million for third-party NIL). *See id.* ¶¶ 22, 28, 32. Further, the $600 million that Class Counsel secured for the Additional Compensation Claims Settlement Amount represents 31.6% of the estimated damages for pay-for-play claims. *See* Rascher Decl. ¶¶ 8, 49. These are outstanding results, particularly given that lesser recoveries in other antitrust actions have been hailed as excellent. *See, e.g.*, *In re Lithium Ion Batteries Antitrust Litig.*, No. 13MD02420YGRDMR, 2020 WL 7264559, at *20 (N.D. Cal. Dec. 10, 2020), *aff'd*, No. 21-15120, 2022 WL 16959377 (9th Cir. Nov. 16, 2022) (finding as "excellent" that "the common fund of the settlement equates to 11.7 percent of the single damages" for a nationwide class in an antitrust case); *see also Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 628 (9th Cir. 1982) ("It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery will not per se render the settlement inadequate or unfair.").

Class Counsel also secured the Injunctive Relief Settlement, which will open the doors for each Division I school that chooses to opt in to the IRS to provide Division I student-athletes with benefits and compensation of more than $20 million for the first year of the IRS (2025-26), with the amount increasing over the ten-year period of the IRS to reach approximately $32.9 million per school in 2034-35. *See* Rascher Decl. ¶¶ 82-87. Dr. Rascher opines that it would be economically reasonable to expect due to competition that Division I schools, in the aggregate, will provide Division I student-athletes with at least $1.6 billion in 2025-26 in new benefits and compensation that were not previously permitted under existing NCAA rules but will be permitted under the IRS. *See id.* ¶¶ 86-87. Dr. Rascher estimates that, in 2025-2026, the combined value of existing benefits to Division I student-athletes and the Pool benefits and compensation that will be permitted under the IRS will represent approximately 50% of Division I revenues. Rascher Decl.

¶¶ 82-87. According to Dr. Rascher, that percentage is similar to the share of professional sports revenue that is shared with professional athletes. *See Id.* Dr. Rascher estimates that, in the aggregate, the combination of benefits and compensation that are permitted under current NCAA rules and the new benefits and compensation that will be allowed under the IRS will total at least $19 billion over the ten-year period of the IRS. *See id.*

The IRS will provide additional benefits to Division I student-athletes over its ten-year period, however. It requires the elimination of the NCAA scholarship limits that restrict scholarships that Division I schools can provide in each sport. The IRS will also result in new protections for student-athletes in the context of third-party NIL payments. The IRS will permit the NCAA to continue its current restrictions on third-party NIL payments to Division I student-athletes, but only to the extent that such payments are made by Associated Entities or Individuals. By contrast, the NCAA's current rules allow it to prohibit *all* third-party NIL payments to Division I student-athletes, regardless of their source. The IRS further requires that any disputes arising out of the enforcement of third-party NIL restrictions permitted under the IRS be resolved via neutral arbitration under rules that will ensure transparency and due process protections for student-athletes, which is a significant improvement over the NCAA's current system for enforcing third-party NIL restrictions.

The Court finds that the relief provided to settlement class members under the SA is fair and reasonable considering the exceptionally positive reaction of the settlement class members, which, as noted, resulted in approximately 26.2% of the estimated 389,700 current members of the settlement classes submitting claim forms or updating their contact and payment information to receive damages distributions and only 73 valid objections and 357 opt outs. This conclusion is supported, as well, by the Rule 23(e)(2)(C) factors, which the Court discusses below.

### 1. The Costs, Risks, and Delay of Trial

The parties settled this action after Plaintiffs achieved certification of damages and injunctive relief classes, and after the parties had begun their briefing on their respective motions for summary judgment and had completed discovery.

United States District Court
Northern District of California

Class Counsel represent that, in light of the significant risks involved with proceeding to a jury trial and a possible appeal, the settlement of the claims under the terms now before the Court would be in the best interest of the settlement classes.  Class Counsel explain that some of the risks the class members would face at trial include the risk of *Daubert* challenges and the burden to establish liability and damages over Defendants' arguments that Plaintiffs' damages models are inadequate.  Defendants would argue that Plaintiffs' estimated BNIL damages are insufficiently supported because they have never before been valued as a separate component of damages, that no college basketball video game would have existed during the relevant period, and that the NIL lost opportunity damages model relies on unreliable data.

Class Counsel also explain that, even if they were to prevail at trial, an appeal would be certain, during which Defendants would raise the same arguments just discussed.  The Court is persuaded that, if the litigation had continued through trial and appeals, it is very possible that Plaintiffs would have recovered less, or nothing.  In 2015, the Ninth Circuit vacated this Court's injunction that would have allowed college football and basketball players to receive $5,000 in deferred compensation for the use of their NILs.  *See O'Bannon*, 802 F.3d at 1078.  Given that, ten years ago, the Ninth Circuit found that $5,000 in deferred compensation for student-athletes was not permissible shows that the relief that Class Counsel obtained on behalf of settlement class members under the SA, including the extraordinary amounts of student-athlete compensation that will be permissible pursuant to the Injunctive Relief Settlement and the multi-billion dollar damages funds, is a significant achievement.

The Court thus finds that the relief provided for settlement class members is reasonable and fair when compared with the costs, risks, and delay of trial.

> **2.    The Effectiveness of the Proposed Method for Distributing Relief to the Class**

As noted, to receive distributions for damages claims, some members of the damages classes were required to submit a claim form, while others were only required to submit their updated contact and payment information.  *See* Notice, Docket No. 544-4 at 11; Peak Decl. ¶¶ 32-35.  After the hearing on Plaintiffs' motion for preliminary approval, the Court reviewed and

United States District Court
Northern District of California

edited Plaintiffs' proposed claim form to ensure that it was easy to understand and fill out, and did not require class members to provide any unnecessary information or information that could be burdensome to collect. *See* Docket No. 544-2.

Members of the damages classes were provided with 105 days from the notice date, i.e., until January 31, 2025, to submit their claim form or contact and payment information on the settlement website or by mail. Damages distributions to those class members who submitted valid and timely claims, or who provided updated contact and payment information to the claims administrator, will receive yearly distributions from the damages funds over the course of ten years following the Effective Date pursuant to Plaintiffs' proposed allocation plan. *See* SA ¶¶ 3-4.

The SA does not contain any provisions that unclaimed portions of the settlement funds that were intended for settlement class members will revert to Defendants. Any balance remaining in the Gross Settlement Fund after the initial distributions, because of uncashed checks or otherwise, may be distributed, subject to Court approval, in an equitable and economical fashion to "Authorized Recipients," which are defined in the SA as members of the damages settlement classes who are entitled to a distribution under the SA. *See* SA ¶¶ 1(f) & 9.

The Court finds that the proposed method for distributing relief to the classes is fair and reasonable and weighs in favor of granting final approval of the SA.

### 3. The Terms of Any Proposed Award of Attorneys' Fees, Including Timing of Payment

In considering whether the relief provided to the classes pursuant to the SA is adequate, the Court accounts for the terms of "any proposed award of attorneys' fees, including timing of payment[.]" *See* Fed. R. Civ. P. 23(e)(2)(C). Rule 23(e) requires courts to "balance the 'proposed award of attorney's fees' vis-à-vis the 'relief provided for the class' in determining whether the settlement is 'adequate' for class members." *See Briseno v. Henderson*, 998 F.3d 1014, 1024 (9th Cir. 2021). This requires scrutinizing the settlement agreement for "subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Id.* at 1023. Such subtle signs exist: (1) when counsel receive a disproportionate distribution of the settlement; (2) when the parties negotiate a "clear sailing" arrangement

providing that defendants will not oppose class counsel's request for fees; and (3) when the parties arrange for fees not awarded to class counsel to revert to defendants rather than to the class members (i.e., a so-called "kicker" clause). *Id.* Where any of these signs are present, the district court must "examine the negotiation process with even greater scrutiny than is ordinarily demanded" and the "approval of the settlement [must] be supported by a clear explanation" of why the negotiated attorneys' fee is justified and "does not betray the class's interests." *In re Bluetooth*, 654 F.3d at 949.

Here, the SA does contain two arguably clear-sailing provisions. The SA provides that Defendants will not oppose paying the $20 million upfront injunctive fee and cost award, and that Defendants shall not unreasonably oppose fees that Class Counsel may apply for in the future as a percentage of the total amount spent by Division I institutions under the Pool for each academic year, or for monitoring and enforcement work in connection with the IRS. *See* SA ¶¶ 27-29. Even when viewing these provisions as clear-sailing provisions, their presence does not preclude the Court from granting final approval of the SA. The Court has carefully reviewed the record and has found no indication of collusion or that the settlement negotiations were not conducted at arm's length.

Class Counsel request an award of attorneys' fees equivalent to 20% of the NIL Claims Settlement Fund (or $395.2 million in fees), 10% of the Additional Compensation Claims Settlement Fund (or $60 million in fees), an upfront injunctive relief award of $20 million to be paid by Defendants, the right to apply to the Court or special master for an award of a percentage of the total amount spent by Division I member institutions under the Pool for each academic year (with the percentage increasing from .75% to a maximum of 1.25%), and the right to apply to the Court or special master for an award of fees and costs for their ongoing work in monitoring and enforcing compliance with the IRS.

The Court compares the amount in fees that Class Counsel now seek under the terms of the SA to the relief that Class Counsel achieved for the settlement classes, taking into account the risks of continued litigation discussed above. The Court finds that all of the fees that Class Counsel request are proportionate to the benefits that the SA provides for the settlement class

United States District Court
Northern District of California

34

members, because the fees requested represent a small of percentage the benefits that settlement class members will receive.  That is in contrast with other settlements where the fees requested were disproportionate to the benefits conferred on class members.  *Cf. Lowery v. Rhapsody Int'l, Inc.*, 75 F.4th 985, 991 (9th Cir. 2023) ("The district court's fee award is not reasonable under Rule 23, given that the $1.7 million fee award is more than thirty times larger than the amount paid to class members"); *In re Bluetooth*, 654 F.3d at 938 (vacating attorneys' fee award of $800,000 where class members received "zero dollars for economic injury" and $100,000 in cy pres awards); *Briseno*, 998 F.3d at 1026 (finding that attorneys' fees of almost $7 million were disproportionate to the benefits conferred on the class, which would total less than $1 million).  Additionally, the percentages in fees that Class Counsel request are lower than the 25% benchmark in the Ninth Circuit.  *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949 (9th Cir. 2015) ("Under the percentage-of-recovery method, the attorneys' fees equal some percentage of the common settlement fund; in this circuit, the benchmark percentage is 25%.").  The Court finds that the requested fees do not render the SA unfair to class members for the additional reason that Class Counsel committed substantial resources on a contingency basis for the benefit of the class and achieved excellent results on behalf of the class throughout this highly contested litigation.

The Court further finds that the proposed timing for the payment of any fees awarded to Class Counsel does not detract from the fairness and reasonableness of the SA to settlement class members.  Class Counsel ask that fees on damages claims be paid to them over the same ten-year period as the damages funds will be distributed to members of the damages classes, which the Court finds to be fair and reasonable.  *See* Docket No. 583 at 25.  Further, the fees that Class Counsel will apply for in the future as a percentage of the total amount spent by Division I member institutions under the Pool for each academic year will also be distributed as the Pool amounts are provided to members of the Injunctive Relief class, which is also fair and reasonable.  Any fees for monitoring and enforcing the IRS, if approved, will be paid when earned.  The $20 million upfront injunctive relief award, if approved, will be paid by Defendants into an escrow account within 45 days of the entry of the Court's order approving the award, and thereafter will

be paid to Class Counsel within 10 days of the Effective Date. *See* SA ¶ 27(a)-(d). The Court finds that the timing of the injunctive fee award is appropriate and fair to settlement class members because those fees will be paid by Defendants and will not be taken out of funds that would otherwise go to settlement class members. *See id.*

Because there is no evidence of collusion here and the requested attorneys' fees are reasonable when compared to the settlement class members' recovery under the SA and other factors discussed above, the Court finds that this factor weighs in favor of granting final approval of the SA.[5] *See In re Bluetooth*, 654 F.3d at 949; *Briseño*, 998 F.3d at 1026-28.

Some objectors argue that the fees that Class Counsel can seek under the terms of the SA indicate the existence of a conflict. For the reasons discussed in more detail below in the objections section of this order, the Court will reject those arguments.

### 4. Any Agreement Required to be Identified Under Rule 23(e)(3)

The parties have not identified any agreement under Rule 23(e)(3) to disclose. Accordingly, this factor does not impact the Court's findings as to the fairness of the SA.

### D. Whether the Settlement Agreement Treats Class Members Equitably Relative to Each Other

The Court is required to consider whether the "proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D).

The Court finds that the SA satisfies that standard. A plan of allocation is equitable and fair where it distributes funds based on the strength of the class members' claims. *See In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1045 (N.D. Cal. 2008) ("It is reasonable to allocate the settlement funds to class members based on the extent of their injuries or the strength of their claims on the merits.") (citation and internal quotation marks omitted). Plaintiffs' proposed allocation plans for the damages funds do exactly that.

---

[5] The Court will resolve Plaintiffs' motion for attorneys' fees and costs, Docket No. 583, in a separate order. The SA provides that any applications by Class Counsel for fees and costs are not a part of the SA and that proceedings relating to any such applications shall not affect or delay the finality of the SA. *See* SA ¶ 30.

United States District Court
Northern District of California

Plaintiffs' proposed allocation plan for the NIL Claims Settlement Fund will result in the distribution of that fund in a manner that is proportional to Dr. Rascher's estimated damages for each type of NIL-related claim (BNIL, videogame NIL, and third-party NIL) alleged in the operative complaint.  Damages funds for BNIL and videogame NIL will be distributed amongst eligible settlement class members based on Dr. Rascher's opinions relating to the types of Division I student-athletes who were likely to receive each type of NIL compensation in the but-for world.  *See, e.g.*, Rascher Decl. ¶¶ 20-28.  Damages for third-party NIL will be further distributed amongst eligible class members based on Dr. Rascher's before-and-after methodology, which takes into account actual payments that student-athletes received from third parties for their NIL.  *See, e.g.*, Rascher Decl. ¶¶ 31-32.

Plaintiffs' allocation plan for the Additional Compensation Settlement Fund will result in the distribution of 95% of the Fund to damages class members who played football, men's basketball, and women's basketball and who, according to Dr. Rascher's economic analyses, would most likely have received compensation for their athletic services in the but-for world in light of the revenues that those sports achieve.  *See* Rascher Decl. ¶¶ 50-81.  Allocations to those athletes will be based on a formula that will provide class members with an individual compensation minimum that Dr. Rascher believes would likely be paid in high-revenue sports like basketball and football, and that would account for certain individual factors, such as seniority, recruiting star rating, and other metrics.  *See id.*  The remaining 5% of the Fund will be allocated to members of the Additional Sports Class who play certain sports, based on Dr. Rascher's opinions as to which sports would have been likely to support compensation for athletic services in the but-for world based their lesser revenues.  *See id.*

Plaintiffs submitted a chart that shows the approximate damages recovery by class and by type of claimed damages.  *See* Docket No. 450, Exhibit A.  The recoveries range from $80 to $91,000 per athlete.

The Court finds that Plaintiffs' proposed damages allocations are adequately supported by Dr. Rascher's opinions and treat damages class members equitably.  They reflect the extent of class members' injuries and the strength of their claims.  Any members of the damages classes

who were dissatisfied with the proposed allocations had the opportunity to opt out of the SA and pursue their claims individually.

The parties acknowledge that neither of the damages settlement funds will compensate members of the damages classes who suffered injury only as a result of the NCAA's limits on scholarships. That is not inequitable because Plaintiffs have shown that claims arising out of those injuries have little or no value given that prior cases that challenged scholarship caps did not get beyond the class certification stage and were, thus, not successful. This is discussed in more detail in the objections section of this order.

The Court also finds that the IRS treats members of the Injunctive Relief Settlement Class equitably. The IRS' provisions will apply equally to all NCAA member schools that choose to opt in to the IRS. Accordingly, members of the Injunctive Relief Settlement Class who choose to attend schools that opt in to the IRS will be subject to the same NCAA rules regarding compensation and benefits that are permitted under the IRS. Some objectors argue that some provisions of the IRS do not treat class members equitably, but the Court rejects those arguments for the reasons discussed below in the objections section.

Class Counsel's request for service awards for the named Plaintiffs does not render the SA inequitable. As noted, Class Counsel request that the Court approve service awards for the named Plaintiffs, as follows: $125,000 each for Grant House, Sedona Prince, and Tymir Oliver; $10,000 each for DeWayne Carter and Nya Harrison; and $5,000 for Plaintiff Nicholas Solomon. The Court finds that these requested service awards, which are not opposed by any of the objectors, do not evidence inequitable treatment of settlement class members. The Court finds that the requested service awards are intended to compensate class representatives for their work on behalf of settlement class members, their active involvement in this litigation (including assisting Class Counsel in prosecuting the case, responding to discovery requests, and preparing for and attending depositions), the financial or reputational risks they undertook in bringing the action (which were significant given the high degree of publicity this action has received), and the very favorable results they were able to achieve for the settlement class members by way of the SA. The fact that some members of the damages classes are estimated to receive settlement damages payments of

tens of thousands of dollars each, *see* Docket No. 450, Exhibit A, further supports the Court's conclusion that the amounts of the service awards are not unreasonable.  Other courts have found service awards of a magnitude similar to the ones requested to be appropriate.  *See, e.g.*, *In re High-Tech Emp. Antitrust Litig*., No. 11-CV-02509-LHK, 2015 WL 5158730, at *18 (N.D. Cal. Sept. 2, 2015) (authorizing service awards of $120,000 and $80,000 where the average recovery would be $5,770 per class member). The Court finds that this factor weighs in favor of granting final approval of the SA.

**III.    Adequacy of Notice**

A court must "direct notice [of a proposed class settlement] in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1).  Due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane v. Cent. Hanover Bank & Tr. Co*., 339 U.S. 306, 314 (1950).

The Court finds that the notice provided to class members complied with the requirements of Rule 23 and due process.  The notice plan, which the Court approved, involved direct notice (by email and postcard where feasible), a digital campaign, and press releases.  Plaintiffs have shown that the direct notice successfully reached over 81.9% of current settlement class members.  *See* Peak Decl. ¶ 21.  Further, as discussed above, the Court reviewed and edited the notices to ensure that they were easy to understand and described the settlement terms with more than sufficient detail to enable class members to make educated decisions as to whether to file a claim, opt out, or investigate further prior to the applicable deadlines.  *See In re Hyundai*, 926 F.3d at 567 ("To satisfy Rule 23(e)(1), settlement notices must present information about a proposed settlement neutrally, simply, and understandably.  Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.") (internal citations and quotation marks omitted).  Although not required, Plaintiffs made available as of December 17, 2024, on the settlement website estimates of damages allocations where possible for members of the damages classes.  *See* Peak Decl. ¶ 29.

United States District Court
Northern District of California

Some objectors argue that the notice plan was deficient. However, for the reasons discussed below in the objections section of this order, the Court will reject those arguments.

The Court finds that the adequacy of the notice weighs in favor of granting final approval of the SA.

## IV.    Objections to the SA

Under Rule 23(e)(5), any class member may object to the settlement agreement if it requires court approval under Rule 23(e). "An objector to a proposed settlement agreement bears the burden of proving any assertions they raise challenging the reasonableness of a class action settlement." *Noll v. eBay, Inc.*, 309 F.R.D. 593, 602 (N.D. Cal. 2015) (citation omitted). "To survive appellate review, the district court must show it has explored comprehensively all factors, and must give a reasoned response to all non-frivolous objections." *Dennis v. Kellogg Co.*, 697 F.3d 858, 884 (9th Cir. 2012) (citations and quotation marks omitted).

There were only 73 valid, timely objections filed by settlement class members, out of an estimated 389,700 current settlement class members across all settlement classes. *See* Berman Decl., Ex. A, Docket No. 717-1.[6]

The Court has reviewed all of the objections, but will not address those that were filed by non-class members, such as parents, athletics associations, and other individuals and entities who are not class members, because non-class members do not have standing to object to the SA.[7] *See In re TracFone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d 993, 1008 (N.D. Cal. 2015) (holding that objector had "no legal standing to object to the settlement because he has not demonstrated that he is an aggrieved class member") (collecting cases); *Moore v. Verizon Commc'ns Inc.*, No. C

---

[6] Class Counsel filed a chart that indicates which objections were invalid because they were untimely, filed by non-class members, filed anonymously, or filed by class members who opted out. *See* Docket No. 717-1. The Court has reviewed that chart and agrees with Class Counsel's conclusions and incorporates them here by reference.

[7] Some non-class members filed objections in the form of amicus curiae briefs. *See, e.g.*, Docket Nos. 971, 760, 762, 603, 705. The Court is not persuaded by these objections because the individuals and entities who filed them do not have standing to object to the settlement, and because the Court does not find the briefs they filed to be helpful.

01-MenkeER-0157

United States District Court
Northern District of California

09-1823 SBA, 2013 WL 4610764, at *9 (N.D. Cal. Aug. 28, 2013) ("[A] court need not consider the objections of non-class members because they lack standing.").

The Court will not address objections that were filed on the docket or postmarked after the January 31, 2025, deadline for objecting to the SA, with the exception of objections and related briefs that the Court specifically invited and permitted after the final approval hearing from objectors or their counsel who the Court invited to speak or argue during the final approval hearing. The untimely objections fail to comply with the objection procedures that the Court set forth in its order granting preliminary approval of the SA. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. MDL 3:07-MD-1827 SI, 2011 WL 7575004, at *3 (N.D. Cal. Dec. 27, 2011).

The Court also will not address objections that were filed anonymously because such objections fail to comply with the requirements for objecting to the SA, which, among other things, required class members to include their full name in the objection. *See Moore*, 2013 WL 4610764, at *9 (overruling objections because objectors "failed to comply with the proper procedures to object to the Settlement").

The Court also will not address objections filed by settlement class members who opted out, because class members who submitted them do not have standing to object to the SA given that they will not be affected by the SA as a result of having opted out. *See In re TracFone*, 112 F. Supp. 3d at 1008; *Moore*, 2013 WL 4610764, at *9.

For all valid, timely objections, the Court has considered carefully any supporting declarations and other materials that the objectors attached to their objections.

Below, the Court addresses by topic the substance of the valid, timely objections that were filed by members of the settlement classes. *See Dennis*, 697 F.3d at 884.

**A.** **Injunctive Relief Settlement**

**1.** **The Pool**

Multiple objectors argue that the SA does not satisfy the standards for final approval because of its provisions that limit or "cap" the compensation and benefits that schools can provide to class members under the "Pool."

United States District Court
Northern District of California

Some objectors argue that the SA cannot be approved because the Pool cap, which limits the compensation and benefits that each school can provide to student-athletes each year to 22% of the Power Five schools' average athletic revenues each year (subject to certain specified yearly increases), is anticompetitive and perpetuates the very harm that this litigation was supposed to remedy.

The Court overrules these objections. "So long as the conduct perpetuated under a settlement agreement does not per se violate antitrust law, the settlement may be approved, even if the perpetuated conduct might not withstand scrutiny under the rule of reason." *In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, 85 F.4th 1070, 108990 (11th Cir. 2023) (internal citation omitted), *cert. denied sub nom. Behenna v. Blue Cross Blue Shield Ass'n*, 144 S. Ct. 2686 (2024), and *cert. denied sub nom. Home Depot U.S.A., Inc. v. Blue Cross Blue Shield Ass'n*, 144 S. Ct. 2687 (2024). Here, the objectors have not pointed to any authority that the Pool spending cap provisions of the SA are a per se violation of the Sherman Act. Accordingly, those provisions are subject to the rule of reason. Because the alleged anticompetitive effect of the Pool spending cap provisions has not been established, and because Defendants argue that the cap is procompetitive because it is necessary for competitive balance and to ensure the greatest output of athletic opportunity, *see* Docket No. 721 at 8, it is not clear that the Pool spending cap provisions violate the Sherman Act.[8] Thus, the fact that the SA includes the Pool spending cap does not preclude the Court from granting final approval of the SA. *See id.*; *see also Robertson v. Nat'l Basketball Ass'n*, 556 F.2d 682, 686 (2d Cir. 1977) (affirming approval of a settlement agreement in antitrust case brought by professional athletes against a professional league over objections that the settlement agreement authorized the continuation of illegal conduct under the Sherman Act on the basis that the conduct authorized by the settlement agreement was not "clearly illegal").

---

[8] Because this action is being settled instead of being litigated through trial, the question of whether the Pool cap provisions violate the Sherman Act has not been and will not be adjudged by this Court. *See Robertson*, 556 F.2d at 686 (holding that "a court in approving a settlement should not in effect try the case by deciding unsettled legal questions").

01-MenkeER-0159

Some objectors argue that the Pool cap is unfair to class members because, in their view, there is no valid reason for imposing any kind of cap on student-athlete compensation and benefits.

The Court overrules these objections. The Pool spending cap does not alter the Court's finding, above, that the SA is fair, reasonable, and adequate to all class members. First, the Court credits Class Counsel's representation that the Pool cap reflects a settlement compromise that was informed by their extensive experience in challenging NCAA restraints. In prior cases where classes of student-athletes prevailed at trial in challenging NCAA restraints on student-athlete compensation, the relief achieved did not result in the complete elimination of those restraints. For example, in *O'Bannon*, a class of student-athletes prevailed at trial and that success resulted in an order from this Court that simply increased by a few thousand dollars the limit on education-related compensation that the NCAA could bar schools from offering student-athletes to the cost of attendance, and that permitted NCAA members to provide $5,000 per year in deferred cash compensation to student-athletes for the use of their NIL. *See O'Bannon*, 7 F. Supp. 3d at 963. The Ninth Circuit affirmed the increase of the lower limit on education-related compensation to the cost of attendance, but it reversed the aspect of the Court's ruling that permitted NCAA members to provide $5,000 per athlete per year in deferred cash compensation to student-athletes for their NIL. The circuit court found that that amount of cash compensation, not tethered to education, would constitute a "quantum leap" from the status quo. *See O'Bannon*, 802 F.3d at 1078. In *Alston*, a different class of student-athletes prevailed at trial in this Court but the remedy that this Court issued was constrained by the Ninth Circuit's reversal in *O'Bannon* of the $5,000 in deferred cash compensation. In light of the Ninth Circuit's holdings in *O'Bannon*, the Court issued an order in *Alston* that enjoined restrictions on non-cash education-related benefits but permitted the NCAA to continue to limit cash-equivalent education-related compensation at $5,980 per student-athlete per year, and that ruling was affirmed by the Ninth Circuit and unanimously by the Supreme Court. *See Alston*, 375 F. Supp. 3d at 1061-1110. In neither *O'Bannon* nor *Alston* did the success of the plaintiffs result in an order that completely enjoined

the challenged restrictions on student-athlete compensation even though that had been the relief that the plaintiffs had sought in the complaint.

The Court finds that, in light of that history, Class Counsel had a reasonable basis for the compromises that are reflected in the Injunctive Relief Settlement, including the Pool spending cap. Plaintiffs have shown that, even with the Pool spending cap, the Injunctive Relief Settlement will open the door for compensation and benefits for Division I student-athletes that will dwarf what is permitted under current NCAA rules, even after *O'Bannon* and *Alston*. The Pool spending cap will permit schools that choose to opt in to the IRS to provide benefits and compensation to Division I student-athletes of approximately $20 million per year per school. That is a dramatic increase from the $5,980 per student-athlete per year that was permitted in *Alston*, and from the $5,000 per student-athlete per year that the Ninth Circuit reversed in *O'Bannon*. The settlement result here is all the more remarkable because, absent the SA, members of the settlement classes risked a lesser recovery or no recovery at all.

Additionally, to the extent that class members in the future believe that the Pool cap has caused them injury, they will be free to sue Defendants for claims arising out of the Pool cap, as class members will not release damages claims that arise out of the Pool cap or any other restrictions permitted by the Injunctive Relief Settlement. *See* SA ¶ 1 (pp) & (qq).

Some objectors argue that the Injunctive Relief Settlement is unfair to class members because Plaintiffs have overestimated the benefits that may become available to student-athletes under the Pool. Those objectors contend that the actual benefits and compensation that will be provided to class members under the Injunctive Relief Settlement will be more modest than what Plaintiffs contend, because schools will not be required to provide any benefits and compensation to Division I student-athletes. Instead, schools will be permitted to provide compensation and benefits pursuant to the Injunctive Relief Settlement at their discretion, which means that schools will have the ability to choose to provide compensation and benefits that are significantly below the Pool cap or to provide no compensation and benefits at all.

The Court overrules these objections. The absence of provisions in the Injunctive Settlement Agreement that would require schools to provide specific amounts of benefits and

44

compensation to class members does not render the SA unfair or inadequate. The absence of those provisions is explained by the fact that, even if Plaintiffs prevailed at trial, Plaintiffs would not be able to obtain a court order forcing schools to provide any amount of compensation or benefits to student-athletes. The appropriate injunctive remedy in antitrust cases where liability has been established is to remove or lessen anticompetitive restrictions, not to require that the defendants pay any specific amounts to the plaintiffs. *See, e.g.*, *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 85 (2021) (affirming injunction that precluded NCAA from limiting non-cash education-related benefits while allowing the NCAA to continue to limit cash-equivalent education-related compensation). Further, Plaintiffs have shown that, even though the Injunctive Relief Settlement does not require schools to provide benefits and compensation in specific amounts, competition amongst schools to attract student-athletes is likely to lead schools to provide Division I student-athletes with benefits and compensation under the Injunctive Relief Settlement. *See* Rascher Final Approval Decl. ¶¶ 15, 73. As discussed above, the amounts and types of benefits and compensation that schools will be permitted to provide under the Injunctive Relief Settlement will be a significant improvement from what is currently permitted. The Court thus finds that the Injunctive Relief Settlement will provide settlement class members with significant and meaningful relief. *Cf. In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (E.D.N.Y.), 2024 WL 3236614, at *27 (E.D.N.Y. June 28, 2024) (declining to grant approval of settlement agreement that included injunctive component in relevant part because the relief it provided to class members was "significantly limited").

Finally, some objectors complain about the methodology that was used to determine the Pool cap limits and the amounts by which the Pool cap can increase each year. They argue, for example, that the Pool cap should have been set at a higher limit because more of the Power Five's revenues (such as revenues from concessions) should have been taken into account when determining the Pool cap. Other objectors complain about the fact that some types of compensation and benefits that are permitted under current NCAA rules (such as *Alston* academic achievement awards) will count against the cap; these objectors argue that benefits and compensation currently permitted should not count against the cap.

The Court overrules these objections.  As discussed above, the standard for whether a settlement can be approved is not whether the settlement could have been better, but rather whether it is fair and adequate. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ("Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion.").  The Court finds that the parties' methodology for determining the Pool spending cap amounts, as well as the types of benefits and compensation that will count against the cap, is fair and reasonable despite the objectors' dissatisfaction with it, because it is the product of a compromise that takes into account the history of prior class actions challenging NCAA compensation restrictions, as well as the delay, risks and costs of continuing this litigation.[9]

### 2.      Limits on NIL Payments from Associated Entities or Individuals

Some objectors argue that the Injunctive Relief Settlement cannot be approved because it permits the NCAA and its members to pass rules that allow them to police and veto student-athletes' NIL deals with Associated Entities and Individuals.  The objectors argue that these provisions of the SA are anticompetitive restrictions on compensation that violate the Sherman Act because they usurp the market's role in determining the fair market value for student-athletes' NIL and vests that power in the NCAA.

The Court overrules these objections.  As noted above, "[s]o long as the conduct perpetuated under a settlement agreement does not per se violate antitrust law, the settlement may be approved, even if the perpetuated conduct might not withstand scrutiny under the rule of reason." *In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th at 1089–90.  Here, the objectors have not pointed to any authority that the IRS provisions that permit the NCAA to prohibit payments to student-athletes from an Associated Entity or Individual third-party are a per se violation of the Sherman Act.  Accordingly, those provisions are subject to the rule of reason.

_____

[9] The objectors cited declarations and reports by their own experts relating to the Pool cap.  If the case were tried, Defendants might counter Plaintiffs' experts with experts like those of the objectors.  However, the Court does not find those submissions to be determinative.

Because the alleged anticompetitive effect of the Associated Entity third-party NIL provisions has not been established, and because Defendants advanced procompetitive justifications for these NIL provisions at the final approval hearing, *see* Final Approval Hearing Tr. at 217-18, it is not clear that such provisions violate the Sherman Act under the rule of reason.[10]  Thus, the Associated Entity third-party NIL provisions do not preclude the Court from granting final approval of the SA.  *See id.*; *see also Robertson*, 556 F.2d at 686.

Some objectors also argue that the third-party NIL Associated Entity provisions of the Injunctive Relief Settlement are unfair to class members because they will preclude class members from obtaining NIL payments from collectives and boosters and from obtaining the full market value of their NIL from such third parties.

The Court overrules these objections.  The Court finds that the Associated Entity third-party NIL provisions at issue are fair and reasonable to class members because they are a significant improvement in two ways relative to existing NCAA rules that regulate third-party NIL payments to student-athletes.

First, the Associated Entity third-party NIL provisions in the Injunctive Relief Settlement will have the effect of allowing class members to receive any and all third-party payments for their NIL, excepting only those that are made by Associated Entities or Individuals, which are, generally speaking, entities or individuals that promote or support a particular NCAA member school's athletic program.  *See* IRS Art. 1, §1(c).  The Injunctive Relief Settlement's Associated Entity third-party NIL provisions will not apply to other third parties that may seek to license student-athlete NIL and that do not fall within the definition of Associated Entity or Individual, such as companies that sell sports apparel, food, or other consumer products.  By contrast, under existing NCAA rules, the NCAA may limit or prohibit third-party NIL payments from all third parties.  Under the Injunctive Relief Settlement, NIL payments by Associated Entities or

---

[10] Because this action is being settled instead of being litigated through trial, the question of whether the third-party Associated Entity NIL provisions violate the Sherman Act has not been and will not be adjudged by this Court.  *See Robertson*, 556 F.2d at 686 (holding that "a court in approving a settlement should not in effect try the case by deciding unsettled legal questions").

Individuals can be prohibited *only if* the payment is not for a valid business purpose related to the promotion or endorsement of goods or services provided to the general public for profit, with compensation at rates and terms commensurate with compensation paid to similarly situated individuals with comparable NIL value who are not current or prospective student-athletes at the Member Institution. *See* IRS Art. 4, § 3. The Court finds that these provisions will not unduly restrict class members' ability to enter into contracts with third parties for their NIL or to maximize the payments they can obtain for their NIL from third parties. This is because those provisions will apply only to transactions with Associated Entities or Individuals. Further, NIL payments from Associated Entities and Individuals will be allowed if they are for a valid business purpose and are commensurate with the NIL value of similarly situated individuals. A similarly situated individual could potentially be a professional athlete, celebrity, or public figure who earns significant amounts for their NIL. Further still, Associated Entities and Individuals will be allowed to make indirect payments to student-athletes for their NIL by making contributions to the schools, which can then make payments to student-athletes.

Second, the Associated Entity third-party NIL provisions in the Injunctive Relief Settlement will result in an enforcement system that is far superior to the one that exists under current NCAA rules. Under the NCAA's current enforcement system for third-party NIL payments, the NCAA is the only decision-maker with respect to the enforcement of NCAA rules governing third-party NIL deals. By contrast, the Injunctive Relief Settlement requires that any disputes arising out of NCAA members' enforcement of the third-party NIL restrictions in the Injunctive Relief Settlement be resolved via neutral arbitration. *See* IRS Art. 6, § 2. The Injunctive Relief Settlement's requirement that disputes be resolved via neutral arbitration will benefit class members, because neutral arbitration will be accompanied by due process protections and a degree of transparency that class members do not have under current NCAA rules.[11]

---

[11] Examples of due process protections and transparency that will be afforded to class members under the Injunctive Relief Settlement include that (1) during the pendency of an arbitration, enforcement of any discipline imposed by NCAA members in connection with a violation of the SA's third-party NIL restrictions shall be stayed unless the arbitrator finds good cause to lift the stay; and (2) the arbitrator will be required to issue a written decision. *See* IRS Art. 6, § 2(d).

01-MenkeER-0165

The Court finds that the Injunctive Relief Settlement's Associated Entity third-party NIL restrictions are fair and reasonable to class members for the additional reason that they are the product of a reasonable compromise that takes into account the delay, risks, and costs of continued litigation and the fact that prior successful class actions challenging NCAA compensation restrictions resulted in injunctions that permitted the NCAA to continue to limit student-athlete compensation, as discussed above. Further, the SA does not require class members to release damages claims that arise out of the third-party NIL provisions in the Injunctive Relief Settlement.

### 3. Roster Limits

Multiple objectors argue that the SA does not satisfy the standards for final approval because of its provisions that permit the NCAA to adopt roster limits for Division I if the SA is approved.

Some objectors argue that the SA is not fair to class members because the provisions that permit the NCAA to adopt roster limits are anticompetitive horizontal agreements that violate the Sherman Act. The objectors argue that the roster limits provisions are anticompetitive because they reduce competition for student-athletes among NCAA members by restricting the number of permissible roster spots for each team, which in turn limits the number of scholarships and other student-athlete benefits that NCAA members can award to student-athletes on each team. These objectors contend that no procompetitive justification exists to justify the roster limits provisions under federal antitrust law.

The Court overrules these objections. As noted, "[s]o long as the conduct perpetuated under a settlement agreement does not per se violate antitrust law, the settlement may be approved, even if the perpetuated conduct might not withstand scrutiny under the rule of reason." *In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th at 1089–90. Here, the objectors have not pointed to any authority that the roster limits provisions are per se violations of the Sherman Act. Accordingly, the roster limits provisions are subject to the rule of reason. Because the alleged anticompetitive effect of the roster limits provisions has not been established, and because

United States District Court
Northern District of California

Defendants have advanced procompetitive justifications for the roster limits provisions,[12] it is not clear that the roster limits provisions violate the Sherman Act under the rule of reason.[13]  Thus, the inclusion of the roster limits provisions in the SA does not preclude the Court from granting final approval of the same.  *See id.*; *see also Robertson*, 556 F.2d at 686.

Some objectors argue that the SA is unfair and unreasonable because some class members will suffer injury as a result of the immediate implementation of the SA's roster limits provisions. Defendants began to implement the roster limits of the SA before the SA was approved, which is not something that the SA requires.  The objectors contend that some class members have lost or will lose their roster spots because of the immediate implementation of the SA's roster limits provisions, and that this will cause those class members harm.  The objectors argue that the parties should be pressured to modify the SA to either "grandfather" in the affected class members (i.e., to guarantee that the affected class members will not be removed from their roster because of the immediate implementation of the roster limits) or to require that the roster limits provisions be implemented gradually over time to ensure that no class member is removed from a roster because of the immediate implementation of roster limits.

The Court overrules these objections.  As noted above, the parties modified the SA to provide that class members who lost or may lose roster spots because of the immediate implementation of the roster limits provisions (i.e., the Designated Student-Athletes) will be exempt from roster limits at any Division I school for the remainder of their Division I athletic careers.  The Court finds that these modifications negate any harm that the roster limits could have caused to class members who were or will be impacted by the immediate implementation of the

---

[12] Defendants argue that the roster limits provisions are procompetitive because they enhance competitive balance among Division I NCAA member institutions and enhance output of college athletics opportunities for student-athletes.  *See* Docket No. 721 at 17.  Roster limits promote competitive balance among NCAA Division I member institutions because they ensure that team sizes are uniform for each sport and that no team is able to stockpile team members.  Some objectors concede that most teams have a set number of players on each sport's roster.

[13] Because this action is being settled instead of being litigated through trial, the question of whether the roster limits provisions violate the Sherman Act has not been and will not be adjudged by this Court.  *See Robertson*, 556 F.2d at 686 (holding that "a court in approving a settlement should not in effect try the case by deciding unsettled legal questions").

50

roster limits, because they enable Designated Student-Athletes to be eligible for roster spots without the roster limits provisions posing an obstacle. In other words, the modifications provide Designated Student-Athletes with what they had prior to the roster limits provisions being implemented, which was the opportunity to be on a roster at the discretion of a Division I school.

The fact that Defendants did not agree to modify the SA to guarantee roster spots for Designated Student-Athletes does not alter the Court's conclusion. This is because, under current NCAA rules, roster spots are not guaranteed for any student-athlete and schools have discretion to revoke roster spots for any reason. The parties' modifications of the SA maintain the schools' discretion to decide which student-athletes to have on their rosters. This does not render the SA unfair or unreasonable. Moreover, the SA contains other protections and new benefits for class members who may be impacted by the roster limits provisions. For example, the SA provides that the implementation of NCAA rules on roster limits shall not result in the loss of an athletic scholarship for student-athletes receiving a scholarship who may be cut because of the SA's roster limits provisions, and that roster limits shall not result in a reduction in the number of scholarships permitted under NCAA rules. *See* IRS, Art. 4, § 1. Further, the SA's elimination of all Division I athletic scholarship limits, *see* IRS, Art. 4 § 1, may lead to the creation of tens of thousands of new scholarships that could potentially be awarded to the class members who lost a roster spot because of the immediate implementation of the roster limits provisions. *See* Rascher Final Approval Declaration ¶ 74, Ex. 5 (opining that the SA, if approved, would open the door for more than 115,000 additional scholarships annually that would be available to class members). Finally, the Court finds that the SA modifications to exempt Designated Student-Athletes from roster limits will make those athletes more valuable to teams than they otherwise would be, because they will be able to participate on a team without counting against the roster limits.

Some objectors argue that the modifications to the SA to exempt Designated Student-Athletes from roster limits are not sufficient to negate the harm that the immediate implementation of the roster limits provisions caused to certain class members for two particular additional reasons: first, because the modifications are not coupled with any procedures that would permit class members who were impacted by the immediate implementation of the roster limits

01-MenkeER-0168

51

provisions to challenge errors in the Designated Student-Athletes lists; and second, because class members will be unable to sue Defendants for claims arising out of the immediate implementation of the roster limits provisions.

The Court overrules those objections. The Court finds that the SA contains sufficient procedural protections to ensure that Designated Student-Athlete designations are accurate and fair. The SA requires schools to identify Designated Student-Athletes in good faith, and to provide copies of the Designated Student-Athletes lists to Class Counsel. The Court interprets these requirements as empowering Class Counsel to ascertain that the Designated Student-Athletes lists are accurate and to ensure that any inaccuracies are corrected promptly. Class Counsel has already compiled a preliminary list of Designated Student Athletes and Defendants have not raised any dispute over that list. Additionally, the SA provides that Class Counsel have the power to monitor and enforce each school's obligations under the Injunctive Relief Settlement, and that the Court has jurisdiction to resolve any disputes that may arise concerning compliance with the SA. *See* SA ¶ 48; IRS, Art. 6 §§ 1-3. Those provisions can be employed by Class Counsel to bring to the Court's attention any disputes about Designated Student-Athlete designations. Finally contrary to objectors' argument, the SA preserves the right of class members to bring damages claims against Defendants that arise out of the implementation of the SA, including its roster limits provisions. *See* SA ¶ 1 (pp) & (qq).

Some objectors contend that the SA's roster limits provisions created conflicts of interests between the named Plaintiffs and other class members who are on athletic scholarships, on the one hand, and class members who are not on scholarships, on the other hand. The objectors argue that those conflicts exist because scholarship student-athletes, including the named Plaintiffs, are elite athletes who are not in danger of being cut from a roster because of any roster limits, whereas the same cannot be said for non-scholarship class members, who are not considered to be elite when compared to scholarship athletes and are therefore more likely to be cut from a roster because of roster limits.

The Court overrules those objections. The Court finds no evidence of a conflict between class members on athletic scholarships and class members who are not on athletic scholarships,

52

whether in the context of the roster limits provisions or otherwise. To the contrary, the Court finds that *all* class members in this case share a common interest in securing a more competitive market for the labor of Division I student-athletes and in achieving greater compensation for Division I student-athletes via this litigation. The Court further finds that the existence of this overarching common interest is sufficient to conclude that non-scholarship student-athletes had adequate representation from the named Plaintiffs in the context of the roster limits provisions, as well as the remainder of the SA. The fact that the parties made modifications to the SA to exempt from roster limits for the remainder of their Division I eligibility any class members who lost or would have lost roster spots because of the implementation of the roster limits provisions supports that the interests of class members who were or would have been negatively impacted by the roster limits provisions have been adequately represented.[14] While some of the objectors argue that the modifications in question did not go far enough to protect class members who were or would have been affected by the immediate implementation of the roster limits provisions, those arguments fail given that the standard for approving a settlement agreement does not require perfection but rather requires that the settlement be fair, reasonable, and adequate to class members. The Court finds that the SA, as modified, satisfies the fair, reasonable, and adequate standard with respect to all class members, including those who were or may be impacted by its roster limits provisions. *See Cohen v. Brown Univ.*, 16 F.4th 935, 945–46, 953 (1st Cir. 2021) (affirming approval of class settlement and noting, in relevant part, that a settlement need not be "perfect" for it to be "fair, reasonable, and adequate").

### 4.   Future Student-Athletes

Some objectors argue that the SA does not satisfy the standards for final approval because the Injunctive Relief Settlement Class includes future Division I student-athletes who are unknown and whose claims are unripe and because those future student-athletes will not receive

---

[14] These modifications were made after the Court recommended them and the parties considered the advocacy of counsel for certain groups of objectors who are represented by Laura Reathaford, Steven Molo, and the Buchalter firm. The Court allowed these groups of objectors to participate through their counsel in the negotiations pertaining to the SA's roster limits provisions that took place after the final approval hearing.

notice and an opportunity to object to the SA before it is approved and before they release their claims.

The Court overrules those objections. "Class action settlements may cover both present and future class members." *See LeClair v. Massachusetts Bay Transportation Auth.*, 300 F. Supp. 3d 318, 323 (D. Mass. 2018) (citations omitted); *see also Gaskin v. Pennsylvania*, 389 F. Supp. 2d 628, 631 (E.D. Pa. 2005) (approving five-year settlement agreement that bound a class comprised of present and future students); *Staton v. Boeing Co.*, 327 F.3d 938, 948 (9th Cir. 2003) (approving injunctive relief settlement class of Boeing employees including future employees, but reversing approval of the settlement for other reasons). The Court finds that the inclusion of future athletes in the Injunctive Relief Settlement Class is appropriate and permissible because the composition of that class is inherently transitory given that the rosters for Division I change each year. *See A. B. v. Hawaii State Dep't of Educ.*, 30 F.4th 828, 838 (9th Cir. 2022) (holding that a Rule 23(b)(2) class of students who participated in athletics at a particular school could include future athletes because the student body was expected to turn over significantly each year and "[g]iven the purely equitable nature of the claims, there is little if any benefit to continually joining, or potentially dismissing, large numbers of additional class members"). The fact that the claims of future student-athletes are not yet ripe is not problematic, because those claims will become ripe when the future student-athletes become members of the Injunctive Relief Class. *See id.* ("The inclusion of future class members in a class is not itself unusual or objectionable," because "[w]hen the future persons referenced become members of the class, their claims will necessarily be ripe.") (collecting authorities).

Further, as discussed above, the parties modified the SA to clarify that future Division I athletes will not release their injunctive and declaratory relief claims until they have received notice and an opportunity to object to the continuation of the SA and the Court has resolved any objections. The Court finds that those procedural protections satisfy the requirements of Rule 23 and due process. Objectors have not cited any authority providing otherwise, nor have they cited any authority that the claims of future student-athletes cannot be released after they have received notice and an opportunity to object as the SA provides.

01-MenkeER-0171

Some objectors argue that the SA cannot be approved in its current form because future student-athletes who are members of the Injunctive Relief Settlement Class did not have adequate representation by the named Plaintiffs in the negotiation of the SA. The objectors contend that none of the named Plaintiffs will be a class member when the Injunctive Relief Settlement goes into effect and, for that reason, the named Plaintiffs do not share the same interests as future Division I student-athletes, because they will not be impacted by the Injunctive Relief Settlement as future Division I student-athletes will be if the SA is approved.

The Court overrules those objections. As discussed above, the Court has found that the named Plaintiffs are adequate representatives for *all* class members, because they share with all class members a common interest in securing a more competitive market for the labor of Division I student-athletes and in achieving greater compensation for Division I student-athletes via this litigation. The existence of this overarching common interest is sufficient to conclude that future Division I student-athletes who are a part of the Injunctive Relief Settlement Class had adequate representation from the named Plaintiffs. *See Cohen*, 16 F.4th at 948–51 (rejecting objections that settlement could not be approved due to intra-class conflict because of finding that all class members had a "significant interest" in common). Although not necessary to ensure adequate representation for future student-athletes, Plaintiffs will add new class representatives for the Injunctive Relief Settlement Class throughout the ten-year term of the Injunctive Relief Settlement to replace previous class representatives as they graduate. *See* Final Approval Hearing Tr. at 26-27.

### 5. Ten-year Duration of SA

Some objectors argue that the SA is unfair and should not be approved because the Injunctive Relief Settlement will be in force for ten years if approved.

The Court overrules that objection. First, the parties represent, and the Court is persuaded, that the ten-year term is essential for providing stability for Division I college sports. The Court credits the parties' representations that college sports would be unmanageable if individual future student-athletes (or groups of future student-athletes) pursued different types of injunctive relief each year, that would result in certain rules applying to certain athletes (or groups of athletes),

United States District Court
Northern District of California

while different rules applied to others. The Court finds that the stability that the ten-year duration of the Injunctive Relief Settlement will provide to Division I sports and, consequently, to class members, is highly beneficial for class members and weighs strongly in favor of granting final approval of the SA. Second, Plaintiffs have shown that multi-year settlements in antitrust cases challenging student-athlete compensation are commonplace where, as here, the settlement is fair to class members and will provide stability in the industry. *See, e.g., Robertson v. Nat'l Basketball Ass'n*, 72 F.R.D. 64, 71 (S.D.N.Y. 1976), *aff'd*, 556 F.2d 682 (2d Cir. 1977) ("The proposed settlement constitutes a negotiated compromise which fairly seeks to protect the interests of both the players and the club owners. It should make for an era of peace and stability in professional basketball for many years to come."). On the other hand, objectors have not cited any authority that a settlement agreement in an antitrust case cannot be approved if it will be in force for a multi-year period.

### 6. Stay Pending Appeal

Some objectors argue that the SA is unfair because paragraph 18 of the same provides that the Injunctive Relief Settlement will not be stayed if there is an appeal of an order granting final approval of the SA. The objectors request that the Court stay the implementation of the Injunctive Relief Settlement pending appeal. The objectors argue that a stay is necessary because class members will suffer irreparable harm if the Injunctive Relief Settlement goes into effect immediately after the SA is approved. The potential harm that the objectors describe arises from NCAA members' implementation of the roster limits permitted under the SA, which the objectors claim will result in class members losing roster spots.

The Court overrules those objections. The Court is not persuaded that the term of the SA that provides that the implementation of the Injunctive Relief Settlement will not be stayed pending appeal is unfair to class members. To the contrary, the Court is persuaded that the provision in question is in the best interests of class members, because it will ensure that NCAA members that wish to opt in to the Injunctive Relief Settlement will not delay in providing the extraordinary levels of compensation and benefits to class members that are permissible under the SA.

The Court finds that the objectors have not met their burden to show that a stay of the Injunctive Relief Settlement pending appeal is warranted. "An applicant for a stay pending appeal must show that a stay is necessary to avoid likely irreparable injury to the applicant while the appeal is pending." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020) (citation and internal quotation marks omitted). "[S]imply showing some possibility of irreparable injury" is insufficient. *Id.* (citation and internal quotation marks omitted). "The minimum threshold showing for a stay pending appeal requires that irreparable injury is likely to occur during the period before the appeal is likely to be decided." *Id.* (citation and internal quotation marks omitted). "The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough." *Id.* at 1008 (citation and internal quotation marks omitted, ellipses in the original).

Here, the objectors have not shown that being cut from a roster because of the immediate implementation of roster limits constitutes *irreparable* harm. As discussed above, the parties modified the SA to negate any harm to class members who may be cut because of the immediate implementation of roster limits by ensuring that those class members will be exempt from any roster limits at any Division I school for the duration of their athletic eligibility. Those modifications will enable the affected class members to be eligible for roster spots for the remainder of their Division I career notwithstanding the roster limits, which is what those class members had before the SA. Further, the SA does not require any class members to release claims for damages arising out of new NCAA and conferences rules permitted under the Injunctive Relief Settlement. *See* SA ¶¶ 1 (pp) & (qq). This means that the affected class members will be able to sue Defendants for damages arising out of the roster limits provisions of the Injunctive Relief Settlement. Given the foregoing, the Court cannot conclude that class members who may be cut from rosters while an appeal is pending would suffer *irreparable* injury. Accordingly, the Court denies the objectors' request for a stay pending appeal.

### 7.      Unionization and Collective Bargaining

Some objectors argue that the SA is unfair because it risks stifling the efforts to unionize college student-athletes to enable collective bargaining. Other objectors argue that the SA cannot

01-MenkeER-0174

be approved because any such agreement must be the product of collective bargaining in order for it to include restrictions on student-athlete compensation (such as the Pool cap discussed above), which the objectors argue are anticompetitive.

The Court overrules those objections. First, the Court finds no basis for the objectors' arguments that the SA will impede collective bargaining by student-athletes. The SA expressly provides that nothing in the agreement "shall limit or interfere" with the ability of student-athletes or Defendants to explore and implement alternative structures for providing benefits to student-athletes, "including but not limited to collective bargaining in the event that a change in law or circumstances permits such collective bargaining to take place." *See* IRS Art. 7, § 2. Additionally, the SA provides that class members will not release claims under the Fair Labor Standards Act or any other federal labor law or analogous state labor laws. *See* SA ¶ 1(ww).

Second, collective bargaining is not a precondition for approving a settlement agreement that includes restrictions that could be anticompetitive. As discussed above, "[s]o long as the conduct perpetuated under a settlement agreement does not per se violate antitrust law, the settlement may be approved, even if the perpetuated conduct might not withstand scrutiny under the rule of reason." *In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th at 1089–90. Here, the conduct perpetuated under the SA does not per se violate the Sherman Act. Accordingly, the SA can be approved even if it contains elements that restrict student-athlete compensation and that the objectors argue are anticompetitive.

To the extent that the objectors object to the SA on the basis that Plaintiffs should have pursued, or that this Court should order, collective bargaining, the Court overrules that objection. This is an antitrust action, not a labor law case. The question of whether student-athletes are employees who can unionize and engage in collective bargaining is not one for adjudication and resolution in this litigation.

**B.     Allocations of Damages**

**1.     Damages Allocations Generally**

Some objectors oppose approval of the SA because they believe that damages class members are being undercompensated for their injuries or that their personal circumstances entitle

58

United States District Court
Northern District of California

them to a higher damages payment under the SA.  In other words, these objectors take issue with Plaintiffs' damages allocation formulas.  Some of those objectors argue that the allocation formulas undercompensate female athletes, or athletes in lower-revenue sports, such as sports that are not football or basketball.

The Court overrules those objections.  For the reasons discussed above, the Court has found that Plaintiffs' damages allocations are fair and reasonable to all damages class members, and that they have an adequate basis in the economics analyses of Dr. Rascher, which reflect the extent of class members' injuries and the strength of their claims based on what class members would have received for their claims in the but-for world.  That some objectors believe that more favorable allocations could have been achieved does not alter that conclusion, particularly given that members of the damages classes had the opportunity to opt out of the SA if they were dissatisfied with Plaintiffs' damages allocations.  *See Hanlon*, 150 F.3d at 1027; *Nwabueze v. AT&T Inc.*, 2013 WL 6199596, at *7 (N.D. Cal. Nov. 27, 2013) ("That a more favorable result for some Class Members could potentially have been reached is not a sufficient reason to reject an otherwise fair and reasonable settlement."); *Wren v. RGIS Inventory Specialists*, 2011 WL 1230826, at *12 (N.D. Cal. Apr. 1, 2011) (finding that "class members' challenges to the amount of their individual awards do not provide any grounds to reject the proposed settlement"); *In re Apple iPhone 4 Prods. Liab. Litig.*, 2012 WL 3283432, at *2 (N.D. Cal. Aug. 10, 2012) (rejecting objections that settlement damages were insufficient because "if any objector believed that his or her personal claim was being sacrificed for the greater good . . . they had the right to opt-out of the class") (citation omitted); *Rosado v. Ebay Inc.*, 2016 WL 3401987, at *9 (N.D. Cal. June 21, 2016) (granting final settlement approval over objector's contention "that he ha[d] suffered damages that [we]re significantly higher than the typical class member" because the objector "should opt out of the class and separately pursue his claims").

### 2.      The Pay-for-Play Claims

Some objectors argue that the SA is not fair and reasonable because settlement class members who have pay-for-play claims will receive only a small fraction of what those claims are

worth and because Plaintiffs' allocation formula for pay-for-play claims prioritizes revenue-generating sports and disadvantages student-athletes in non-revenue-generating sports.

The Court overrules these objections for the reasons discussed above.  The Court has found Plaintiffs' allocation formulas to be fair and reasonable because they are based on Dr. Rascher's sound economic analyses and because they reflect the difficulties of challenging NCAA pay-for-play restrictions in light of prior actions that failed to succeed on that claim, such as *Alston*.  *See Alston*, 375 F. Supp. 3d at 1062-1110.  The objectors' belief that the allocations could have been different and more favorable does not impact that finding.  To the extent that these objectors were dissatisfied with Plaintiffs' damages allocations, they could have exercised their opportunity to opt out of the SA.

### 3.    The Partial Scholarship Claims

Some objectors argue that the SA is not fair because no settlement money is being devoted to compensate damages class members who suffered injury as a result of the NCAA's caps on scholarships.  These objectors argue that such claims are worth at least $300 million in damages because some class members would have received at least partial scholarships in the absence of the scholarship caps.

The Court overrules these objections.  The Court finds that the fact that damages class members who allegedly suffered injury as a result of scholarship caps will not receive any compensation out of the settlement funds specifically for those injuries does not render the SA unfair or unreasonable.  Plaintiffs have shown that claims arising out of those injuries have little or no value given that prior cases that challenged scholarship caps did not get beyond the class certification stage and were, thus, not successful.[15]  *See In re: Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944 JST, 2016 WL 3648478, at *14 (N.D. Cal. July 7, 2016) ("Class counsel

---

[15] *See, e.g.*, *In re NCAA I-A Walk-On Football Players Litig.*, 2006 WL 1207915, at *9-13 (W.D. Wash. May 3, 2006) (challenging scholarship limits on behalf of walk-on football players in the Power 5); *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328 (7th Cir. 2012) (challenging the NCAA's then-prohibition on multiyear scholarships and the cap on the number of scholarships per team); *Rock v. National Collegiate Athletic Association*, 2016 WL 1270087, at *15-16 (S.D. Ind. Mar. 31, 2016) (challenging the multiyear scholarship and one-year limits imposed at that time by the NCAA).

here were within their rights to allocate the settlement proceeds according to the degree of injury suffered by the class" because "no Ninth Circuit case holds that the release of a class action claim must be compensated in all instances") (citations omitted); *see also Vinh Nguyen v. Radient Pharms. Corp.*, No. SACV 11-00406 DOC, 2014 WL 1802293, at \*5 (C.D. Cal. May 6, 2014) ("[A]n allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent counsel.") (citation and internal quotation marks omitted).  Further, class members who allegedly suffered injury because of scholarship caps will be eligible for damages payments from the $600 million fund that will be used to compensate settlement class members for the value of their athletic services in the context of pay-for-play claims.  Plaintiffs argue, and the Court is persuaded, that the value of the athletic services of damages class members who the objectors argue would have received partial scholarships is the same value that would be considered in the context of determining injury and damages arising from the NCAA's scholarship caps.  Finally, to the extent that objectors were not satisfied with Plaintiffs' allocation plan, they could have opted out of the SA so that they could pursue their claims in a separate lawsuit.  *See Milligan v. Toyota Motor Sales, U.S.A., Inc.*, 2012 WL 10277179, at \*7 (N.D. Cal. Jan. 6, 2012) (granting final approval of a settlement over objections that the settlement "provide[d] no benefit to" certain class members because "[o]bjectors who raised these concerns could have simply opted out of the settlement").

### 4.    Third-Party NIL Claims

Some objectors argue that SA is not fair and reasonable because Plaintiffs' damages allocation model undercompensates some damages class members for their third-party NIL claims.

The Court overrules this objection for the reasons discussed above.  The Court has found Plaintiffs' methodology for calculating and allocating third-party NIL damages to be fair and reasonable and to be based on Dr. Rascher's sound economic analyses.  The objectors' belief that the allocations could have been different and more favorable does not impact that finding.  To the extent that these objectors were dissatisfied with Plaintiffs' damages allocations, again, they could have exercised their opportunity to opt out of the SA.

**5.**      **Limits on BNIL Damages**

Some objectors argue that the SA is not fair and reasonable because it limits BNIL damages to Division I football and basketball student-athletes who received a scholarship and does not allocate BNIL damages to walk-on (non-scholarship) athletes or to athletes who play sports other than football and basketball.

The Court overrules those objections. The Court has found, as discussed in more detail above, that Plaintiffs' allocation plan for BNIL damages, which limits BNIL damages to Division I football and basketball student-athletes who received a scholarship, is fair and reasonable. The fact that Plaintiffs' damages allocation plan does not call for the distribution of BNIL damages to damages class members other than those who played Division I football and basketball and received a scholarship is based on the assumption, based on Dr. Rascher's economic analyses, that other student-athletes have no BNIL claims. Dr. Rascher opines that, because schools have not competed to offer scholarships to the student-athletes who the objectors argue should be eligible for BNIL payments under the SA, it is reasonable to assume that schools would not have competed to provide BNIL payments to those same athletes in the but-for world (i.e., if schools had been permitted to do so in the absence of the NCAA rules challenged in the operative complaint). Because the student-athletes in question have no BNIL claims, the fact that they will not receive damages payments under the SA for BNIL claims does not render the SA unfair. To the extent that the objectors were dissatisfied with Plaintiffs' allocation plan for BNIL damages, they had the opportunity to opt out so that they could litigate their BNIL claims in a separate action.

**C.**      **Antitrust Immunity**

Some objectors have expressed concern that Defendants will attempt to use the approval of the SA as a shield in future antitrust litigation brought against them by people or entities who are not bound by the SA. These objectors believe that Defendants will argue that the approval of the SA means that any conduct permitted under the SA is immune from antitrust scrutiny.

The Court overrules those objections. Defendants may make these arguments but that does not mean they will be successful. Because this action is being settled instead of being

United States District Court
Northern District of California

litigated through trial, the questions of whether the conduct challenged in the operative complaint and the conduct permitted under the terms of the SA violate the Sherman Act will remain unresolved and unadjudicated.  *See Robertson*, 556 F.2d at 686 (holding that "a court in approving a settlement should not in effect try the case by deciding unsettled legal questions") (citation omitted).  The Court's approval of the SA will not constitute a judgment on the competitive impact of the conduct challenged in the operative complaint or the conduct permitted under the SA, nor will it constitute a determination that the conduct challenged in the operative complaint or the conduct permitted under the SA complies (or does not comply) with the Sherman Act or any other law.

### D.  Title IX

Some objectors argue that the SA is unfair to female class members because it violates Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, in two ways: because the SA's damages allocations favor male class members over female class members in violation of Title IX, and because the SA does not contain any provisions that require that benefits and compensation provided to class members pursuant to the Injunctive Relief Settlement be made in compliance with Title IX.

The Court overrules these objections.  First, the objectors have cited no authority that Title IX applies to damages awards distributions or that damages distributions made by a claims administrator are subject to Title IX.  Accordingly, the Court cannot conclude that Title IX violations will occur when the Gross Settlement Fund is distributed by the claims administrator pursuant to the damages allocations that Plaintiffs have proposed.[16]  Second, the Court cannot conclude that violations of Title IX will necessarily occur if and when schools choose to provide compensation and benefits to student-athletes pursuant to the Injunctive Relief Settlement.  To the extent that Title IX governs benefits and compensation provided by schools pursuant to the

---

[16] Plaintiffs' proposed damages allocations are based on Dr. Rascher's damages methodology, which allocates more funds to class members who played Division I football and men's basketball on the basis that schools and conferences received far more revenues from those sports than from other sports during the class period.

Injunctive Relief Settlement, schools will be free to allocate those benefits and compensation in a manner that complies with Title IX. There is nothing in the SA that would prevent or prohibit schools from distributing benefits and compensation pursuant to the Injunctive Relief Settlement in a manner that complies with Title IX. Further, the SA does not require class members to release claims arising out of Title IX in connection with the implementation of the Injunctive Relief Settlement. *See* SA ¶ 1(ww) (providing that claims under Title IX are not released, except for claims arising out of or relating to the distribution of the Gross Settlement Fund). Thus, to the extent that schools violate Title IX when providing benefits and compensation to student-athletes pursuant to the Injunctive Settlement Agreement, class members will have the right to file lawsuits arising out of those violations.

### E. State NIL Laws

Some objectors argue that the SA cannot be approved because, according to the objectors, the terms of the Injunctive Relief Settlement contradict certain state laws that govern student-athlete compensation. These objectors contend that the SA cannot override the state laws that it allegedly contradicts.

The Court overrules those objections. First, the only binding authorities that the objectors have cited for the proposition that the SA cannot be approved because it conflicts with state laws regarding student-athlete compensation are inapposite. Those authorities hold that, because state officials do not have the authority to enter into agreements that would violate state or federal law, any such agreements would be unenforceable. *See League of Residential Neighborhood Advocates v. City of Los Angeles*, 498 F.3d 1052, 1055 (9th Cir. 2007) (holding that "[a] federal consent decree or settlement agreement cannot be a means for state officials to evade state law"); *Keith v. Volpe*, 118 F.3d 1386, 1392 (9th Cir. 1997) (holding that state officials "could not agree to terms which would exceed their authority and supplant state law"). Here, no state officials are parties to the SA, which renders the objectors' authorities irrelevant. Second, the SA does not require that this Court find that the SA preempts state laws regarding student-athlete compensation, nor is the Court making such a finding.

United States District Court
Northern District of California

**F.      Scope of the Releases**

Some objectors argue that the SA cannot be approved because its release provisions are impermissibly broad.

The Court overrules those objections.  The scope of the Released Damages Class Claims is tailored to claims that were raised or could have been raised in this action.  *See* SA ¶ 1(pp).  The Court finds that the scope of that release is appropriate.  *See Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) (holding that a release may extend to "claims not alleged in the underlying complaint where those claims depended on the same set of facts as the claims that gave rise to the settlement").  The scope of the Released Injunctive Class Claims reflects the scope of the Injunctive Relief Settlement and the rules that Defendants are permitted to enact pursuant to the Injunctive Relief Settlement to effectuate the SA, and embraces the injunctive relief requested in the operative complaint.  *See id.* ¶ 1(qq).  The scope of this release is also permissible.  *See In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th at 1088 ("Public policy does not categorically prohibit releases of future antitrust claims.") (collecting authorities).  The Court further finds that the scope of the releases is fair and reasonable because it represents the compromises that Class Counsel decided to make in light of the delay, risks, and costs of continued litigation, and the possibility that, absent the settlement, class members might have recovered nothing.

Some objectors argue that the SA's release provisions are overbroad because they release the unripe claims of future student-athletes who fall within the definition of the Injunctive Relief Settlement Class.

The Court overrules that objection.  As discussed above, the Injunctive Relief Settlement Class definition can include future student-athletes even though their claims are unripe at this point, because those claims will become ripe when the future student-athletes become members of the Injunctive Relief Class.  *See A. B. v. Hawaii State Dep't of Educ.*, 30 F.4th at 838.  Further, the parties modified the SA to provide that future Division I student-athletes will not release their injunctive and declaratory relief claims until they have received notice and an opportunity to object to the continuation of the IRS.

Finally, some objectors argue that the release provisions of the SA are overbroad because they release claims against entities and individuals who are not named as defendants in this action and who are not sufficiently identified in the SA, such as Division I member institutions and the College Football Playoff.

The Court overrules those objections. A settlement agreement may release claims against entities and individuals who are not named as defendants as long as the released claims are factually related to those asserted against the defendants. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 748 (9th Cir. 2006) ("A class settlement may also release factually related claims against parties not named as defendants[.]") (citations and internal quotation marks omitted). The release of claims against Division I member institutions and the College Football Playoff is not improper because the released claims are factually related to those against Defendants given that the Division I institutions and the College Football Playoff are affiliated with Defendants.[17] *See id.*; *see also Eisen v. Porsche Cars N. Am., Inc.*, 2014 WL 439006, at \*9 (C.D. Cal. Jan. 30, 2014) (noting "[r]eleases of non-parties in class action settlements are readily approved and enforced" because "[n]o defendant would agree to a release that permitted plaintiffs to continue to initiate litigation against individuals or entities related to the defendant").

### G.   Adequacy of the Notice and Claims Submissions Process

Some class members object to the SA on the grounds that not every class member received the notice, and that there was no notice program specifically aimed at reaching African-American class members.

The Court overrules those objections. Rule 23 requires the Court to direct notice "in a reasonable manner to all class members who would be bound by the proposal if giving notice is justified by the parties' showing that the court will likely be able to" approve the proposal under

---

[17] After the final approval hearing, the parties clarified that the College Football Playoff is comprised of entities that are affiliated with or comprised of Defendants and their member schools and that the revenues from the College Football Playoff are included as part of the Injunctive Relief Settlement (such that those revenues will be eligible for sharing with class members pursuant to the Injunctive Relief Settlement). *See* Docket No. 796 at 18; Docket No. 812 at 2, 6. The parties also modified the SA to define the term "College Football Playoff." *See* SA § A.1.(j).

United States District Court
Northern District of California

Rule 23(e)(2) and certify the class for purposes of judgment on the proposal. *See* Fed. R. Civ. P. Rule 23(e)(1)(B). The notice plan that the Court approved easily satisfies those requirements. As noted above, the notice plan involved direct notice (by email and postcard), a press release, and a digital notice campaign. The claims administrator estimates that the notice program successfully reached at least 81.9% of current settlement class members. Peak Decl. ¶ 21. The objectors have not cited any authority that this notice program fails to comply with the requirements of Rule 23 and due process.

Some objectors argue that the SA should not be approved because the notice did not contain any specific information that would permit class members to determine how much money each of them would be able to recover in damages under the SA, and because the notice did not include more detailed descriptions of the SA's terms, such as the NCAA rule changes that may occur if the SA is approved.

The Court overrules those objections. The notices did not need to include individual damages estimates or detailed information about the SA's terms for them to comply with the requirements of Rule 23 and due process. Instead, the notices needed to include only sufficient information to permit class members to determine whether to investigate further, opt out, or object. *See Lane v. Facebook, Inc.*, 696 F.3d 811, 826 (9th Cir. 2012) ("Notice provided pursuant to Rule 23(e) must generally describe[] the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard," which "does not require detailed analysis of the statutes or causes of action forming the basis for the plaintiff class's claims, [nor] an estimate of the potential value of those claims."); *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 567-68 (9th Cir. 2019) (holding that a class notice need not "explain in a step-by-step formula how each class member's benefit is calculated" and that a "settlement notice need not provide an exact forecast of the award each class member would receive, let alone a detailed mathematical breakdown; it merely must give class members enough information so that those with adverse viewpoints could investigate and come forward and be heard") (citation and internal quotation marks omitted). Prior to their dissemination, the Court reviewed and edited the notices to ensure that they complied with the requirements just described.

United States District Court
Northern District of California

67

The notices informed class members of the nature of this action and the claims and issues presented therein, the class definitions, that class members could opt out or object and the procedures for doing so, the effect of a judgment in connection with the SA, the basic terms of the SA, that class members could access a complete copy of the SA on the settlement website or on PACER, and that class members could contact Class Counsel if they had questions about the SA. Nothing more was required.

One objector argues that the notice was inadequate because the parties modified the SA after the notice was disseminated to define "College Football Playoff."[18]  *See* Docket No. 802. The Court suggested this definition to satisfy an earlier objection.  The subsequent objection is that, because the modification to the SA to define "College Football Playoff" expanded the scope of the release and the modification took place after the notice was disseminated, the Court must strike the SA and deny final approval of the SA.  *See id.*

The Court overrules that objection.  The parties' modification to the SA to define the "College Football Playoff" did not expand the scope of the release but rather clarified what was stated in every prior version of the SA.  The College Football Playoff has been a releasee in those versions of the SA, including the version of the SA that was operative during the notice period. Because the clarification of the meaning of College Football Playoff in the SA did not expand the scope of the releases or otherwise effectuate modifications to the SA that adversely affect class members, the dissemination of a new notice is not required.  *See In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 330 (N.D. Cal. 2018) (Koh, J.) (holding that additional notice may be necessary after a settlement agreement is modified if the modifications "adversely affect class members") (collecting authorities).

Some objectors argue that the SA should not be approved because they experienced problems or errors when submitting claims on the settlement website.

---

[18] This objection was styled as a motion to strike the SA.  *See* Docket No. 802.  The Court DENIES the motion to strike because the objector's arguments are not well-taken for the reasons set forth above.

68

The Court overrules those objections. The parties agreed to take several steps to ensure that any errors or problems with the submission of claims are corrected. After the final approval hearing, the parties agreed to accept late-filed claims up to May 16, 2025, and to continue to work with class members and NCAA member institutions to allow class members to submit additional or corrected information that may impact a class member's damages allocation. *See* Docket No. 796 at 18. The parties also agreed to publish the new deadline for late claims on the settlement website and to issue an additional press release and email to inform class members of the updated deadline to submit claims and supporting information. *See id.* Class Counsel also committed to continue to answer class member inquiries through the email addresses and phone numbers that are posted on the settlement website. *See id.* The Court finds that these steps are sufficient to mitigate any problems that may have occurred in connection with the submission of claims.

Some objectors argue that, apart from the arguments they raise about the submission of claims, the SA should not be approved because the information that was provided to class members about their estimated individual damages distributions on the settlement website was inadequate, inaccurate, or confusing. Other objectors argue that the SA should not be approved because the individual estimated damages allocations on the settlement website do not reflect the true value of their NIL or athletic services.

The Court overrules those objections. As noted above, Plaintiffs were not required to provide class members with detailed information about their individual damages estimates. *See In re Hyundai*, 926 F.3d at 567-68 (9th Cir. 2019). Plaintiffs nevertheless chose to make available on the settlement website individual damages estimates for class members who may be entitled to damages, where possible. To the extent that class members believe that their individual damages estimates on the settlement website were incorrect for any reason, the parties have agreed to offer class members the opportunity to submit additional or corrected information that bears on their individual damages estimates, and they have further agreed to continue to work to correct any errors that may impact class members' allocations. *See* Docket No. 796 at 17-18. As noted above, Plaintiffs have also committed to continue to answer class member inquiries about damages allocations through the email addresses and phone numbers that are posted on the settlement

69

website.  *See id.*  Further, if members of the damages classes were not satisfied with the damages estimates they saw on the settlement website, or with Plaintiffs' proposed damages allocation models, they had the opportunity to opt out of the SA so that they could pursue their claims against Defendants individually.  In light of the foregoing, the Court finds that the objectors' complaints lack merit.

### H.   Adequacy of Representation by Class Counsel

Some objectors argue that the SA does not satisfy the requirements of Rule 23 because the same Class Counsel represented both the Injunctive Relief Settlement Class and the Damages Settlement Classes in the context of negotiating the SA even though the members of the Injunctive Relief Settlement Class have interests that differ from those of the members of the Damages Settlement Classes.  The objectors contend that members of the Damages Settlement Classes have an interest in ensuring that they obtain the highest possible damages amount for past harm, whereas the members of the Injunctive Relief Settlement Class have an interest in ensuring that the rule changes that will be permitted under the Injunctive Relief Settlement going forward are beneficial to Division I student-athletes.  According to the objectors, these alleged diverging interests give rise to a conflict that requires separate counsel for the Injunctive Relief Settlement Class.

The Court overrules these objections.  In light of the Court's familiarity with the work and experience of Class Counsel, as discussed in more detail above, the Court appointed Class Counsel in 2023 to represent class members in this action in connection with the damages and injunctive relief claims asserted in the operative complaint, including for settlement purposes.  The objectors rely heavily on *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), which in turn relies on *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997).  In *Ortiz* and *Amchem*, the Supreme Court reversed the approval of class settlement agreements that resolved a massive number of present and future personal injury claims arising out of asbestos exposure.  The Supreme Court held that the adequacy of representation requirement was not satisfied with respect to the settlement class in each case because the settlement in each case had been reached without structural protections that

United States District Court
Northern District of California

United States District Court
Northern District of California

would ensure fair and adequate representation for all class members involved in the settlements. *See Ortiz*, 527 U.S. at 848-64; *Amchem*, 521 U.S. at 636-27.

The objectors rely on the following statement in *Ortiz* for the proposition that separate counsel for the Injunctive Relief Settlement Class is necessary:

> [I]t is obvious after *Amchem* that a class divided between holders of present and future claims (some of the latter involving no physical injury and attributable to claimants not yet born) requires division into homogeneous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel.)

*See Ortiz*, 527 U.S. at 856 (citing *Amchem*, 521 U.S. at 627).

The Court is not persuaded that a conflict exists between members of the Damages Settlement Classes and members of the Injunctive Relief Settlement Class that would require separate counsel for the Injunctive Relief Settlement Class under *Ortiz*. The conflict in *Ortiz* arose from the fact that the same counsel achieved a global settlement on behalf of people who had pending asbestos claims as well as people who could have future asbestos claims, without any structural protections to ensure fair and adequate representation for all settlement class members.

The circumstances in *Ortiz*, which at least one court of appeals has described as "atypical," are not present here. *See Pro. Firefighters Ass'n of Omaha, Loc. 385 v. Zalewski*, 678 F.3d 640, 646 (8th Cir. 2012) (noting that the circumstances that warranted separate counsel in *Ortiz* were "atypical"). Class Counsel here took sufficient steps to ensure that structural protections were in place that would ensure fair and adequate representation for all settlement class members. Class Counsel negotiated the SA at arm's length, used an experienced and highly regarded mediator, and structured the settlement negotiations sequentially, such that the settlement of the injunctive relief claims was done before the parties proceeded to negotiate the settlement of the damages claims. The Court is persuaded that this manner of conducting the settlement negotiations served to ensure that the interests of the members of the Injunctive Relief Settlement Class were not traded away for the benefit of the members of the Damages Settlement Classes, and vice versa. *See Pro. Firefighters*, 678 F.3d at 646 (holding that appointing separate counsel is not "the only acceptable means of addressing any conflicting interests of class members, and providing structural assurance of fair and adequate representation for the entire class") (internal citations and quotation marks

omitted); *In re Cmty. Bank of N. Virginia Mortg. Lending Pracs. Litig.*, 795 F.3d 380, 393 (3d Cir. 2015) (quoting *Pro Firefighters*, 678 F.3d at 646, for the same proposition); *Fata v. Pizza Hut of Am., Inc.*, No. 614CV376ORL37DCI, 2016 WL 7130932, at *3 (M.D. Fla. Oct. 31, 2016) (holding that adequacy of representation requirement was met because "the extensive, arms-length negotiations performed separately by counsel on behalf of each Subclass, with the assistance of an experienced mediator, at least at the conditional certification stage, provide structural assurance of fair and adequate representation") (citation and internal quotation marks omitted).  The Court has carefully reviewed the record and finds no indication that the interests of one class were traded away to benefit those of another in the context of the SA.

Further, the Court finds that Class Counsel's representation of all settlement class members when negotiating the SA was beneficial for all settlement class members, because it likely increased their bargaining power and resulted in a better outcome for all settlement class members relative to the settlement they could have achieved with separate counsel.  *See In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981) ("[L]ogic dictates that one set of negotiators, with the authority to release defendants from all claims, would be in a better bargaining position than negotiators with authority to compromise only part of the action."). Accordingly, the Court cannot conclude that the Injunctive Relief Settlement Class must be represented by separate counsel for the adequacy of representation requirement to be met.  *See In re Blue Cross Blue Shield Antitrust Litig*, 85 F.4th at 1091 ("Our precedents do not categorically prohibit the same plaintiffs and counsel from representing an injunctive relief class and a damages class" in the context of a settlement); *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 235 (2d Cir. 2016) (noting that Rule 23(b)(3) and Rule 23(b)(2) classes do not "necessarily and always require separate representation" in the context of a settlement).

Some objectors argue that Class Counsel had an incentive to trade away the interests of members of the Injunctive Relief Settlement Class because the SA contains a provision that will allow Class Counsel to apply to the Court for a $20 million "upfront injunctive fee and cost award," which shall be paid by Defendants within forty-five days after the SA is approved.  The

01-MenkeER-0189

72

SA provides that Defendants shall not oppose any such application. The objectors argue that this fee is indicative of a conflict because Class Counsel will receive it regardless of whether members of the Injunctive Relief Settlement Class receive substantial compensation and benefits from the Injunctive Relief Settlement, as the fee is not tied to the amount of compensation and benefits that class members ultimately receive from the Injunctive Relief Settlement. The objectors argue that this upfront fee is in contrast to how the fees for the damages claims will be calculated, which will be based on a percentage of the damages funds.

The Court overrules those objections. First, the Court is not persuaded that the fee at issue is indicative of a conflict on the part of Class Counsel. The $20 million upfront fee will be paid by Defendants and will not be taken out of funds that would otherwise go to settlement class members. The Court has reviewed the record carefully and finds no evidence that Class Counsel traded away the interests of any set of class members to obtain fees for themselves. The Court has presided over the present action since 2020 and there have been close to 1,000 entries filed in the case. The Court also presided over *Alston*, which was brought by Class Counsel on behalf of a class of student-athletes to challenge NCAA rules on student-athlete compensation, as discussed in more detail above. The Court has observed Class Counsel's representation over almost a decade in this case and in *Alston* and has been impressed throughout with the skill and dedication that they have applied to their vigorous representation of student-athletes. The Court credits the evidence that Plaintiffs filed, which shows that the parties negotiated all fee provisions relating to the Injunctive Relief Settlement separately from the rest of the SA, and that they did so only after the substantive terms of the SA, including damages, were agreed upon. Professor Eric Green, who is a very experienced and highly regarded mediator who has facilitated successful settlements in many high-stakes and complex cases, has corroborated Class Counsel's representations. *See, e.g.*, Green Decl. ¶ 9, Docket No. 494-2. The Court finds that sequencing the negotiations of the fees in that manner served as a structural protection that ensured fair and adequate representation for all class members. *See Fata*, 2016 WL 7130932, at *3. Second, the SA provides that, in addition to the $20 million upfront fee, Class Counsel may seek fees based on a percentage of the money and benefits awarded each year to class members pursuant to the Injunctive Relief Settlement, subject

to Court approval.  *See* SA ¶ 27.  Thus, Class Counsel's potential fees in connection with the Injunctive Relief Settlement are tied in part to the value of the relief provided to class members pursuant to the Injunctive Relief Settlement in a manner that is similar to how their fees for the damages claims will be tied to the value of the damages funds.  This is because such fees will be commensurate with the likely value of the IRS to student-athletes each year.  Such fees will be paid over the course of the IRS's ten-year term, just like benefits and compensation to student-athletes under the IRS will be provided over that same term.

Some objectors argue that conflicts exist between the members of the Damages Settlement Classes because different segments of the Damages Settlement Classes have different types of claims (e.g., pay-for-play claims vs. third-party NIL claims vs. claims arising out of the scholarship cap) and because each type of claim has a different value.  The objectors argue that, because of these purported conflicts, the Court must create damages subclasses for each type of damages claim and appoint separate counsel for each subclass.  The objectors further contend that the failure to create damages subclasses represented by different counsel means that Class Counsel was incentivized to agree to a settlement that resolved all types of damages claims at once without realizing the full value of each type of claim, as doing so allowed Class Counsel to secure large fees for themselves.

The Court overrules those objections.  The Court has reviewed the record carefully and finds no evidence that Class Counsel traded away the interests of class members to obtain large fees for themselves.  The Court credits the evidence that Plaintiffs submitted, which shows that the parties structured the damages settlement negotiations to discuss each type of damages claim (including associated damages and litigation risk) separately, and that the final, agreed-upon damages amount for each type of claim was determined before the parties discussed the next type of claim.  *See, e.g.*, Green Decl. ¶ 10, Docket No. 494-2.  The Court finds that sequencing the negotiations in that way served as a structural protection that ensured fair and adequate representation for all class members.  *See Fata*, 2016 WL 7130932, at *3.  The Court also credits Class Counsel's representations that their assessments of the value of each type of damages claim in the context of the settlement negotiations was informed by the methodologies and economic

74

analyses of Dr. Rascher, as well as their experience in litigating actions challenging NCAA rules on student-athlete compensation. As discussed above, the Court is familiar with Dr. Rascher's work, as he filed numerous reports and provided testimony as Plaintiffs' economics expert in *Alston* and has filed multiple reports in this litigation. The Court finds that Dr. Rascher's methodologies and economic analyses, as well as the risks and costs of continued litigation as informed by Class Counsel's experience in challenging NCAA compensation restraints, provide a reasonable basis for the settlement damages amounts that the parties agreed to for each type of damages claim. Finally, as discussed above, the Court has found that Class Counsel's representation of all class members in a single settlement likely served to increase class members' bargaining power and resulted in a better settlement for all settlement class members relative to the settlement they could have obtained with separate counsel. *See In re Corrugated Container Antitrust Litig.*, 643 F.2d at 208. As discussed above, the recovery that Class Counsel was able to achieve for all class members is extraordinary.

Some objectors argue that Class Counsel have a conflict with class members because the SA requires Class Counsel to lobby arm-in-arm with the NCAA to secure antitrust immunity for Defendants, and to secure preemption of state laws regarding student-athlete compensation that may conflict with the Injunctive Relief Settlement.

The Court overrules those objections. The SA provides that Class Counsel "will use reasonable efforts to support the portions of any proposed federal or state legislation implementing/codifying this Injunctive Relief Settlement, including reasonably cooperating to support antitrust immunity for conduct undertaken by Defendants in compliance with or to implement the terms of this Injunctive Relief Settlement during the Term or any court-approved extension thereof, and preemption of any state law existing before or as of the date of Final Approval in conflict with this Injunctive Relief Settlement." *See* IRS Art. 7, § 1. The Court interprets that provision as simply requiring Class Counsel to take the position that the SA and actions taken to implement it do not necessarily violate the antitrust laws or state laws. Given that Class Counsel represents, and the Court has found, that the SA is in the best interests of class members, the Court finds that the provision in question does not indicate that Class Counsel are

not adequate representatives for class members, or that Class Counsel's interests conflict with those of class members. Objectors have not cited any authority that a provision such as the one at issue precludes finding that Class Counsel are adequate representatives for class members or preclude granting approval of the SA.

**CONCLUSION**

For the reasons set forth above, the Court will GRANT Plaintiffs' motion for final approval of the settlement agreement. The Court will issue an order granting the motion for final approval and the judgment in separate documents.

IT IS SO ORDERED.

Dated: June 6, 2025

CLAUDIA WILKEN
United States District Judge

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| IN RE COLLEGE ATHLETE NIL LITIGATION | CASE NO. 4:20-cv-3919-CW |
| | [PROPOSED] ORDER GRANTING MOTION FOR ADMINISTRATIVE RELIEF |
| | Judge: Hon. Claudia Wilken |

No. 4:20-cv-3919-CW

**[Proposed] Order**

01-MenkeER-0194

This matter comes before the Court to determine whether to grant leave to four former student-athletes, Seth Beer, Benjamin Burr-Kirven, Yoeli Childs, and James Okonkwo, to opt out of the Class Settlement in *College Athletes NIL Litigation*, No. 4:20-CV-03919 (N.D. Cal).

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

Seth Beer, Benjamin Burr-Kirven, Yoeli Childs, and James Okonkwo are granted leave to opt out of the Class Settlement.

**IT IS SO ORDERED.**

Dated:  ___June 6, 2025___

_____
The Honorable Claudia Wilken
United States District Court Judge

1    No. 4:20-cv-3919-CW

**[Proposed] Order**

01-MenkeER-0195